# EXHIBIT 1

1
2
3
4
5
6
7
8
9
10                          IN THE COURT OF COMMON PLEAS
11                              LORAIN COUNTY, OHIO

12   JOHN DOE                              )        CASE NO.:
     c/o Zukerman, Lear & Murray Co., L.P.A. )
13   3912 Prospect Ave. East,              )        JUDGE:
     Cleveland, Ohio 44115                 )
14                                         )
15              Plaintiff,                 )
                                           )
16          -vs-                           )
                                           )
17                                         )        **VERIFIED COMPLAINT FOR**
     OBERLIN COLLEGE                       )        **PRELIMINARY AND PERMANENT**
18   173 W. Lorain Street                  )        **INJUNCTIVE RELIEF AND MONEY**
     Oberlin, Ohio 44074,                  )        **DAMAGES**
19                                         )
20          -and-                          )
                                           )
21   OBERLIN COLLEGE BOARD OF              )
22   TRUSTEES                              )        **JURY DEMAND**
     173 W. Lorain Street                  )
23   Oberlin, Ohio 44074                   )
                                           )
24                                         )
25          -and-                          )
                                           )
26   REBECCA MOSELY                        )
     Director of the Office of Equity, Diversity, )
27   and Inclusion                         )
     and Oberlin College Title IX Coordinator )
28   Oberlin College                       )
     Carnegie Building, Room 204           )

**ZUKERMAN**   3912 PROSPECT AVE.    / 216.696.0900      ZUKERMAN  LEAR  &  MURRAY  CO.LPA
               CLEVELAND, OHIO 44115  / 216.696.8800
               WWW.ZUKERMAN-LAW.COM



52 W. Lorain Street )
Oberlin, Ohio 44074 )
)
    -and- )
)
OBERLIN COLLEGE DOE )
DEFENDANTS 1 - 5 )
Designated Reporting Representatives )
Oberlin College )
173 W. Lorain Street )
Oberlin, Ohio 44074, )
)
    -and- )
)
OBERLIN COLLEGE DOE )
DEFENDANTS 6 – 10 )
Designated Title IX Investigators )
Employed by and/or engaged by )
Oberlin College )
173 W. Lorain Street )
Oberlin, Ohio 44074, )
)
           Defendants. )
)

## OVERVIEW OF PLAINTIFF'S COMPLAINT

1. Plaintiff John Doe's[1] causes of action in this matter are based on the

unconstitutional and/or unconstitutionally gender-based discriminatory policies and procedures

set forth in Oberlin College's Sexual Misconduct Policy and the named Oberlin College

Defendants' implementation of said policies and procedures against him in response to false and

wildly inconsistent allegations of sexual misconduct asserted by Jane Roe, a female student at

Oberlin College (hereinafter, "the College).

2. Jane Roe's allegations against the Plaintiff fail to rise to the level of any threshold

---

[1] Due to the nature of the allegations in this lawsuit, Mr. Doe is proceeding under the pseudonym "John Doe" and identifies his accuser as "Jane Roe." He identifies other Oberlin students by their initials.

2

that would justify the Defendants' decision to pursue a formal investigation into her allegations and ultimately subject him to a hearing process where he will not only face the penalty of expulsion from the College, but a permanent disciplinary record on his academic transcript.

3. The Oberlin College Defendants' original assessment of Jane Roe's allegations led them to conclude that her allegations against the Plaintiff should be resolved informally, without an investigation, and without any disciplinary action being taken against Plaintiff.

4. On or about December 12, 2019, which was at or about the time of Jane Roe's initial allegations, Jane Roe agreed to informal resolution of her complaint and, at or about that same time, REBECCA MOSELY and/or Jane Roe conspired and agreed to not notify John Doe of the pendency of the allegations that Jane Roe had made against him and/or the commencement and/or pendency of the Title IX process until after Oberlin College's winter break had ended.

5. At the time that Jane Roe had made her initial allegations, again on or about December 12, 2019, physical evidence crucial to John Doe's defense of the allegations made by Jane Roe existed in the form of electronically stored security video.

6. On or about December 12, 2019 and thereafter, neither Rebecca Mosely, nor any John Doe Defendant 1-5, nor any John Doe Defendant 6 -10, nor anyone else made any effort, whatsoever, to investigate the veracity of the allegations made by Jane Roe, nor took any steps to preserve any physical evidence that was, at that time, known, or should have been known, to exist.

7. John Doe was not notified of the existence of Jane Roe's allegations and/or the commencement and pendency of the Title IX process against him until February 4, 2020. By the time that John Doe was notified of the existence of Jane Roe's allegations and/or the

3

commencement and pendency of the Title IX process against him, the physical evidence referred to herein, i.e., electronically stored security video, had been destroyed.

8.      Although John Doe was notified about the existence of the commencement and pendency of the Title IX process and or the identity of his accuser, John Doe was not notified of any specifics of the allegation.

9.      Based on the identity of his accuser, John Doe made efforts to preserve and/or obtain the exculpatory electronically stored security video prior to learning that it had been destroyed. Neither Rebecca Mosely, nor any John Doe defendant in this matter, responded to John Doe's requests for preservation and/or production of the electronically stored security video – in fact, Rebecca Mosely failed to respond to this request at all.

10.     Shortly prior to February 25, 2020, Rebecca Mosely informed counsel for John Doe that the allegations made by Jane Roe would be handled by way of informal resolution, meaning no adverse action would be taken against John Doe as a result of Jane Roe's allegations.

11.     As no adverse action would be taken against him, John Doe agreed to meet with Rebecca Mosely in person on February 25, 2020.

12.     On February 25, 2020, John Doe did meet with Rebecca Mosely. During this meeting, Rebecca Mosely informed John Doe of the specifics of the allegations made against him by Jane Roe. Rebecca Mosely further informed John Doe that she (Rebecca Mosely) and Oberlin College and Jane Roe had agreed to resolve the matter informally, meaning that no adverse action would be taken against him.

13.     Based on Rebecca Mosely's representations that the matter would be resolved informally, and that no adverse action, nor any adverse reporting, would be made against him, John Doe agreed to the informal resolution of the allegations.

14.     During the February 25, 2020 meeting, John Doe's advocate voiced a concern and complaint that Jane Roe had published to other Oberlin College students that John Doe was a "rapist" and that a Title IX complaint had been lodged against him.

15.     Despite the representations of Rebecca Mosely and despite John Doe's acceptance of the terms of the information resolution, after John Doe's acceptance of information resolution, Jane Roe reportedly met with Jane Roe. On information and belief, after being informed of the complaint lodged against her (Jane Roe) that she had communicated the pendency of the Title IX complaint and had referred to John Doe as a "rapist" to other Oberlin College students, Jane Roe suddenly changed her mind and requested a "formal resolution process" be commenced against John Doe, some 2 ½ months after she first made the allegation against John Doe.

16.     On February 26, 2020, Rebecca Mosely informed John Doe that Jane Roe had informed her that she (Jane Roe) was no longer interested in informal resolution, requested a "formal resolution process", and that an investigation would be commenced.

17.     Since that date, it has been confirmed that all of the electronically stored surveillance video that, based on the nature of the allegations would have contained exculpatory and/or favorable and/or highly relevant evidence had not been preserved and was no longer in existence. It was further confirmed that such evidence would have been available on December

5

12, 2019 and thereafter, but by February 4, 2020 – the date on which John Doe was first informed of the allegations by Rebecca Mosely – the evidence had been destroyed.

18.     Plaintiff respectfully asserts that if this Honorable Court does not immediately intervene and prevent the Oberlin College Defendants from proceeding with a fundamentally unfair sexual misconduct investigation and a hearing process that historically has been rife with unconstitutional, gender-based discriminatory policies and procedures, he will be irreparably harmed as evidenced by the fact that Oberlin College has boasted about its 100% conviction rate for students accused of violating its Sexual Misconduct Policy when their cases proceed to a formal hearing.[2] Upon information and belief the College has never lodged any complaint against a female student for any alleged violation of the Title IX Sexual Misconduct Policy, including this case.

19.     Oberlin College's unprecedented conviction rate for students accused of violations of its Sexual Misconduct Policy has been the subject of widespread national media attention, and has led at least one Ivy League Law School Professor to question:  1) "whether Oberlin's sexual assault hearings amounted to nothing more than show trials in which the accused were presumed guilty" and; 2) whether Oberlin was affording accused students with a meaningful opportunity to present a defense "in light of campus pressures to always believe an accuser and to fight 'rape culture.'"[3]

20. Oberlin College's Sexual Misconduct Policy, investigative procedures, and formal

---

[2] "Cultivating Campus Climate:  How Oberlin Meets the Challenges and Opportunities."  Oberlin College & Conservatory, Office of Equity, Diversity, and Inclusion, Campus Climate Report, Spring 2016.
[3] Richardson, Bradford.  "Oberlin College's 100% Sexual Assault Conviction Rate Prompts Lawsuit, Due Process Concerns."  *The Washington Times*.  January 4, 2018.
https://www.washingtontimes.com/news/2018/jan/4/oberlin-college-sex-assault-conviction-rate-100/

hearing process has been the subject of ongoing litigation for the past several years, including a former male student's allegations of gender-bias, in violation of 20 U.S.C. § 1681 (commonly known as Title IX) and negligently conducting its sexual misconduct disciplinary proceedings.[4]

21.     Thus, in an effort to try and prevent the irreparable harm that he will sustain if the Oberlin College Defendants are permitted to proceed against Plaintiff with their unconstitutional, gender-based discriminatory policies and procedures, the Plaintiff brings the within Complaint against the Defendants and further states as follow:

**THE PARTIES:**

22. Plaintiff John Doe is a sophomore student at Oberlin College and a member of the College's Football Team.

23. Defendant Oberlin College is a private liberal arts college and conservatory of music located in Oberlin, Lorain County, Ohio.

24. Defendant Rebecca Mosely is employed by Oberlin College as its Title IX Coordinator and Director for Equity, Diversity, and Inclusion.  Defendant Mosely is responsible for developing and administering Oberlin College's Sexual Misconduct Policy which is at issue in this litigation.

25. Upon information and belief, Defendant Oberlin College Board of Trustees is the governing body of Oberlin College.  Upon information and belief, Defendant Oberlin College Board of Trustees is responsible for setting policy to govern the College and approving budgets and expenditures.

---

[4] *John Doe v. Oberlin College*, 1:17-cv-01335 (N.D. Ohio) and *John Doe v. Oberlin College*, 19-3342 (6th Circuit Court of Appeals).

26.      Upon information and belief Defendant Oberlin College Doe Defendants 1-5 and Oberlin College John Doe Defendants 6 – 10 are employees of Oberlin College and/or have been hired and/or retained by Oberlin College to report and/or investigate allegations of sexual misconduct, including but not limited to the allegations that Jane Roe has raised against Plaintiff.

27. When referred to collectively, the Defendants are referred to herein as the Oberlin College Defendants.

## JURISDICTION AND VENUE

28. This Honorable Court has jurisdiction under Revised Code Chapter 2307, specifically but not limited to R.C. 2307.382.

29. Venue lies in Lorain County, Ohio because Oberlin College has its principal place of business in Lorain County and the conducted activity of the Oberlin College Defendants that has given rise to Plaintiff's claims for relief occurred in Lorain County.

## FACTS

30. Jane Roe is a female sophomore student at Oberlin College and a member of the College' Women's Volleyball Team.

31. Erica Rau is the Head Coach of Oberlin College's Women's Volleyball team and the Deputy Title IX Coordinator for Athletics at Oberlin College.  Coach Rau is also an Assistant Athletics Director and Senior Woman Administrator at Oberlin.

32. Suzanne Denneen is the Program Coordinator for Equity, Diversity and Inclusion at Oberlin College.

33. Erin Butcher is lawyer licensed by the State of Ohio and been retained and/or hired by Oberlin College to conduct a Title IX investigation into Jane Roe's allegations against Plaintiff.

8

**OBERLIN COLLEGE'S DOCUMENTED HISTORY OF GENDER-BASED DISCRIMINATION REGARDING ALLEGATIONS OF SEXUAL MISCONDUCT AND ITS 2014 SEXUAL MISCONDUCT POLICY**

34. Around October 2012, a female student's very public complaint that Oberlin College had traumatized her by the way it handled her sexual misconduct complaint gathered widespread attention.[5]

35. The female student complained that the punishment that Oberlin College imposed (a suspension) on a male student who accepted responsibility for touching her vagina without her consent was not adequate and that the length of time the College's disciplinary process had taken had harmed her. *Id.*

36. Less than a month after said female student publicly complained about Oberlin College's sexual misconduct process, Oberlin College's then president, Marvin Krislov, announced that a task force would be appointed to overhaul its sexual misconduct policy and procedures.

37. That task force would spend a year and half developing a new Sexual Misconduct Policy as well as the training by which the Oberlin College administrators who implement it would be educated. *Id.*

38. In 2013, while a new Sexual Misconduct Policy was being drafted, one of the members of the task force, Professor Meredith Raimondo, was named Oberlin College's Title IX Coordinator, the administrator who "oversees the College's central review, investigation and

---

[5] See Adiel Kaplan, "Oberlin 3rd Highest in Reported Sexual Offenses Among Similar Schools," The Oberlin Review (Nov. 9, 2012) (available at http://oberlinreview.org/3242/news/oberlin-3rdhighest-in-reported-sexual-offenses-among-similar-schools) (last visited March 16, 2020).

resolution of reports of sexual harassment, misconduct, stalking and intimate partner violence .
. . and coordinates the College's compliance with Title IX."[6].

39. In March of 2014, the task force issued a draft of its new Sexual Misconduct Policy
and discussed it with the campus community.

40.     Ms. Raimondo made clear, at an open forum that day, that "[o]ne large emphasis
of the policy . . . is to ensure that the needs of survivors are met and their psychological and
physical safety is guaranteed."[7]

41. Ms. Raimondo further explained that the Sexual Misconduct Policy, and its
implementation, would have a much broader goal, to steer the conversation away from
preventative measures that can be taken and instead provide a clear understanding of rape
culture, and the actions that can be taken to eradicate this culture.[8]

42. Neither the draft of the Sexual Misconduct Policy circulated in March 2014, nor the
final version adopted on May 1, 2014, defined "rape culture" or otherwise explained what it
meant.

43.     But a wide array of materials—from faculty resource guides, to The Counseling
Center, to editorials in The Oberlin Review, to tweets from the College's Assistant Dean of
Students (an appellate officer in its sexual misconduct adjudications) made clear its primary
characteristic: An unwavering belief in the truth of sexual misconduct allegations.

---

[6] See *Oberlin's Title IX Policy* at 6, attached hereto as Exhibit A.
[7] See http://www.fearlessandloathing.com/2014/03/special-task-force-revises-oberlins-sexualoffense-policy/
(March 1, 2014) (last visited March 16, 2020).
[8] *Id.*

44.     On information and belief, from at least December 22, 2013 through at least March 12, 2015, Oberlin College faculty were instructed, via an online resource guide, on how to respond to allegations of sexual misconduct that were communicated to them.

45. On further information and belief, among other things, that resource guide instructed faculty members to believe a student who reports sexual misconduct to them, because a very small minority of reported sexual assaults prove to be false reports.

46. Oberlin College's efforts to overhaul its sexual misconduct policy and procedures, by creating a complainant-centered process designed to combat "rape culture," did not save Oberlin College from public scrutiny of its handling of sexual misconduct claims.

47. On November 24, 2015, Oberlin College was notified that it was being investigated by the Education Department's Office for Civil Rights (OCR) to determine whether it had violated Title IX in a recent sexual assault disciplinary proceeding.[9]

48. That investigation, OCR explained, was not limited to the particular complaint that occasioned it but was "a systemic investigation of the College's policies, procedures, and practices with respect to its sexual harassment and sexual assault complaint process."[10]

49. Oberlin College's status as a target of investigation was made freely available by OCR and was the focus of local media attention[11] and it brought the College under intense scrutiny by OCR.

---

[9] The letter from OCR notifying Oberlin of the investigation can be found at https://www.documentcloud.org/documents/3121549-Oberlin-College-15-16-2009.html (last visited March 16, 2020).

[10] See https://www.documentcloud.org/documents/3673160-Oberlin-College-15-16-2216.html (last visited June 12, 2017) at 1-2.

[11] See, e.g., "Cleveland State, Ohio State and Oberlin College Being Investigated for Possibly Violating Laws Prohibiting Sexual Discrimination," Cleveland.com (Jan. 11, 2016) (available at

50. It was no secret that the view of sexual violence OCR was enforcing was a gendered view that saw men as the paradigmatic perpetrators of that violence and heterosexual women as its paradigmatic targets.

51. The OCR's then-head, Catherine Lhamon, made that clear on numerous occasions, as one national media outlet reported in October 2016, in a story on OCR's Title IX campaign:

> Lhamon says she is frustrated. As she sat in her Washington, D.C. office during an interview with SI.com, she said she couldn't help but to think about the women who are suffering every day.[12]

52. Similarly, an OCR press release notified the public that, on May 1, 2014, Ms. Lhamon would be speaking at the culmination of an event titled, "Walk a Mile in Her Shoes," "an event that will raise awareness about sexual assault and highlight men's roles in preventing sexual violence."[13]

53. And in August 2015 Ms. Lhamon would tell a different national media publication, "'We don't treat rape and sexual assault as seriously as we should,'" citing a statistic about the rate of unwanted sexual activity experienced specifically by college women.[14]

54. Ms. Lhamon also left no doubt about the consequences colleges and universities faced

---

http://www.cleveland.com/metro/index.ssf/2016/01/cleveland state ohio state and oberlin college being investigated for possible violations of federal law prohibiting sexual_discrimination.html) (last viewed March 16, 2020).

[12] Scooby Axson, "Explaining Title IX and how sexual assaults are prosecuted on college campuses," SI.com (October 21, 2016) (available at https://www.si.com/collegefootball/ 2016/10/20/title-ix-sexual-assault-explained, last visited March 16, 2020)

[13] "U.S. Assistant Secretary for Civil Rights Catherine E. Lhamon to Visit Two California Universities to Highlight Successes in Addressing Community Responses to Sexual Assault" (available at https://www.ed.gov/news/media-advisories/us-assistant-secretary-civil-rightscatherine-e-lhamon-visit-two-california-universities-highlight-successes-addressing-communityresponses-sexual-assault, last visited March 16, 2020).

[14] David G. Savage and Timothy M. Phelps, "How a little known education office has forced farreaching changes to campus sexual assault investigations," LOS ANGELES TIMES (August 17, 2015) (available at http://www.latimes.com/nation/la-na-campus-sexual-assault-20150817-story.html, last visited March 16, 2020).

if they failed adequately to heed OCR's mandates: They would lose all of their federal funding. "Do not think it's an empty threat," she told a group of university administrators in July 2014.[15]

55. "There is 'a need to push the country forward,'" she said in August 2015, echoing the same sentiment.[16] "It's nice when you carry the big stick of the federal government," she would say again in October 2016, leaving no doubt that the threat of having one's federal funding yanked remained very real.[17]

56. The OCR investigation initiated at Oberlin College in November 2015 brought Oberlin College under the intense scrutiny of an Education Department that the College knew was primarily concerned with eradicating the perpetration of sexual violence by men against women.

57. Oberlin College knew that failing to appear to OCR during this investigation to be tough on sexual assault alleged by women against men risked substantial negative publicity and a potential loss of hundreds of millions of dollars in federal funding.

58. Consistent with that scrutiny and the campus ethos fostered by Ms. Raimondo's 2014 overhaul of Oberlin College's Sexual Misconduct Policy, Oberlin College's Spring 2016 Campus Climate Report paints a striking picture of what Title IX enforcement looked like at Oberlin during

---

[15] See, e.g., Rachel Axon, Feds Press Colleges on Handling of Sex Assault Complaints, USA TODAY (July 14, 2014), http://www.usatoday.com/story/sports/ncaaf/2014/07/14/collegesexual-assaults-dartmouth-summit/12654521/; Robin Wilson, 2014 List: Enforcer, THE CHRON. OF HIGHER EDUCATION (Dec. 15, 2014), http://www.chronicle.com/article/Enforcer-Catherine-ELhamon/150837/; Tyler Kingkade, Colleges Warned They Will Lose Federal Funding For Botching Campus Rape Cases, THE HUFFINGTON POST (July 14, 2014), http://www.huffingtonpost.com/2014/07/14/funding-campus-rape-dartmouthsummit_n_5585654.html.

[16] David G. Savage and Timothy M. Phelps, "How a little known education office has forced farreaching changes to campus sexual assault investigations," LOS ANGELES TIMES (August 17, 2015) (available at http://www.latimes.com/nation/la-na-campus-sexual-assault-20150817-story.html, last visited March 16, 2020).

[17] Scooby Axson, "Explaining Title IX and how sexual assaults are prosecuted on college campuses," SI.com (October 21, 2016) (available at https://www.si.com/collegefootball/2016/10/20/title-ix-sexual-assault-explained, last visited March 16, 2020).

the 2015-16 academic year. As of the date of its publication (which is not included in the document), Oberlin's Title IX Team had "received and reviewed over 100 reports of potential sex-based discrimination and harassment.[18]

59. "Most" of those 100 reports involved reporting parties who "request[ed] that the College take no disciplinary action nor inform the responding party about the report."[19] But of those reports that were investigated, about half were deemed eligible for resolution via Oberlin College's formal process.

60. And in every single case sent through the formal process, the respondent was found responsible on at least one charge:

> When the threshold was met [for formal resolution], findings of responsibility on all charges occurred in 70 percent of processes. In the remaining processes, the responding party was found responsible for some but not all of the conduct charges.[20]

61. Oberlin College, consistent with the "anti-rape culture" ethos instilled by the 2014 Sexual Misconduct Policy, and distilled so purely by the school newspaper's Editorial Board and the school's Counseling Center, literally never told a complaining student, at the end of the adjudication process, "We don't believe you."

62. The Oberlin College employees who preside over hearings, and who judge appeals, have quite literally credited, at least partially, the allegations of every single student who came before them in the 2015-16 academic year, as of the date of Oberlin College's Spring 2016 Campus Climate Report (for which there has been no update).

---

[18] See Spring 2016 Campus Climate Report at 5 (available at
http://new.oberlin.edu/office/equity-diversity-inclusion/campusclimate/
Oberlin_Campus_Climate_Spring_2016.pdf) (last visited March 16, 2020).
[19] *Id*. at 6.
[20] *Id*.

14

63. Upon information and belief, the vast majority of the Oberlin College students who bring sexual misconduct complaints are women, and the vast majority of the Oberlin College students accused of sexual misconduct are men.

64. Ms. Raimondo made clear that the 2014 Policy overhaul, and its implementation by her in her role as Oberlin's Title IX Coordinator, were motivated by a gendered view of sexual misconduct as an offense committed primarily by men against women.

65. On May 26, 2015, Ms. Raimondo stated, as to her implementation of Oberlin College's 2014 Sexual Misconduct Policy and its ethos, "I come to this work as a *feminist* committed to survivor-centered processes."[21]

66. In a panel discussion the next month, entitled "Sex, Lies and Justice: A Discussion of Campus Sexual Assault, Title IX Compliance, and Due Process" Ms. Raimondo made her gender bias against males very clear. She said she doesn't like the term "grey areas" as a description for sexual-assault allegations that don't involve "predators" or "sex with someone who is fundamentally unconscious." This terminology can "discredit particularly women's experiences of violence," she said.

67. Additionally, Ms. Raimondo stated, "For me, the question and the goal of these processes, has to start with this: "For a student who comes forward to make a report, a safe supportive space for someone to ask, 'What are the harms that you experienced and how can we address them so that you can continue your education?'"

68. Further, Ms. Raimondo said, with respect for the Accused student, they need to be

---

[21] See https://yalealumnimagazine.com/articles/4137 (May 26, 2015) (last visited March 16, 2020).

15

asked the following question, "What if anything in your conduct are you willing to be accountable for and how can you be responsible for the harm you've done to others if in fact that was the result of your conduct? Hearings are a tool or a technique for answering those big questions."[22]

69. Ms. Raimondo added, "I do have some concerns that the process becomes overly legalized" and she reiterated that with respect to the Title IX resolution process, "this is not law and order."

70. During the panel discussion, Ms. Raimondo also made the following statement evidencing her gender bias against males and her and her colleagues' willingness to endure litigation to further her personal beliefs:

> You know it's interesting … I'm thinking about whether I think I and the people I know worry more about now being sued by people who file complaints because we have not met their needs and I actually don't think that's the case on my campus and for the other practitioners I know, we kind of assume that somebody is going to sue us no matter what.

> And I have to say that is concerning from an economic standpoint, so as a practitioner the one thing that hasn't been part of this conversation that I would love to talk about is the economic impact for campuses of Title IX but that's actually kind of an enormously freeing place to be because it lets us have, really it is, because you can have what I think is actually the right conversation, which is which is the lawsuit you want to defend, right?

> And the lawsuit that you want to defend is we did what we thought was the right thing and here's why. And I think that's, you know, what I see as kind of the positive aspect of the moment that we are in right now is we are being called to do the right thing and we are being called to bring together a whole set of professional specialties to figure out what the right thing is. That's actually enormously exciting, I don't think we are there yet…[23]

71. Upon information and belief, in Ms. Raimondo's view, survivors are chiefly women,

---

[22] *See* https://www.youtube.com/watch?v=EbmfXvd_6gw&feature=youtu.be&t=1748
[23] *Id.*

16

and the complainant-centered process she established and implemented at Oberlin College was gender-motivated.

72. Oberlin College's 2014 Sexual Misconduct Policy and the investigative and hearing process set forth in said Policy is currently the subject of litigation in the federal court system.

73.      On June 23, 2017 a former male student at Oberlin College who was expelled from the College after being found responsible for alleged sexual misconduct sued Oberlin College in the United States District Court for the Northern District of Ohio alleging causes of action for breach of contract, gender-based discrimination, and negligence.[24]  Said litigation is currently on appeal to the United States Court of Appeals for the Sixth Circuit.[25]

74. Said student alleged in his lawsuit that Oberlin College breached its contract with him by failing to comply with the Sexual Misconduct Policy in the following ways:  1) failing to apply the Policy's definition of "incapacitation" in finding him responsible for sexual assault when there was no evidence presented at the hearing to show that the complainant was incapacitated; 2) failing to apply the preponderance of the evidence standard in concluding that the evidence tending to show that the complainant could not consent to oral sex outweighed the evidence that she could, and did consent.[26]

75. Said student further alleged that the "egregious misapplication of the Policy's definition of 'incapacitation'; the complete lack of evidence that his accuser exhibited any signs of incapacitation to him; and the serious credibility issues that emerged with respect to his

---

[24] *John Doe v. Oberlin College*, 1:17-cv-01335.
[25] *John Doe v. Oberlin College*, 19-3342.
[26] *Id.*

accuser's testimony, caused serious doubt on Oberlin College's finding of responsibility and showed that their decision against him was based on his gender and the gender of his accuser.[27]

76.    In his federal civil complaint against Oberlin College, said student noted fundamentally unfair investigative process that Oberlin College uses in its sexual misconduct investigations by not requiring the complainant's and other witness's statements to the Title IX investigator be recorded.

77. By only requiring that the investigator summarize the statements, Oberlin enables the complainant to change her allegations at the full hearing without any notice to respondent and simply claim that the investigator's report misrepresented her testimony on a critical fact.[28]

78.    At said student's hearing, the panel asked the male Title IX investigator assigned to the case whether he heard any testimony that contradicted what he had been told in the investigation.   The investigator responded that he heard just one contradiction, the complainant's testimony that the respondent had not asked her to perform oral sex on him.[29]

79.    After the investigator testified, the complainant asked for an opportunity to address the panel again and testified that the investigator misrepresented her prior statement to him in his investigative report on the critical fact as to whether she recalled the respondent asking her to perform oral sex on him.[30]  The hearing panel not only permitted her an additional opportunity to address them, but also presumably found her explanation to be credible.

80. That case, however, is not the only case in which Oberlin College's unconstitutional,

---

[27] Id.
[28] Id.
[29] Id.
[30] Complaint in *John Doe v. Oberlin College*, 1:17-cv-01335.

gender-based discriminatory policies and procedures have been on display.

81. Said student's civil lawsuit against the Oberlin College also alleged that the advisor that the College provided him for the hearing, Associate Dean Adrian Bautista, left the hearing early, further calling into question the fairness of the hearing and disciplinary process.[31]

82. In December of 2016, Ms. Raimondo appointed Associate Dean Adrian Bautista to serve as the Appeals Officer in a sexual assault case involving allegations brought by a female Oberlin Student against a male Oberlin student.

83. On October 19, 2016, fewer than two months before that appointment, Associate Dean Bautista retweeted the following tweet by a group called "End Rape on Campus": "To survivors everywhere, we believe you."

84. On information and belief, Associate Dean Bautista also participated in an Ohio Alliance to End Sexual Violence ("OAESV") workshop.  OAESV teaches, among other things,

- That allegations of campus sexual assault should be met with the "BLAB IT" response model, which teaches campus leaders to "BREATE"; "LISTEN"; "AFFIRM"; and "BELIEVE" when a student tells them they have been sexually assaulted.[32]

85. On information and belief, all of the above facts about Associate Dean Bautista were brought to Ms. Raimondo's attention and to the attention of other Oberlin College officials – including Oberlin's General Counsel – as soon as the respondent in that proceeding was informed that Dean Bautista had been designated his appeals officer.

86. On information and belief, Oberlin College refused to replace Associate Dean Bautista with another appeals officer.

---

[31] Complaint in *John Doe v. Oberlin College*, 1:17-cv-01335.
[32] https://www.oaesv.org/site/assets/files/1310/day-1-prevention-workshop-pdf-july-16.pdf

19

87.     On further information and belief, Associate Dean Bautista affirmed the sanction levied against the respondent in its entirety, rejecting an 18-page appeal in a decision letter that spanned barely a page and a quarter.

88. In short, in the wake of drafting and implementation of the 2014 Sexual Misconduct Policy, the entire Oberlin College Community – from the faculty to whom a report might first be made, to the student body whose concerns motivated the drafting of the 2014 Policy, to the staff members who preside over sexual misconduct allegations, to the individual largely drafting and implementing that policy – share a common belief:  that something called "rape culture" must be eliminated and the primary means of doing so is to adopt an unfailing belief in the truthfulness of sexual misconduct claimants.  And the Policy – inspired by a gendered view of the prototypical complainant (a female student) and the prototypical respondent (a male student) – has that as one of its primary goals.

89. Oberlin College and specifically, Ms. Raimondo, have continued to have well-documented, and a very recent history, of pushing, encouraging and furthering false narratives to promote perceived social justice initiatives, in knowing or reckless disregard for the truth of their statements.

90. Specifically, in June 2019, in the case of *Gibson Bros., Inc., et al. v. Oberlin College, et al.,* Case No. 17CV193761, a jury found the College and Ms. Raimondo liable, to the tune of tens of millions of dollars, for their wrongful libel and defamation of Gibson's Bakery, after the College and Ms. Raimondo sought to further the false narrative that Gibson's was a racist institution.

91. Ms. Raimondo's idea of acceptable conduct and her paradigm, wherein she is willing

to disregard the truth and abandon all logic and reason, to further false narratives for her perceived social justice purposes, regardless of who is harmed in the process, as evidenced in the Gibson Bros. case clearly, is the same idea of acceptable conduct and paradigm that Raimondo brings to the Title IX process, concerning her anti-male, "survivor"-focused approach to the proceedings.

## OBERLIN'S COLLEGE'S 2019 SEXUAL MISCONDUCT POLICY CONTINUES TO IMPLEMENT OBERLIN COLLEGE'S GENDER-BASED DISCRIMINATION

92. After a two year review process by the Title IX Policy Committee, the updated version of Oberlin College's Sexual Misconduct Policy was approved via a vote by the General Faculty Council on October 16, 2019.

93. Defendant Rebecca Mosely oversaw the drafting and editing of Oberlin College's 2019 Sexual Misconduct Policy.

94. In an interview with The Oberlin Review in November of 2019, Defendant Mosely stated "[w]e originally started editing the policy in the 2017-2018 academic year," "[w]e had an idea of how we wanted to edit it, and then the stuff that was coming out from the federal government was leaked and we knew that what we were pushing forward wasn't going to meet the requirements of the federal government or the sixth circuit ruling.  So we had to go back and redo."[33]

95. One of the Oberlin College students who was a member of the Title IX Policy Committee responsible for the 2019 Sexual Misconduct Policy was quoted in the same interview as stating "[u]nfortunately or fortunately, we have to be in compliance with federal law on things

---

[33] Vietze, Anisa. "Title IX Policy Undergoes Significant Revisions." *The Oberlin Review.* November 15, 2019. https://oberlinreview.org/19859/news/title-ix-policy-undergoes-significant-revisions/

like Title IX" and expressed uncertainty as to whether the Policy that was ultimately approved on

October 16, 2019 would be in compliance with the U.S. Department of Educations' forthcoming

mandates as to how colleges and universities must respond to accusations of sexual harassment

and sexual assault on campus, noting "they've yet to come down."[34]

96. Another college student who was also a member of the Title IX Policy Committee at

Oberlin College was quoted in the same interview as stating "[p]ersonally, I'm not a fan of

the live hearing and panel-style of investigation as mandated by the government, since it requires

parties who have experienced trauma to participate heavily in the process regardless of whether

they feel comfortable doing so."[35]

97. Said Title IX Policy Committee Member was further quoted as stating "However, I do

believe that there is a silver lining to this … [g]iven that the new official process is less ideal, we've

been working with Rebecca Mosely to develop informal restorative justice-style processes that

are oriented toward addressing harm and healing, rather than being purely punitive."[36]

98. The Title IX Policy Committee members at Oberlin College are not the only

individuals who have expressed their concerns about whether the current Title IX procedures

used by Oberlin College and other colleges and universities across the United States will be

compliant with the forthcoming mandates from the U.S. Department of Education as to how

colleges and universities must conduct investigations and hearings into allegations involving

sexual misconduct in order to ensure that an accused student's due process rights will be

protected.

---

[34] *Id.*
[35] *Id.*
[36] *Id.*

99. Brett A. Sokolow, the current president of ATIXA, a 3,500 member Association of Title IX Administrators, recently published an article on January 15, 2020 that discussed his views regarding the anticipated federal title IX regulations.[37]  Mr. Sokolow acknowledged those regulations would "be far more sweeping than the 2011 Dear Colleague letter promulgated by the Office of Civil Rights" as "the changes [would] coincide with *the due process revolution* occurring in some federal courts ... with respect to college and university disciplinary processes.[38]

100.    Mr. Sokolow disclosed that based on a draft of the proposed changes that OCR released in November of 2018 most of the changes revolved around due process, "rights that you would want to protect you if you were accused – rightfully or wrongfully – of sexual misconduct", *including provisions requiring more substantive written notice to the respondent of the nature of sexual misconduct allegations, the right of the parties to review investigation materials prior to a final determination and the right to a written rationale for the outcome and any sanctions assigned.[39]*

101.    Mr. Sokolow warned that if colleges and universities dragged their feet on implementing these due process protections, "responding parties will sue you the minute you are not according them the full panoply of rights OCR has promised them" as they would finally have the "force of the law behind them", instead of just the mere guidance from the OCR's Dear Colleague letter.[40]

---

[37] *See Exhibit B,* Sokolow, Brett A. "OCR Is About to Rock Our Worlds." *Inside Higher ED.* January 15, 2020. https://www.insidehighered.com/views/2020/01/15/how-respond-new-federal-title-ix-regulations-being-published-soon-opinion
[38] *Id.*
[39] *Id.*
[40] *Id.*

23

102.    Mr. Sokolow further warned colleges and universities that if they continued to fail to provide the respondent party with a copy of the investigation report and/or sufficient time to prepare for a hearing, they should expect a motion for a temporary restraining order from the responding party's lawyer.[41]

103.    Mr. Sokolow advised that he anticipated that the new mandates would also require

the Title IX investigators to provide the responding parties with all evidence provided by the reporting party, even when that evidence would not be considered admissible at a full hearing or be used to support a decision, and even more importantly, ***allowing the responding party's lawyer to cross-exam the reporting party at the Title IX hearing and increasing the evidentiary standard to clear and convincing evidence instead of the current preponderance of the evidence standard.***[42]

104.    Despite being aware of the "sweeping changes" that the United States Government will soon mandate colleges and universities follow in Title IX investigations and hearings involving sexual misconduct allegations, it is clear Title IX Oberlin College continues to perpetuate the OCR's gendered view that sees men as the paradigmatic perpetrators of sexual violence and heterosexual women as its paradigmatic targets.

105.    In addition to the mandatory training that all first-year and transfer students are required to attend related to sexual consent, Oberlin College's Office Of Equity, Diversity, and Inclusion also offers workshops for male students to attend called "Consent for Men" and

---

[41] *Id.*
[42] *Id.*

discusses why they should obtain "enthusiastic consent" before engaging in sex, whereas there is no similar program designed specifically for female students.

106. Demonstrating her and the College's anti-male bias, with respect to the "Consent for Men" workshop in the context of the anti-male #MeToo movement[43], Title IX Coordinator Rebecca Mosely was quoted in the following passage and stated the following in an article from *The Oberlin Review* Entitled "Oberlin Engages in Wider Conversations about Sexual Misconduct" on March 9, 2018 :

> "I think Oberlin has been in a space on campus where the awareness has been here for a number of years now, and so I would say within the student population here, I think it has had less impact, though it brings support to the work that students were already doing," Mosely said. "I would say the impact to me is supporting more [alumni] of the College as they become aware of the #MeToo movement outside of what we're doing here, because they don't have the same privilege to be part of what we're already doing here on campus. They're not getting that education in their daily life. #MeToo, I think, has brought awareness beyond our campus, and that has definitely had an impact for [alumni] to feel like they can finally speak up and speak their truth."

> The Office of Equity, Diversity, and Inclusion has engaged in concrete efforts to reduce gender-based discrimination and violence on campus with the Preventing and Responding to Sexual Misconduct Program, a peer education program in which student trainers host workshops to teach students about issues including consent, intimate partner violence, bystander intervention, and supporting survivors.
> "Our PRSM trainers … also created a number of other workshops to take it beyond [the mandatory trainings]," Mosely said. "***Fall semester, an additional workshop that they did was Consent for Men, and they had over 50 men show up to that workshop, which I think just speaks to the interest of our students in making sure that people are trying to get it right.***"[44]

---

[43] "The 'me too.' movement was founded in 2006 to help survivors of sexual violence, particularly Black women and girls, and other young women of color from low wealth communities, find pathways to healing." *See* https://metoomvmt.org/about/

[44] *See Exhibit C, "Oberlin College Engages in Wider Conversations About Sexual Misconduct", see* https://oberlinreview.org/15771/news/oberlin-engages-in-wider-conversations-about-sexual-misconduct/

107. Moreover, based on the description provided by Oberlin College's Office Of Equity, Diversity, and Inclusion for its "Consent 201" training workshop, the Office admits that Oberlin College has "specific factors that complicate [consent]." As the definition of consent is admittedly different at and more complicated at Oberlin College, is there really any doubt as to how the College has ensured that it obtained a 100% conviction rate for students accused of violating its sexual misconduct policy and that the standard at the College for consent is not simply consent, but a heightened standard of "enthusiastic consent."

108. The fact that "consent' is complicated and involves a multi factor approach and that the College stresses the need for male students to obtain "enthusiastic consent" before engaging in sexual contact and/or conduct with a female student further evidences Oberlin College's discriminatory policies and procedures against male students.

**RELEVANT PORTIONS OF OBERLIN COLLEGE'S 2019 SEXUAL MISCONDUCT POLICY**

109. In general, Oberlin College's Current Sexual Policy provides two types of avenues for the resolution of Title IX Complaints: Informal Resolution and Formal Resolution.[45]

110. Once a Title IX Complaint is received by the College, the College's Title IX Team conducts an "Initial Assessment" to determine whether, "depending on a variety of factors, such as the Reporting Party's wish to pursue formal or informal resolution, the risk posed to any individual or the campus community, and the nature of the allegation" the Complaint should be referred for Formal or Informal resolution.[46]

---

[45] *See* Exhibit A, *Policy*.
[46] *Id*. at p. 43.

111.   Specifically, the policy provides that, "At the conclusion of the Title IX assessment, the Title IX Team will determine the appropriate manner of resolution and, if appropriate, refer the report either for informal resolution or for further investigation and, if the appropriate threshold is met, formal resolution."[47]

112.   With respect to Formal Resolution, once the College has determined that a Title IX Complaint will be submitted for Formal Resolution, "an Investigator will be assigned to facilitate the formal resolution process."[48]

113.   On February 26, 2020, as discussed previously and in further detail below, the College initiated the Formal Resolution process against Plaintiff, and Investigator Erin Butcher was hired by the College to prepare a report relative to the formal resolution process.

114.   The College's policy provides that, "Information gathered during the investigation will be used to evaluate the appropriate course of action, provide for the safety of the individual and the campus community, and offer remedies as necessary to address the effects of the conduct cited in the report [and] an investigation is also required if the Title IX Team believes that disciplinary action may be appropriate."[49]

115.   Additionally, the Policy provides that, "At the conclusion of the investigation, the investigator will prepare a written report synthesizing the facts for review by the Title IX Coordinator and a Hearing Coordinator [and] upon receipt of the investigative report, the Hearing Coordinator, in consultation with the Title IX Coordinator, and as appropriate, the Title IX Team, will review the report and make a threshold determination as to whether there is sufficient

---

[47] *Id.* at p. 44.
[48] *Id.* at p. 45-46.
[49] *Id.* at p. 45-46.

27

factual information upon which a Hearing Administrator or Body could find a violation of this policy."[50]

116.    There is no definition set forth in Oberlin's policy concerning what a "threshold determination" is, or what must be found to make said determination.

117.    Next, per the Policy, "If the threshold has been established, the Hearing Coordinator will issue a notification letter to the Responding Party and the Reporting Party and refer the report for the appropriate resolution procedures."[51]

118.    The Policy provides that "Disciplinary action against a Responding Party may only be taken through Formal Resolution procedures" and with respect to specific procedures, the Policy provides that, "For a report against a student, disciplinary action may be taken by the Dean of Students or designee if the student accepts responsibility for the conduct, or after a Formal investigation when a hearing panel comprised of three trained staff members reaches a finding of responsibility and recommends appropriate sanctions.[52]

119.    Thus, before a Responding Party (like Plaintiff) who maintains his absolute innocence of the charges, can be sanctioned by Oberlin, the College's Policy provides that they are entitled to a hearing, before a three-member panel, who, after the hearing, must find that the Responding party violated the College's policy by a preponderance of the evidence.[53]

120.    Specifically, the policy provides that "The hearing is intended to provide a fair and

---

[50] *Id.* at p. 47.
[51] *Id.* at p. 47.
[52] *Id.* at p. 48.
[53] *Id.* at p. 60.

ample opportunity for each party to present relevant information and witnesses. The Hearing Body will make factual findings, determine whether College policy was violated, and recommend appropriate sanctions and remedies" and [t]he Hearing Body is the mechanism by which the College assesses whether College policy has been violated, and as appropriate, takes formal disciplinary action regarding a violation of College policy."[54]

121. With respect to cross-examination at the hearing, the Policy permits limited cross-examination of the Reporting Party by the Responding Party, specifically, "[t]he Hearing Body may pose questions to the Reporting Party, including questions submitted in writing to the Hearing Body by the Responding Party...[t]he Responding Party will not be permitted to question the Reporting Party directly."[55]

122. However, notwithstanding the "cross-examination by proxy" provision in the Policy, pursuant to Oberlin's Policy, "If a party does not attend a hearing for any non-emergency or non-compelling reason, the hearing may be held in their absence at the discretion of the Hearing Coordinator. **The College will not require a Reporting Party to participate in or attend a hearing,** although the College's ability to present evidence may be limited in the instance that a Reporting Party chooses not to participate in the hearing."[56]

123. Of utmost concern is the following catchall provision set forth in the College's Policy, regarding circumstances when a hearing cannot be commenced:

> In most cases, it should be possible to convene a Hearing Panel; however if the hearing must be heard at or after the end of the semester or academic year or during Winter Term and/or a full Hearing Panel cannot reasonably be convened,

---

[54] *Id.* at p. 58.
[55] *Id.* at p. 59.
[56] *Id.* at p. 57 (emphasis added).

those cases may be heard by the Dean of Students (or designee) or the College may *substitute an alternate method of adjudication at its discretion*.[57]

124.    On March 11, 2020, in light of the largely unprecedented outbreak of the

Coronavirus Pandemic, Oberlin College issued the following statement to its students and took

the following immediate measures:[58]

> Following yesterday's campus communication about COVID-19 and the possibility of remote learning, here is specific information about actions you will need to take and resources that will be available to you in the coming weeks.  Based on new state information regarding the community spread of COVID-19 in Ohio, all students should depart campus for Spring Recess by noon Saturday, March 21. Only students who petition to stay on campus due to exceptional circumstances and receive approval will be allowed to remain in College or OSCA housing.[59]

125.    Then, the following day, on March 12, 2020, the College, advanced its evacuation

timeline for students to March 16, 2020, and announced the initiation of remote learning,

specifically, stating the following:

> We have been in frequent consultation with our local health department to ensure that our decisions are in keeping with their assessment of the impact of COVID-19 in our region. In light of rapidly moving events, we have re-evaluated our timeline for student departures from campus and our views about the remainder of the semester.
>
> Spring Recess: In-person classes will now end tomorrow, Friday, March 13. Students will be dismissed from in-person classes on Saturday, March 14, a week earlier than planned. We will be moving to remote learning on March 30.
>
> Remote Classes: Once we move to remote learning on March 30, we will continue in this mode of instruction for the remainder of the spring semester. It is our expectation that students will not return to campus for academic coursework this semester. This change will allow us to be firm in our plans to provide remote instruction and to develop strategies accordingly.

---

[57] *Id.* at p. 51 (emphasis added).
[58] https://www.oberlin.edu/campus-resources/bulletins/remote-classes-and-student-departure-update
[59] https://www.oberlin.edu/campus-resources/bulletins/updated-information-covid-19-and-spring-break-action-required

Students' Departure: Since classes are ending on March 13, we have moved up the date by which students will need to depart campus. Students will now have Saturday and Sunday to pack and will be required to depart by Monday, March 16.[60]

126.     As described below, that same day, on March 12, 2020, Erin Butcher, the Investigator hired by Oberlin to investigate the Title IX allegations made by Jane Roe against Plaintiff, advised Plaintiff and Plaintiff's counsel in an email that she is nevertheless, "proceeding with the investigation."

127.     In light of these events, the closure of Oberlin's Campus, its instructions that students are not to return to campus for the rest of the school year (until, presumably fall semester 2020 which is several months away) and the statement of Investigator Butcher, that she is nevertheless "proceeding with the investigation", Oberlin is preparing to invoke its "Catch-all" provision and convene proceedings against Plaintiff that violate his rights to due process.

128.     Specifically, Oberlin is preparing to determine that it is not possible to convene a Hearing Panel, and/or that a Hearing Panel cannot reasonably be convened, and therefore, allow the Dean of Students Meredith Raimondo or her designee to conduct Plaintiff's hearing.

129.     Further, Oberlin College is preparing to "substitute an alternate method of adjudication at its discretion" to determine whether Plaintiff violated the Title IX Policy.[61]

130.     Oberlin's Policy does not set forth any specifics whatsoever concerning the "alternate method of adjudication" that the College can commence in the event it cannot reasonably convene a Hearing Panel.

131.     Oberlin's Policy's self-serving and inherently due process violative "catch all"

---

[60]https://www.oberlin.edu/campus-resources/bulletins/remote-classes-and-student-departure-update
[61] *Exhibit A, Title IX Policy*, at p. 51.

provision permitting the "alternate method of adjudication" would essentially permit the College to do anything to determine Plaintiff's responsibility, including "flipping a coin", as the "College may substitute an alternate method of adjudication at its discretion."

132.    Furthermore, in light of the above, the College's decision to allow Ms. Raimondo to conduct Plaintiff's hearing would violate Plaintiff's right to due process because Ms. Raimondo has demonstrated gender bias against Accused, male students, like Plaintiff.

133.    The College's decision to conduct anything other than a live hearing by an unbiased, three-person hearing panel, wherein the Plaintiff can conduct live cross examination of his accuser, will violate the Plaintiff's right to due process.

134.    Furthermore, the College's decision to continue with its investigation, notwithstanding recent events, the evacuation of the campus, and all of its students and staff, and the global, Coronavirus pandemic, demonstrates the College's unfiltered prejudice against Plaintiff because he is a male and bias in favor of Jane Roe because she is a female.

135.    Unless Investigator Butcher's investigation is immediately stopped, which, as set forth below, has already caused several violations of Plaintiff's right to due process, Investigator Butcher and the College will continue to violate the Plaintiff's right to due process by subjecting Plaintiff to a resolution process that does not conform or comport with Plaintiff's right to due process.

**OBERLIN COLLEGE'S 2019 SEXUAL MISCONDUCT POLICY GENERALLY**

136.    Upon receipt of a report alleging sexual misconduct, the Policy provides that the "Title IX Team will conduct an initial Title IX assessment" and "[a]t the conclusion of the assessment, the Title IX Team may refer the report for informal resolution" and that "[t]he initial

steps for any resolution of a report . . . against a student . . . will involve the same stages: an initial assessment, investigation, and the determination to pursue either informal or formal resolution."[62]

137. Although the Policy references an "investigation" and, as stated above, states that an "investigation" will follow an initial assessment, elsewhere in the Policy, an "investigation" is inferred to be discretionary: "The initial review will proceed to the point where a reasonable assessment of the safety of the individual and of the campus community can be made.

138. Thereafter, an investigation may be initiated depending on a variety of factors, such as the Reporting Party's wish to pursue formal or informal resolution, the risk posed to any individual or the campus community, and the nature of the allegation."[63]

139. Further with respect to investigations, the Policy states "[b]ased on the findings of the initial Title IX assessment, the College may initiate a prompt, thorough and impartial investigation."[64]

140. Significantly, despite the threat posed to a student's academic and professional career and/or his or her liberty (should criminal charges be sought), the Policy provides that the "Responding Party" does not have to be notified of the existence and/or pendency of a Title IX report or complaint.

141. Specifically, in relevant part, the Policy states:

At the conclusion of the Title IX assessment, the Title IX Team will determine the appropriate manner of resolution and, if appropriate, refer the report either for informal resolution or for further investigation and, if the appropriate threshold is met, formal resolution.

---

[62] *Id.* at pp. 40-41.
[63] *Id.* at p. 43.
[64] *Id.* at p. 46.

> The determination as to how to proceed will be communicated to the Reporting Party in writing. Depending on the circumstances and requested resolution, the Responding Party may or may not be notified of the report or resolution. A Responding Party will always be notified when the College seeks action that would directly impact a Responding Party, such as protective measures that restrict their movement on campus, the initiation of an investigation, or the decision to involve the Responding Party in informal resolution. . . .[65]

142.    As can be seen, although the Policy requires an "initial Title IX assessment" upon the filing of a Title IX report, and states that upon conclusion of the assessment, the Title IX Team will determine the "appropriate manner of resolution", the Policy does not require that the Responding Party be notified of the filing of or pendency of a report or complaint.

143.    Further, the Policy empowers a Reporting Party to divert a complaint from Informal Resolution to Formal Resolution:

> The decision to pursue informal resolution will be made when the College has sufficient information about the nature and scope of the conduct, which may occur at any time. Participation in informal resolution is voluntary for all parties, and a Reporting Party can request to end informal resolution at any time. At that time, the report may be referred for formal resolution. Factors that will shape the Title IX Team's recommendation will include the nature of the report, the Reporting Party's stated preference, and relevant evidence about patterns of conduct.

144.    The Policy therefore fails to protect a Responding Party's constitutional rights to due process of law, as, again, the Policy does not require that the Responding Party be notified of the filing and/or pendency of a Title IX report and/or complaint.

145.    The failure of the Policy to protect a Responding Party's constitutional due process

---

[65] *Id.* at p. 44.

rights further prevents and/or inhibits a Responding Party's ability to preserve evidence and/or prevents and/or inhibits a Responding Party's ability to obtain and/or acquire exculpatory evidence.

146.    Nevertheless, and inconsistently, pursuant to its policy, "Oberlin College encourages timely reporting of sexual misconduct. Prompt reporting helps ensure the preservation of evidence and timely investigation."[66] Furthermore, pursuant to the Policy, it is the duty of the assigned investigator to "gather any available physical evidence, including documents, communications between the parties, and other electronic records as appropriate."[67]

147.    Moreover, Oberlin's Policy expressly authorizes students to engage the services of an "Advisor", who can be an attorney.[68]

148.    Were a Reporting Party to demand formal resolution of a Title IX allegation against a Responding party, because the Responding Party exercised their right to counsel under the Policy, or any right under the Policy or the constitution, that would constitute retaliation against the Responding party.

149.    Furthermore, and noteworthy, is that pursuant to Oberlin's Policy, "If a Responding Party who is a student withdraws from the College prior to the conclusion of an investigation or formal resolution under this policy, the Responding Party's academic transcript will be marked Withdrawal Pending Disciplinary Action. If a Responding Party who is a student chooses not to participate, the College will move forward with the resolution of the report and

---

[66] *Id.* at p. 31.
[67] *Id.* at p. 46.
[68] *Id.* at p. 42.

imposition of sanction, if any, in absentia. If the report is finally resolved while the Responding Party is absent, the Responding Party's academic transcript will be marked with the final outcome in accordance with regular practice under this policy."[69]

150.    The College's policy to mark a Responding Party's Academic Transcript as "Withdrawal Pending Disciplinary Action" when a Responding Party "withdraws from the College prior to the conclusion of an investigation" demonstrates the inherently unconstitutional nature of the policy because, even though an investigation may reveal that no misconduct occurred, the College would nevertheless presume misconduct and disciplinary action against the Student, and mark their transcript accordingly.

151.    An investigation is not commenced, and thus a report of Investigation is not prepared, when a Title IX allegation is resolved through Informal Resolution.

Oberlin's Policy provides the following:

Participation in informal resolution is voluntary for all parties, and a Reporting Party can *request to end* informal resolution at any time. At that time, the *report may be* referred for formal resolution. Factors that will shape the Title IX Team's recommendation will include the nature of the report, the Reporting Party's stated preference, and relevant evidence about patterns of conduct.[70]

152.    The College's Policy does not permit a Reporting Party to change their preferred resolution of a complaint from informal to formal resolution for *any reason or purpose*, such as for the purpose of retaliating against a Responding Party for gathering, seeking, and/or obtaining information about the allegation(s) being made against them, and/or for engaging the services of an Advisor—which is expressly authorized under the Policy.[71]

---

[69] *Id.* at p. 57.
[70] *Id.* at p. 45 (emphasis added).
[71] *Id.* at p. 42.

153.    In the event the College permitted a Reporting Party to exercise complete, unfettered and unilateral control over whether that person's Title IX Complaint was going to be resolved informally or informally, such unfettered discretion would violate the Responding Party's right to due process, as the Reporting Party would have the opportunity to unlawfully retaliate against the Responding Party by shifting the process from formal to informal, at any time for any reason.

154.    The Policy's Privacy Statement provides the following:

**Privacy Statement**
In any report, investigation, or resolution of an allegation of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, every effort will be made to protect the privacy and confidentiality interests of the individuals involved in a manner consistent with the need for a thorough review of the allegation and the protection of the parties involved and the broader campus community.[72]

Furthermore, College's Policy prohibits retaliation and specifically provides the following:

**Statement Against Retaliation**
It is a violation of Oberlin College policy to retaliate in any way against a student or employee because they have brought forward or been the subject of allegations of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, or participated in the College's resolution of the report. The College will take immediate and responsive action to any report of retaliation.

155.    The College's failure to "take immediate and responsive action to any report of retaliation" in response to a Responding Party's report of retaliation against a Reporting Party, would demonstrate the College's bias in favor of the Reporting Party and against the Responding Party.

---

[72] *Id.* at p. 7.

## FACTS PERTAINING TO OBERLIN COLLEGE'S TITLE IX INVESTIGATION INTO PLAINTIFF

156.    On December 12, 2019, Jane Roe made a vague report of an alleged Title IX violation to her Volleyball Coach, Deputy Title IX Coordinator and Senior Woman Administrator Erica Rau (hereinafter "Coach Rau"). Jane Roe advised Coach Rau that, "something happened a few weeks ago with one of her good friends who is a football player" and that just this week (week of December 12, 2019), she realized "what actually happened".

157.    At that time, she informed Coach Rau that she was not sure if she wanted to make a report, and she asked Coach Rau about anonymous and informal options.

158.    Rau sent an email to Rebecca Mosely (hereinafter "Mosely") and Suzanne Denneen (hereinafter "Denneen") reflecting Roe's vague report. In her email, Coach Rau added "Obviously, there isn't much we can do with this, I just wanted to report it".[73]

159.    Later that same day, Jane Roe sent a text message to Coach Rau and asked Coach Rau to meet with her again. Thereafter, at approximately 5:45p.m., Jane Roe and her teammate and friend L.F., returned and met with Coach Rau a second time to discuss the alleged incident(s). At that time, Roe reported two (2) alleged incidents to Coach Rau, involving a football player, the Plaintiff herein, John Doe.

160.    Doe alleged that she and Plaintiff had been friends for a long time. She alleged

---

[73]    Following numerous written requests from Plaintiff, on March 6, 2020, nearly three (3) months after Jane Roe made her Complaint against Plaintiff, and over one (1) month after the College first notified Plaintiff of the allegations, the College finally disclosed Coach Rau's December 12, 2019 email containing Jane Roe's Complaint and Mosely's notes from a subsequent meeting with Jane Roe on February 10, 2020, to Plaintiff and Plaintiff's Counsel.

that, "Around Halloween they were both drunk and began hooking up, she asked him to stop and he did but it took him three times before he stopped."

161.    Roe further alleged to Coach Rau that:

About two weeks before Thanksgiving on a Wednesday she was at the Sco' after the Sco' they went back to Barrows. [Roe] says she was very drunk and doesn't remember a lot. They were on a couch hooking up and he started fingering her. She remembers it happening but not a lot of details but knows that she didn't want it to happen. She remembers him asking her if she wanted to go downstairs for somewhere more private. She doesn't remember how she responded or if she did. They went downstairs and he inserted himself into her. She asked if he had a condom. He said no, and she freaked out, jumped away and then he stopped.

162.    Specifically, Jane Roe stated to Coach Rau that "he (Plaintiff) could've asked for consent, but *I don't know if he did and or if he did ask, I don't even know if I gave it*."

163.    Jane Roe further told Coach Rau that "she didn't realize for a while what had happened and it kind of just hit her this week [and that] [s]he has been struggling with whether or not to make a report."

164.    Ultimately, during or shortly after the December 12, 2019 meeting between Jane Roe, L.F. and Coach Rau, Jane Roe instructed Coach Rau not to notify Plaintiff of the Title IX allegations that she made against him.

165.    The College, in blind allegiance to Jane Roe, complied with her instructions and did not notify Plaintiff of Jane Roe's allegations, until almost six (6) weeks later.

166.    Furthermore, even though the College was on Notice that a serious allegation of sexual misconduct had been made against one of its students which, ultimately, could result in the student's expulsion, the College did not investigate, or take any steps to pursue, obtain, and/or preserve any evidence at the time of Jane Roe's complaint, despite the fact that based on Jane Roe's allegations, it was known to the College and/or Rebecca Mosely and/or John Does 1 –

39

5 and/or John Does 6 – 10 that, at a minimum, multiple security cameras were in place within and/or outside of the 'Sco and were in place in areas that would have captured Jane Roe's actions on the evening(s) in question.

167.    From December 12, 2019 through February 4, 2019, Plaintiff was wholly unaware of Jane Roe's allegations against him.

168.    Plaintiff was not notified of the existence of the Title IX Report until February 4, 2020.

169.    On February 4, 2020, Plaintiff received an email from Jane Roe's Volleyball Coach and Senior Women Administrator Coach Rau. The email provided:[74]

> My name is Erica, and I'm a Deputy Title IX Coordinator at Oberlin.  I have received a report about behavior that, if proven, would constitute a violation of the Sexual Misconduct Policy.  Specifically, [Jane Roe] shared with me that you engaged in behavior that could be a violation of sexual misconduct policy.
>
> Please know that I am required to share with you what has been shared with me regarding this report and that sharing this information in no way indicates that you have violated the sexual misconduct policy.  With that in mind, I'd like to learn what happened from your perspective, offer some resources, and share some information about College policy that may apply (which, of course, depends on what happened, which has not been determined yet).  Could you please suggest several possible meeting times for this week? I'll write back to confirm the meeting time and location.
>
> ***

170.    Rather, Plaintiff was merely notified that he was being accused of "sexual misconduct" and that Plaintiff would be subjected to questioning ("I'd like to learn what happened from your perspective") without even being told *any* specifics about the allegations, including *when* the alleged misconduct was alleged to have occurred.

---

[74] *See Exhibit D, Email from Eric Rau, February 4, 2020.*

171.    The College attempted to induce Plaintiff into providing a statement to Coach Rau, even though Coach Rau is objectively biased in favor of Jane Roe considering that she is Jane Roe's Volleyball Coach and that she is a Senior Woman Administrator, whose purpose "is to encourage and promote the involvement of female administrators in meaningful ways in the decision-making process in intercollegiate athletics" and "to enhance representation of female experience and perspective at the institutional, conference and national levels and support women's interests."[75]

172.    Knowing that Ms. Rau was Jane Roe's Volleyball coach and a Senior Woman Administrator, and thus could not be relied upon to be fair and impartial, Plaintiff did not respond to Coach Rau's email, but instead, he retained counsel.

173.    In an email exchange between Plaintiff's counsel and Coach Rau on February 6, 2020[76], Plaintiff's counsel immediately requested Coach Rau to remove herself from further participation in the investigation given her bias in favor of Jane Roe, stating in an email: "we are asking you to recuse yourself from any further participation in this matter".

174.    That same day, acknowledging her bias in favor of female Jane Roe and against Plaintiff, Coach Rau responded to Plaintiff's counsel's email and stated, "I have no issue stepping away from the report.  However, [Plaintiff] will have to reschedule a new time to meet with Rebecca Mosely our Title IX Coordinator."

175.    On February 6, 2020, Mosely emailed Plaintiff and Plaintiff's counsel and stated,

---

[75] *See Exhibit E, Article, "Rau Named Senior Woman Administrator", June 8, 2016.*
[76] *See Exhibit F, Email Chain from February 6, 2020.*

"I received an email from Erica Rau that you would like to have a different person handling the report about you which I am happy to do."[77]

176.    On February 10, 2020, Jane Roe met with Mosely.

177.    Mosely's typed notes from her February 10, 2020 meeting with Jane Roe provide the following:

> [Jane Roe] indicated that she and [Plaintiff] were best friends before the incident. She stated that they don't speak now. The incident happened mid-November and she doesn't remember all of the night and therefore, does not know if she consented. She indicated that she was in and out of knowing what was going on that night and does not remember saying yes to hooking up. She stated that they had previously started to hook up on a different occasion and she had stopped it that time. [Jane Roe] shared that she had to tell him to stop 3 times that first time but he did then listen. On that occasion [Jane Roe] told [Plaintiff] that she did not want to hook up because she did not want to ruin their friendship. She stated that she wanted an informal resolution to this that involved education for [Plaintiff] including the topics of alcohol and consent, healthy relationships, reading your partner's cues, and hearing your partner.

178.    By February 10, 2020, other than the name of Jane Roe, the College had not provided Plaintiff with any specific information about the allegations being made against him, including *when* Jane Roe alleged the incidents of misconduct to have occurred.

179.    Furthermore, by February 10, 2020 the College had not informed Plaintiff of where, procedurally, they were in the Title IX investigation/ complaint process, or that Jane Roe was seeking Informal Resolution.

180.    As a result of the College's complete lack of information or Notice to Plaintiff

---

[77] *See Exhibit G, Email from Mosely, February 6, 2020.*

about the substance of the allegations that were made against him, as well as the lack of information from the College regarding where, procedurally, the College was in the Title IX dispute resolution process, Plaintiff's counsel retained Private Investigator Karen Balmer.

181.    On February 10, 2020, Investigator Balmer traveled to the College's campus to interview witnesses and gather information about the allegations being made against Plaintiff.

182.    While on the campus, Investigator Balmer obtained a voluntary statement from Jane Roe.

183.    After Investigator Balmer advised Jane Roe that she was a Private Investigator hired by Plaintiff's counsel, and that she was "wondering if she could talk to [Jane Roe] a little bit about" the Title IX allegations, Jane Roe cordially invited Investigator Balmer into her dorm room.

184.    Thereafter, in the comfort of her own dorm room, Jane Roe gave Investigator Balmer a voluntary statement which lasted nearly fifteen (15) minutes in length.

185.    Jane Roe advised Balmer that, she "just met with the Title IX coordinator today", and that she "chose to go the informal route, meaning that nothing would stay on his (Plaintiff's) permanent record" and therefore, "it's not an official investigation."

186.    Jane Roe noted to Balmer that she "could have [chosen] the formal route" but further stated "but I chose informal, so I mean, that's kind of it."

187.    Regarding Plaintiff's lack of information from the College about the allegations, Jane Roe  stated to Balmer that, "And so if he (Plaintiff) would have gone in, he would have just, he would have been told that I've requested informal, no harm being done to him at all... but

then he requested that it not be my coach who deals with it because I guess he thought it was biased or something."

188.　Jane Roe further advised Balmer that, "Well, yeah. Because, like, I could change my mind, but I was going to wait until, like, because, like, the process, like, she'll (Mosely) talk to him and, like, depending on how he responds, because he can agree or disagree to go with the process. And so I was going to see if, like, if he was receptive, then we could, like, alter changes, changes. But once the informal process is set, then it gets set and there's nothing else I can change."

189.　Regarding the specifics of her allegations, Jane Roe advised Balmer that the alleged incident of misconduct occurred "before Thanksgiving…in mid-November" and that she "reported it in, like, probably December…like, right before, like, a week or two before finals."

190.　Roe advised Balmer that the alleged incident occurred after she had been drinking at Oberlin College's "Sco" club, located in the basement of Wilder Hall.

191.　Roe alleged that she was met up Plaintiff at Burton Hall, where the two allegedly "were just like talking and we were like kind of cuddling on the couch and we were both laying there."

192.　Roe then alleged that Plaintiff, then "started fingering" her and stated, "And don't, like, I don't really remember, like, when it started. I just know, like, one time, like, I kind of, like, passed out and, like, woke up and that was happening."

193.　Jane Roe then made inconsistent statements to Balmer regarding her allegations of an alleged sexual misconduct incident that occurred with Plaintiff on October 31, 2019. Roe stated to Balmer:

We almost hooked up one time before that. It was, like, Halloween weekend-ish. And I remember, like, we again, once again, we were both drunk. But he, like, we started hooking up and I stopped him and I was, like, "Wait. Like, I don't want to do this because you're one of my closest friends and I don't want anything to ruin that." And he was understanding then. That was, like, a week or two before. I don't remember.

194.    When asked if Plaintiff was drunk, she responded, "I don't know, most likely though."

195.    Jane Roe then alleged that she and Plaintiff "ended up downstairs in the basement, and, like, there's, there are a bunch of common rooms there."

196.    She added, that "I don't really remember, like, getting down there, but I remember, like, when I, like, came to again, like, I was, like, laid back on the table. He was, like, in me."

197.    Then, Jane Roe alleged that, "And I laid back. And um, and so, like, I finally, like, sat up, and I was like, "Wait. Like, we shouldn't do this." And he (Plaintiff) was like, "Do you want me to walk you home?" And I said, "Yes." "

**February 18, 2020 Correspondence to Rebecca Mosely and Request to Preserve and Produce Exculpatory Evidence[78]**

198.    It is Oberlin College's duty to preserve and collect any available relevant evidence stemming from and/or relating to a Title IX Complaint, pursuant to its own Title IX Policy, and to prevent violations of its students' constitutional rights to due process of law.

199.    On February 18, 2020, Plaintiff's counsel emailed correspondence to Mosely,

---

[78] *See Exhibit H, Correspondence from February 18, 2020.*

wherein Plaintiff's counsel advised Mosely that Plaintiff "would like this process to proceed informally, as per the Reporting Party's wishes" though, "must nevertheless inquire about several issues that have come to our attention with respect to this matter."

200.    Thereafter, Plaintiff's counsel addressed the College's and Jane Roe's intentional six (6) to eight (8) week delay in giving Notice to Plaintiff of the allegations, and the resulting exculpatory evidence that may have been lost or destroyed as a result of said lack of Notice/ intentional delay.

201.    The correspondence provided that "we believe that any and all video surveillance footage from the night in question…would constitute exculpatory evidence" and "that if this evidence has been deleted, recorded over, not retained, and/or otherwise lost due to this delay and/or is otherwise unavailable, and said loss and/or unavailability was the result of the above-referenced delays by the Reporting Party or the College…"

202.    Thereafter, Plaintiff's counsel's correspondence specifically set forth particularized portions of video surveillance that constituted exculpatory evidence, and a demand to the College to preserve and produce said evidence to Plaintiff.

203.    Also in the February 18, 2020 correspondence to Mosely, Plaintiff's Counsel addressed the information they received from Investigator Balmer's interview of Witness 1, wherein Witness 1 advised that Jane Roe was telling others, including K.B., that Plaintiff "raped" her and that she filed a Title IX Complaint against Plaintiff.

204.    Plaintiff's counsel stated in their correspondence, "it has come to our attention that the existence of the Title IX Report against [Plaintiff] has been disclosed by the Complainant

46

to other students on Oberlin's campus" and noted the Privacy Statement set forth in the College's Title IX Policy.[79]

205.    The correspondence requested Mosely and/or the College to "take any and all measures available to protect [Plaintiff's] right to privacy by advising the Reporting Party and/or anyone else that has knowledge of this Title IX matter, to cease and desist from disclosing the existence of the Title IX allegation and/or the Title IX proceedings to other Oberlin College students and/or anyone who is not involved with this process"... "in light of Oberlin College's policies aimed at maintaining the privacy of all of the parties involved, including the Responding Party, and considering that " 'every effort will be made to protect the privacy interests of all involved individuals' ", to ensure Plaintiff's reputation is not needlessly diminished as a result of violative campus gossip."

206.    Finally, the correspondence asked Mosely/ the College to confirm, in writing that, the College did not object to the recording of Plaintiff's statements and all witness statements during its investigation, because "the process of recording statements protects both the speaker and the investigator/summarizer against a later allegation of inaccuracies or incompleteness."

207.    Plaintiff's counsel noted in its correspondence that "The failure to record statements when it can be done with such ease, could be seen as an attempt to leave open the opportunity to mischaracterize and/or manipulate the accuracy of the summarized statement during a subsequent proceeding."

208.    Nevertheless, the College has never responded to or addressed Plaintiff's inquiry regarding the recording of statements during its Title IX investigation and/or proceedings.

---

[79] See Exhibit A, Policy, at 16.

209.     As the College failed to take any steps to preserve the exculpatory evidence requested by Plaintiff, and, therefore, based on the College's and Jane Roe's agreement to intentionally delay notifying Plaintiff of the allegations, said exculpatory evidence (video surveillance) has been lost and/or destroyed, and accordingly, the College has not produced any video surveillance to Plaintiff.

**February 24, 2020 Phone Call Between Plaintiff's Counsel and Rebecca Mosely**

210.     Thereafter, Plaintiff's counsel scheduled and participated in a phone call with Mosely on February 24, 2020.

211.     It was during this phone call that Plaintiff, by and through his counsel, for the very first time received from the College information that Jane Doe wished to pursue an informal resolution.

212.     During the call, some fourteen (14) days after Jane Roe cordially invited Private Investigator Balmer into her dorm room and voluntarily provided a lengthy statement to Investigator Balmer, Mosely advised Plaintiff's Counsel that Jane Roe had asked for an informal resolution and that "informal resolution" involved zero investigation because it involved the Responding Party not admitting to any wrongdoing.

213.     Then, even though the Title IX Policy provides that the "Reporting Party's stated preference" is one of several factors the College considers when changing from informal to formal resolution, Mosely expressed her and the College's "concerns" to Plaintiff's counsel that if Plaintiff did not engage in the informal resolution process in a relatively timely manner, that, even though Jane Roe initially wanted informal resolution, she could change her mind, "until that process is engaged."

214.    Plaintiff's counsel then addressed the College's unreasonable six (6) week notice delay which, initially, Mosely tried to avoid, but she ultimately admitted to Plaintiff's counsel 1) the reporting party can decide when she wants an informal process to begin or a formal process to begin, 2) that when Jane Roe made the report on December 12, 2019, Jane Roe requested the College not to notify Plaintiff, and 3) pursuant to Jane Roe's request, the College did not notify Plaintiff until nearly six (6) weeks later, on February 4, 2020, when Plaintiff returned from winter break.

215.    Accordingly, during the phone call with Plaintiff's counsel Mosely admitted that the College failed to investigate Jane Roe's allegations on or after December 12, 2019.

216.    During the phone call with Plaintiff's counsel Mosely admitted that the College and Jane Roe agreed to withhold notification to Plaintiff of the existence of the allegations for almost two (2) months.

217.    During the intentional period of delay between December 12, 2019 and February 4, 2020, exculpatory evidence (video surveillance) was lost and/or destroyed.

218.    Nevertheless, upon hearing, formally, that Jane Roe and the College wished to pursue informal resolution during the phone call, Plaintiff's counsel, on Plaintiff's behalf, reiterated Plaintiff's desire "to proceed informally, as per the Reporting Party's wishes" as set forth in the February 18, 2020 correspondence, and advised Ms. Mosely that Plaintiff was willing to meet with her to proceed with an informal resolution; said meeting was scheduled to pursue an informal resolution *the very next day*.

219.    Accordingly, in sum, on *the same day* that Plaintiff was first officially notified by

49

the College that Jane Roe sought to pursue an informal resolution, Plaintiff's Counsel, on Plaintiff's behalf, engaged the informal process when he set up a meeting with Mosely to pursue informal resolution for the following day, which Plaintiff and Plaintiff's counsel subsequently attended.

### February 25, 2020 Meeting Between Plaintiff, Plaintiff's Counsel and Rebecca Mosely

220.    On February 25, 2020, having engaged in the informal process the day before, Plaintiff and his counsel met with Mosely on Oberlin's campus about the informal process.

221.    During the February 25, 2020 meeting, Mosely reviewed the specifics of the informal process with Plaintiff and Plaintiff's counsel, which was said to include certain forms of additional Title IX related education and an ongoing no contact order between Jane Roe and Plaintiff.

222.    Mosely also reiterated that the informal process involves zero investigation because the Responding Party (Plaintiff) does not admit to any wrongdoing.

223.    Plaintiff, by and through his counsel, reiterated his agreement and acceptance of the College's offer to resolve Jane Roe's Title IX against him through informal resolution.

224.    During the meeting, Mosely also advised Plaintiff and Plaintiff's counsel that Jane Roe wanted to use her report to send a message to the entire Oberlin College Football team, and for the entire team to receive additional Title IX training.

### February 26, 2020- Jane Roe's Abrupt Change of Heart and Retaliatory and Unilateral Decision to Pursue Formal Resolution

225.    Nevertheless, on February 26, 2020, two (2) days after Plaintiff and Plaintiff's counsel engaged the informal process by scheduling the meeting with Ms. Mosely, and thereafter attending that meeting, Plaintiff received an email from Ms. Mosely advising him that Jane Roe

50

had abruptly changed her mind, and now decided that she wished to pursue formal resolution of her claim.

226.    Specifically, Ms. Mosely's February 26, 2020 email to Plaintiff and Plaintiff's counsel provided, in relevant part:

> As I shared with you during our meeting, I had a follow up meeting scheduled with [Jane Roe] late yesterday as well. Since our meeting yesterday, [Jane Roe] has informed me that she is no longer interested in using an informal resolution process to resolve her report. She has asked that I begin a formal resolution process.[80]

227.    From December 12, 2019 to February 25, 2020, nothing changed, and the College obtained no new information with respect to "the nature of the report" by Jane Roe and/or "the relevant evidence about patterns of conduct" by Plaintiff or Jane Roe.

228.    Accordingly, the only change in the substance of Jane Roe's Title IX complaint against Plaintiff was Jane Roe's "stated preference", now being a formal process against Plaintiff.

229.    Jane Roe changed her mind after she found out that, and because, in part, Plaintiff asked Mosely to instruct [Jane Roe] to no longer refer to Plaintiff as a "Rapist" to their mutual friends.

230.    Ultimately, Plaintiff was fraudulently induced, by both Jane Roe and the College, into engaging in the informal process and, once he engaged in the process, the College, in its blind allegiance to Jane Roe, pulled the rug out from under Plaintiff, and diverted the process from informal to formal.

---

[80] *See Exhibit I, Email from February 26, 2020.*

51

**March 2, 2020 Correspondence to Rebecca Mosely, Plaintiff's Retaliation Complaint against Jane Roe and Plaintiff's Request to Preserve and Produce Exculpatory Evidence[81]**

231.    In correspondence from Plaintiff to Mosely on March 2, 2020, Plaintiff, for the second time, raised his concerns regarding the loss of exculpatory evidence due to the College's and Jane Roe's complicit decision to intentionally delay the notice to Plaintiff of the allegations against him.

232.    Specifically, with respect to the exculpatory video surveillance, Plaintiff's correspondence provided:

> I am also concerned that Oberlin College was complicit with [Jane Roe] in deciding to withhold notification of this report to me until February 4, 2020. Given what I now know about [Jane Roe's] allegations, I know that there is, or was if it is no longer in existence, exculpatory evidence – specifically, security video recordings, which would have shown [Jane Roe] and I having a cigarette within the view of a security video camera mounted on the exterior door of Burton Hall. I have enclosed herein a photograph of this door with the clearly visible security camera in question. This video recording will establish, or would have established if this evidence is no longer in existence, that [Jane Roe] was not in any way noticeably impaired on the evening in question. In fact, she exhibited no appearance of being under the influence of alcohol or any other substance, at that or any other time that she was in my presence on that evening.[82]

233.    Based on Oberlin College's Title IX policies, in relevant part, it was incumbent on the Title IX Team to conduct an immediate assessment of the report at the time that Jane Roe made her initial report. As stated in the policy:

> The initial review will proceed to the point where a reasonable assessment of the safety of the individual and of the campus can be made. Thereafter, *an investigation may be initiated depending on a variety of factors, such as* the Reporting Party's wish to pursue formal or informal resolution, the risk posed to any individual or the campus community, and *the nature of the investigation.*[83]

---

[81] *See Exhibit J, Correspondence from March 2, 2020*
[82] *Id.*
[83] *See Exhibit A, Policy at p. 43 (emphasis added).*

234.     Accordingly, in the March 2, 2020 correspondence, Plaintiff again, now for the second time, requested the College to immediately preserve and produce the exculpatory video evidence specifically set forth in the February 18, 2020 correspondence.

235.     Plaintiff requested the College to preserve and produce the following, additional evidence, in the March 2, 2020 correspondence:

1) a copy of the written Complaint made by Jane Roe party against Plaintiff;
2) Jane Roe's Cell Phone, the Contents Thereof, and Jane Roe's Cell Phone Records from November 1, 2019 through December 31, 2019
3) Jane Roe's OCID Charge Card/ Charge Account Records
4) The Schedule of Events at "the Sco" for November and December 2019
5) Drug/Urine Test Records for Jane Roe and/or Relative to Jane Roe's Participation on the Women's Volleyball Team and/or Disciplinary History Report and/or Incident Reports

236.     Also, in the March 2, 2020 correspondence, Plaintiff lodged a formal Retaliation Complaint against Jane Roe, pursuant to the College's strict anti-Retaliation policy, which prohibits retaliation against a Responding Party.[84]

237.     Plaintiff's Retaliation complaint against Jane Roe in the March 2, 2020 correspondence, provided:

I also wish to raise my concern that I have been retaliated against by [Jane Roe]… …[Jane Roe] maintained her request for informal resolution until after I had already agreed to the informal resolution. At the time that I agreed to an informal resolution, Mr. Zukerman, on my behalf, expressed to you my concern that [Jane Roe] had been slandering me by calling me a "rapist" to other Oberlin College students. This fact was made known to you on February 25, 2020 and, pursuant to my request, you indicated that you would address [Jane Roe's] slander of me to her. Accordingly, it is my understanding based on the timing of your February 26, 2020 e-mail that [Jane Roe] "informed [you] that she is no longer interested in using an informal resolution process to resolve her report" during your meeting with her which occurred after our meeting. Thus, it appears that [Jane Roe's]

---

[84] *Id.* at p. 26.

53

decision to change her mind was prompted by my complaint that she was slandering me to other Oberlin College students.

Accordingly, please allow this letter to constitute a formal complaint against [Jane Roe] for her violation of the College's "Statement Against Retaliation". Clearly, in response to my decision to bring to the College's attention the [Jane Roe's] *per se* slanderous statements against me and thus my decision to exercise my legal and administrative rights through obtaining counsel, [Jane Roe] opted to wield her virtually unfettered ability to pursue formal resolution against me, "at any time" as a retaliatory sword. This is a clear violation of the College's Policy and as the Reporting Party, I look forward to being contacted by the College with respect to its initial assessment into my Report.

238.    Clearly, [Jane Roe's] decision to request a formal resolution amounted to retaliation against Plaintiff due to his request communicated to Mosely that she refrain from further slandering Plaintiff.

239.    Further demonstrating the "bad faith" of Jane Roe's decision to proceed with formal resolution is her initial delay in reporting the allegations to the College.

240.    Jane Roe's initial delay in reporting the allegations to the College was purposeful and designed to complicate and/or prevent preservation of and/or Plaintiff's collection of exculpatory evidence

241.    The College's subsequent decision to appease Jane Roe, and to delay providing Plaintiff with notice of the allegations was purposeful and designed to complicate Plaintiff's preservation of and/or collection of evidence. This decision by the College, which caused prejudice to Plaintiff, was based on Plaintiff's gender.

**March 3, 2020 Email from Erin Butcher to Plaintiff[85]**

242.    On March 3, 2020, Investigator Erin Butcher sent an email to Plaintiff and

---

[85] See Exhibit K, Email from March 3, 2020.

Plaintiff's counsel, requesting a meeting with Plaintiff to discuss the allegations, and specifically,

stating the following:

> I have been assigned to investigate the complaint raised by [Jane Roe] against you for Oberlin. I work for INCompliance Consulting, which contracts with colleges and universities to conduct independent investigations for Title IX matters. I would like to set up a time to meet with you in person as soon as possible.
>
> ***

243.    At the time of Investigator Butcher's email to Plaintiff requesting to meet "in

person as soon as possible", Plaintiff had not even received a copy of the written report that was

made against him.

244.    At the time of Investigator Butcher's email to Plaintiff requesting to meet "in

person as soon as possible", Plaintiff had not received any response or even acknowledgement

from the College to his multiple requests for the preservation and production of exculpatory

evidence.

245.    At the time of Investigator Butcher's email to Plaintiff requesting to meet "in

person as soon as possible", Plaintiff had not received a response, or even an acknowledgement

from the College about his Formal Complaint for Retaliation against Jane Roe.

### March 4, 2020 Correspondence from Plaintiff to Investigator Butcher and Request to Preserve and Produce Exculpatory Evidence[86]

246.    On March 4, 2020, Plaintiff sent written correspondence to Investigator Butcher

wherein, again, he requested the immediate production of 1) "a copy of the written complaint

made against me, and please advise me of the specific date, time, and location of the alleged

incident and the nature of the alleged incident(s), that forms the basis for Jane Roe's Complaint",

---

[86] *See Exhibit L, Correspondence from March 4, 2020.*

2) "electronically stored evidence that would be exculpatory in nature, including, but not limited to, security video recordings…[and]  3) "the contents of Jane Roe's cell phone."

247.    In his March 4, 2020 correspondence, Plaintiff again emphasized his Retaliation Complaint against Jane Roe and noted Coach Rau's initial email to Plaintiff, in which Coach Rau emphasized the College's anti-retaliation policy, stating " it is important for you to know that the Sexual Misconduct Policy prohibits retaliation against anyone who has filed a report with my office, or who is participating in a resolution process with my office…[w]ith that in mind, if you experience any form of retaliation, please let me know."

248.    Plaintiff completed his correspondence to Investigator Butcher by asserting his innocence, and stating:

> Once this information is provided to me, I would be happy to schedule a meeting with you, as requested in your email, so that I can tell you, in person, that [Jane Roe's] allegations, whatever they may be, are meritless and false, that I have done nothing wrong and [Jane Roe's] false allegations and defamatory statements against me to others, has caused me significant harm.

**March 5, 2020 Correspondence from Plaintiff's Counsel to Investigator Butcher**

249.    On March 5, 2020, having heard no response to any of Plaintiff's specific questions and/or requests for the preservation and/or production of exculpatory evidence, Plaintiff's counsel sent Investigator Butcher written correspondence.

250.    In said March 5, 2020 correspondence, Plaintiff's counsel requested an immediate status update as to Plaintiff's inquiries set forth in the previous correspondence and *again* requested the immediate production and preservation of exculpatory evidence.[87]

251.    Plaintiff's counsel's March 5, 2020 correspondence to Investigator Butcher

---

[87] *See Exhibit M, Correspondence from March 5, 2020.*

included, as attachments, copies of all previous written correspondence from Plaintiff and his counsel, and specifically provided:

> Accordingly, please allow this letter to constitute a demand for a written status as to the College's preservation and disclosure of the exculpatory evidence, including but not limited to the electronic evidence from [Jane Roe's] cell phone, that we and our client previously requested, including the College's efforts to preserve any such evidence, all of which was described in detail in our previous correspondence to Rebecca Mosely on February 18, 2020, [Plaintiff's] correspondence to Rebecca Mosely on March 2, 2020 and [Plaintiff's] correspondence to you on March 4, 2020.

Finally, Plaintiff's counsel set forth five (5) specific questions to Investigator Butcher in their correspondence of March 5, 2020, specifically:

> 1) what is the status of the College's preservation and disclosure of the exculpatory evidence that we and our client have been repeatedly demanding,
>
> 2) what efforts has the College made to preserve the exculpatory evidence described the previous correspondence, attached hereto,
>
> 3) whether any of the exculpatory evidence described in the previous correspondence (attached hereto) has been lost or destroyed,
>
> 4) what is the status of the College's disclosure of a copy of the written complaint made against [Plaintiff], and its written disclosure of the specific date, time, and location of the alleged incident and the nature of the alleged incident(s) that forms the basis for [Jane Roe's] Complaint against [Plaintiff], and finally,
>
> 5) what is the status of the College's investigation into [Plaintiff's] retaliation complaint against [Jane Roe]?[88]

### March 6, 2020- Correspondence from Rebecca Mosely to Plaintiff and First Disclosure of the Written Report against Plaintiff[89]

252.    On March 6, 2020, Plaintiff and Plaintiff's counsel received an email from Mosely

---

[88] *Id.*
[89] *See Exhibit N, Email from March 6, 2020.*

wherein she addressed Plaintiff's *repeated* request for written copies of the reports/ complaints that were made by Jane Roe against him.

253.    Even though it had been nearly three (3) months since Jane Roe made the reports, and Plaintiff was first notified of the allegations over one (1) month earlier, Mosely stated to Plaintiff, "Ms. Butcher has informed me that you have requested a written copy of the report that was made regarding the complaint against you...I am happy to provide you a copy of the reports that we took. I am attaching the information to this email as PDFs."

254.    Attached to Mosely's email were two PDF files, one was the initial email that was sent to report Jane Roe's allegations to Mosely's office, and the second was Mosely's summary of additional information that Jane Roe provided to Mosely during their meeting on February 10, 2020.

**March 9, 2020 Email from Investigator Butcher to Plaintiff and Plaintiff's Counsel[90]**

255.    In relevant part, Investigator Butcher's March 9, 2020 email provided:

I would like to provide more information about the substance of the reporting party's complaint. After initiating this investigation, I can clarify that the first alleged incident in this investigation occurred on the night of October 31, 2019 and the second on either November 13 or November 20, 2019 (I am still narrowing this down).

***

I am in the process of interviewing witnesses and collecting relevant evidence that I need for my investigation. Once I have completed my initial investigation, I will draft a report and share that report and evidence with both parties at that time. The parties will then be provided the opportunities to respond to the investigation report and evidence for further investigation or follow up if necessary.

My understanding is that Oberlin is not opening a complaint by [Plaintiff] against [Jane Roe] for filing a false claim or retaliation.

---

[90] *See Exhibit O, Email from March 9, 2020.*

*\*\**

256.    Thus, although the Title IX Policy states that a Reporting Party can *request to end* informal resolution at any time and at that time the *report may be* referred for formal resolution" and that "[f]actors that will shape the Title IX Team's recommendation will include the nature of the report, the Reporting Party's stated preference, and relevant evidence about patterns of conduct", by Mosely's statements regarding her and the College's "concerns" during the February 24, 2020 phone call to Plaintiff's counsel, Mosely's email to Plaintiff and Plaintiff's Counsel on February 26, 2020, and Investigator Butcher's email to me on March 9, 2020, it is very clear that the College violated its own policy by allowing Jane Roe, *and Jane Roe alone*, to decide to have the Title IX Complaint referred to formal resolution.

### March 10, 2020 Correspondence from Plaintiff to Investigator Butcher and Request to Preserve and Produce Exculpatory Evidence[91]

257.    In his March 10, 2020 Correspondence from Plaintiff to Investigator Butcher, Plaintiff addressed the College's and Investigator Butcher's ongoing failure to address, acknowledge and/or respond to Plaintiff's repeated questions concerning the status of and the production of exculpatory evidence.

### March 12, 2020 Email from Investigator Butcher[92]

258.    Finally, on March 12, 2020, Investigator Butcher responded to Plaintiff's correspondence and, with respect to the repeated requests for video surveillance, as feared by Plaintiff, confirmed that "there is no video from any of [the relevant] dates."

---

[91] *See Exhibit P, Correspondence from March 10, 2020.*
[92] *See Exhibit Q, Email from March 12, 2020.*

259.    Specifically, Investigator Butcher's March 12, 2020 email provided that some of the cameras had technical issues and did not record and/or were only retained for 45 days.  In said email, Investigator Butcher also advised that

> As part of my information gathering, I am requesting from all parties and witnesses, any relevant text messages, emails, phone records, and/or social media related to October 31, 2019, November 13, 2019, and November 20, 2019.  Again, I am still narrowing down whether the second incident occurred on November 13 or 20.
>
> ***
>
> If [Plaintiff] elects not to provide an interview with me by 5:00 p.m. on March 23, I will have to proceed with my report without his interview, which will be noted in my report. As I stated in my March 8 email and above, both parties will be provided with the equal opportunity to review evidence I have obtained at that time, or evidence I may have questions about that I have when I meet with the parties for interviews.[93]

## FIRST CAUSE OF ACTION – VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972 – ERRONEOUS OUTCOME - AS TO DEFENDANTS OBERLIN COLLEGE AND OBERLIN COLLEGE BOARD OF TRUSTEES

260.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

261.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  *Doe v. Miami University,* 882 F.3d 579, 589 (6th Cir. 2018)(citing 20 U.S.C. § 1681(a)).

262.    Defendant Oberlin College received federal funding, including in the form of

---

[93] *Id.*

federal student loans given to students.

263.    Because it receives federal funding, Defendant Oberlin College is subject to the requirements of Title IX.

264.    The United States Sixth Circuit Court of Appeals has recognized at least four (4) theories of liability that a student who is "attacking a university disciplinary proceeding on grounds of gender bias" can potentially assert under Title IX.  *Doe v. Miami University,* 882 F.3d 579, 589 (6th Cir. 2018).

265.    Those (4) theories are:  1) "erroneous outcome,"; 2) "selective enforcement,"; 3) "deliberate indifference,"; and 4) "archaic assumptions."  *Doe v. Miami University,* 882 F.3d 579, 589 (6th Cir. 2018).

266.    "To plead an erroneous outcome claim, a plaintiff must allege:  1) facts sufficient to cause some articulable doubt on the accuracy of the outcome of the disciplinary proceeding and 2) a particularized causal connection between the flawed outcome and gender bias."  *Doe v. Miami University,* 882 F.3d 579, 592 (6th Cir. 2018).

267.    The Oberlin College Defendants have violated the Plaintiff's rights under Title IX via a documented history of gender-based decision-making that resulted in their decision that Jane Roe's allegations against the Plaintiff should proceed for further investigation and satisfied the appropriate threshold for formal resolution.

268.    The Oberlin Defendants erroneously found that the Title IX investigation in this matter should proceed past the "Initial Title IX Assessment" and/or that it should not be handled through the informal resolution process as it initially communicated to the respondent.

269.    There were significant inconsistencies in Jane Roe's statements that

61

were readily apparent from the summary of statements prepared by Coach Rau and Defendant Mosely that cast doubt on the accuracy of the Oberlin Defendant's decision to proceed with further investigation, to reverse its decision to proceed informally, and to instead proceed to a formal resolution, especially considering the fact that Defendant Mosely had received a copy of Coach Rua's summary of Jane Roe's statement approximately two (2) months prior to her meeting with Jane Roe.

270.    The Oberlin Defendants chose to proceed with further investigation and determined that Jane Roe's allegations satisfied the appropriate threshold for formal resolution despite the fact that Defendant Mosely's notes from her meeting with Jane Roe reflect that Jane Roe "does not know if she consented" to the alleged November incident.

271.    While Coach Rau noted that Jane Roe told her that she was drunk during both of the alleged incidents and that Plaintiff was also drunk during at least the alleged incident in October, Defendant Mosely's notes do not reflect Jane Roe made any claim that either she or the Plaintiff had consumed alcohol, let alone were drunk during either of the alleged incidents.

272.    In addition, whereas Jane Roe advised Defendant Mosely that she told the Plaintiff that she did not want to hook up during the alleged October incident out of concerns for their friendship, she advised Coach Rau that she and the Plaintiff were both drunk and began hooking up without alleging that she had any reservations about hooking up due to their friendship.

273.    Similarly, as it related to the alleged November incident, Jane Roe advised Coach Rau that she recalled asking Plaintiff if he a had a condom when they began having sex and that she freaked out and jumped away when he responded that he did not, whereas Defendant

62

Mosely's notes do not reflect that Jane Roe disclosed to her that she asked the Plaintiff if he was wearing a condom and that upon learning that he was not, "jumped away."

274.    In making the decision to proceed with further investigation, that informal resolution was no longer the appropriate manner to handle Jane Doe's allegations, and to proceed to a formal resolution, the Oberlin Defendants failed to afford Plaintiff a presumption of innocence and have unfairly shifted the burden on him to prove that Jane Roe consented to sexual conduct and/or contact with him during both of the alleged incidents and/or that she was not incapacitated on those occasions.

275.    The Oberlin College Defendants' history of gender-based decision-making is evidenced by the well-documented fact that every single respondent put through Oberlin's formal sexual misconduct resolution process in the Fall of 2015 and at least part of the Spring 2016 semesters was found responsible for at least one of the charges against him.  Upon information and belief, the vast majority of these respondents were men, and the vast majorities of their accusers were women.

276.    Oberlin has continued to engage in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male students.  Upon information and belief, Oberlin has not acted comparably with respect to allegations of sexual misconduct made against female students.

277.    As a direct result of Oberlin College's violation of Title IX through its erroneous outcome of deciding to proceed with the investigation and for a formal hearing in this matter, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others he has endured extreme emotional and

psychological suffering as a result of the College's one-sided treatment of the false sexual misconduct charges against him.

278.    As a result of the forgoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## SECOND CAUSE OF ACTION – VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972 – SELECTIVE ENFORCEMENT - AS TO DEFENDANTS OBERLIN COLLEGE AND OBERLIN COLLEGE BOARD OF TRUSTEES

279.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

280.    Jane Roe communicated to Coach Rau that she and the Plaintiff were both drunk when they began hooking up during the alleged incident in October.

281.    By only opening a Title IX investigation into Plaintiff for engaging in sexual contact and/or conduct with Jane Doe while she was "drunk", but not opening an investigation into Jane Doe as to whether she also violated the sexual misconduct policy by engaging in sexual contact and/or conduct with Plaintiff,  the Oberlin Defendants have selectively enforced its Sexual Misconduct Policy against Plaintiff and Jane Roe differently based on their genders.

282.    The Oberlin College Defendants have also selectively enforced the Sexual Misconduct Policy against the Respondent by refusing to investigate his complaint that Jane Roe clearly violated the Policy by informing other students that Plaintiff was being investigated for violating the Policy due to her allegations and retaliated against him in violation of the Policy by demanding the College reverse its decision to handle her allegations through the informal resolution process and to proceed formally against the Plaintiff upon learning that the Plaintiff

accused her of violating the Policy by disclosing the College's investigation into him to other students.

283.    Despite the fact that the Policy provides a complainant and a respondent with the same basic rights, the Oberlin Defendants have treated Jane Roe more favorably to date than they have Plaintiff based upon their genders.

284.    Based upon the forgoing, Plaintiff has been subjected to a biased, prejudiced, and explicitly unfair process in violation of Title IX.

285.    As a direct and proximate result of the above conduct, Plaintiff has sustained and will continue to sustain damages, including without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

286.    As a result of the forgoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**THIRD CAUSE OF ACTION –  42 U.S.C. § 1983 – FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS PROPERTY AND LIBERTY INTERESTS AS TO DEFENDANTS AND OBERLIN COLLEGE DOE DEFENDANTS 1-2**

287.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

288.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

289.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

290.    A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

291.    On April 4, 2011, the United States, by and through its agent the United States Department of Education, sent a 19-page "Dear Colleague" letter to colleges and universities all over the country, stating that "sexual violence" on campus was a form of "sexual harassment prohibited by Title IX" ("Dear Colleague Letter").

292.    Reversing previous federal policy, the Dear Colleague Letter threatened colleges with hundreds of millions of dollars in de-funding penalties if they did not immediately begin investigating and adjudicating allegations of campus sexual assault under the detailed procedures and terms dictated by the federal government.

293.    If the Federal Government were to impose defunding penalties on Oberlin College, said penalties would be significant.

294.    Since 2011, the United States has consistently reaffirmed and adhered to the threat of substantial monetary penalties made in the Dear Colleague Letter.

295.    Upon information and belief, since 2011 Oberlin College has revised its policies in response to the federal government's threat that colleges refusing to comply would be found in violation of Title IX and be subject to extremely substantial, and in fact crippling, monetary penalties.

296.    Under clear and controlling federal constitutional case law, a private actor becomes a state actor when his or its actions are coerced by the United States government.

297.    Under clear and controlling federal constitutional case law, a private actor

66

required by the United States to investigate and adjudicate alleged violations of federal statute under terms and procedures dictated by the federal government is a state actor when engaging in such investigation and adjudication.

298.    Accordingly, the Oberlin Defendants are state actors during its investigation into Jane Roe's complaint against Plaintiff and is therefore required to honor the rights and guarantees set forth in the United States Constitution during said investigation and adjudication.

299.    In the course of Oberlin College's investigation and its stated process and procedures for adjudication as set forth in the Policy, the Oberlin Defendants have flagrantly violated and intend to continue flagrantly violate Plaintiff's clearly established constitutional rights under the Due Process Clause of the Fourteenth Amendment through its repeated acts of gender bias and deprivation of the minimal requirements of procedural fairness.

300.    The Oberlin Defendants have deprived and continue to deprive Plaintiff of his liberty and property interests without affording him basis due process, including, but not limited to:  his right to fair adjudication, his right to be informed of the exact charges against him, his right to be heard by an impartial factfinder, to question his accuser through cross-examination, to review all witness statements and evidence against him prior to meeting with any Title IX representatives and/or prior to any adjudicatory hearing, to challenge the credibility of other adverse witnesses, to investigate Jane Roe's allegations by questioning and/or interviewing potential witnesses, and to present evidence and witnesses in support of his defense.  Rather than investigate what allegedly occurred, the Oberlin Defendants have conducted a superficial investigation biased against Plaintiff as a male accused of sexual assault.

301.    Plaintiff further asserts that it is clear that Coach Rau and Defendant Mosely have limited the amount of information that they have provided to him regarding the specifics of what Jane Roe communicated to them regarding her allegations against Plaintiff.  It is simply not reasonable to believe that Jane Roe would provide Plaintiff's private investigator with a significantly more detailed version of her allegations against the Plaintiff than what she would have confided to Coach Rau and Defendant Mosely.  It is clear that based on the limited, vague summaries of Jane Roe's statements prepared by Coach Rau and Defendant Mosely and provided to the Plaintiff by Investigator Butcher, than Coach Rau and Defendant Mosely intentionally withheld exculpatory and mitigatory information disclosed to them by Jane Roe.

302.    As a result, the Oberlin Defendants have failed to provide Plaintiff with the basic due process protections that they are required to provide students accused of sexual misconduct, in violation of the Fourteenth Amendment.

303.    Based on the forgoing, the Oberlin Defendants were state actors when they violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation of Jane Roe's complaint against Plaintiff.

304.    As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages.

305.    Accordingly, the Oberlin Defendants are liable to Plaintiff for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

306.    As a direct and proximate result of the above conduct, Plaintiff has

sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

307.    As a result of the forgoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## FOURTH CAUSE OF ACTION – BREACH OF CONTRACT

308.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

309.    At all times relevant hereto, a contractual relationship existed between Oberlin College and Plaintiff through Oberlin College's policies and procedures governing the student disciplinary system, including but not limited to its Sexual Misconduct Policy.

310.    Under that contract, Oberlin College was required to act in accordance with its Sexual Misconduct Policy in resolving reports of alleged sexual misconduct, including the investigation of said reports and the process of adjudicating said reports.

311.    Plaintiff performed his obligations under the contract when he accepted an offer of admission from Oberlin College and paid any required tuition, fees, and/or room and board to Oberlin College.

312.    Oberlin College breached its contract with Plaintiff by failing to comply with the Sexual Misconduct Policy.  Based on the aforementioned facts and circumstances, Defendant Oberlin College breached express and/or implied agreement(s) with Plaintiff.

313.    Based on the forgoing, Oberlin College materially breached its contract with

69

Plaintiff by failing to provide a fair process for the handling of sexual misconduct matters",

failing to give adequate and timely notice of the allegations against him, failing to perform a

fair, thorough and non-discriminatory investigation, and in failing to comply with its policies and

procedures.

314.    The Oberlin College Defendants also breached a contract with Plaintiff by

backing out of the verbal agreement that they entered into with him to proceed informally

against him in response to Jane Roe's allegations of sexual misconduct.

315.    The Oberlin College Defendants clearly communicated an offer to Plaintiff to

resolve their Title IX investigation into Jane Roe's allegations of sexual misconduct against him

via an informal process that would not subject him to any discipline.

316.    Plaintiff accepted the Oberlin College Defendants' offer to resolve Jane Roe's

allegations via said informal process.

317.    There was significant consideration for both the Oberlin College Defendants and

Plaintiff to enter into such an agreement rather than proceed with a formal investigation and

hearing process.

318.    Due to the Oberlin Defendants' breach of said contracts with Plaintiff,  Plaintiff

has sustained damages, including, without limitation, emotional distress, loss of educational

and career opportunities, reputational damages, economic injuries and other direct and

consequential damages.

319.    As a result of the forgoing, Plaintiff is entitled to damages in an amount to be

determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and

disbursements.

## FIFTH CAUSE OF ACTION – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

320.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

321.    Based on the aforementioned facts and circumstances, the Oberlin College Defendants acted in bad faith when it meted out an erroneous decision to reverse its decision to proceed informally against Plaintiff in response to Jane Roe's allegations and to proceed with a formal investigation and hearing process.

322.    Based on the aforementioned facts and circumstances, the Oberlin College Defendants breached and violated a covenant of good faith and fair dealing implied in its agreements with Plaintiff.

323.    As a direct and foreseeable consequence of these breaches, Plaintiff sustained damages, including without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

324.    Plaintiff is entitled to recover damages for the Oberlin College Defendant's breach of the express and/or implied contractual obligations described above.

325.    As a direct and proximate result of the above conduct, Plaintiff has sustained damages, including without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

326.    As a result of the forgoing, Plaintiff is entitled to damages in an amount to be

determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## SIXTH CAUSE OF ACTION - NEGLIGENCE

327.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

328.    The Oberlin Defendants owe a duty of care to Plaintiff, arising from the obligations delineated in Oberlin College's Policies, and directives issued by the U.S. Department of Education's Office for Civil Rights.

329.    Such duties included, without limitation, a duty of reasonable care to allow Plaintiff an equal opportunity to present information and witnesses in support of his defense; a duty to conduct an impartial and thorough investigation into the allegations of sexual misconduct against him.

330.    Based on the forgoing, the Oberlin Defendants breached their duties owed to Plaintiff.

331.    As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

332.    As a result of the forgoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## SEVENTH CAUSE OF ACTION – PROMISSORY ESTOPPEL

333.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

334.    Oberlin College's Policies constitute unambiguous representations and promises that Oberlin College should have reasonably expected to induce action or forbearance on the part of Plaintiff.

335.    Oberlin College expected or should have expected Plaintiff to accept its offer of admission and choose not to attend other colleges based on its express and implied promises including but not limited to:  Oberlin College would not deny Plaintiff his procedural rights should he be accused of a violation of Oberlin College's policies; Oberlin College was committed to providing support to anyone involved in an incident of sexual misconduct; the College would ensure the rights of the complainant and the respondent are maintained by supporting a fair process for the handling of sexual misconduct matters and making determinations regarding the Policy; and the College would respect the rights of all involved by following the stated university sexual misconduct process.

336.    Plaintiff reasonably and foreseeably relied to his detriment on these express and implied promises and representations made by Oberlin College, by choosing to attend Oberlin College rather than other schools of equal caliber.

337.    These express and implied promises and representations made by Oberlin College must be enforced to prevent substantial injustice to Plaintiff.

338.    Based on the forgoing Oberlin College is liable to Plaintiff based on Promissory Estoppel.

73

339.     As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

340.     As a result of the forgoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

**DECLARATORY JUDGMENT**

341.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

342.     Oberlin College has committed numerous violations of the Parties' contracts and of federal and state law.

343.     Without appropriate redress, the unfair investigation and adjudicatory process will continue and cause irreversible damages to Plaintiff's future educational and employment prospects, with no end in sight.

344.     As a result of the forgoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of Plaintiff's formal student record at Oberlin College.

345.     By reason of the forgoing, Plaintiff requests, pursuant to 28 U.S.C. § 2201, a declaration that:  1) any record of Jane Roe's complaint against Plaintiff and/or investigation into Jane Roe's complaint against Plaintiff be destroyed; and 2) Oberlin College's rules, regulations, and guidelines, in the Policy are unconstitutional as applied.

## PRAYER FOR RELIEF

**WHEREFORE,** for the forgoing reasons, Plaintiff demands judgment against the Defendants as follows:

1) An injunction from this Honorable Court halting any investigation, including the investigation by Investigator Butcher, who is an agent of the Oberlin Defendants, and decision-making process with regard to Jane Roe's allegations against Plaintiff because Oberlin College's Title IX investigation process is unconstitutional and deprives Plaintiff of due process;

2) An injunction from this Honorable Court prohibiting the Oberlin College Defendants from further use of the Sexual Misconduct Policy as to any student because said Policy is unconstitutional and is a deprivation of due process rights;

3) A ruling that, as a matter of law, Plaintiff's due process rights have been violated by the Oberlin College Defendants;

4) Whatever other equitable relief appears appropriate at the time of final judgment;

5) On Plaintiff's First and Second Causes of Action, which are causes of action against Defendant Oberlin College and Defendant Oberlin College Board of Trustees for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to the physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

6) On Plaintiff's Third Cause of Action, which is a cause of action against Defendant

Mosely and Oberlin College Doe Defendants 1-2 for violation of Plaintiffs' rights under the Fourteenth Amendment of the United States Constitution to Procedural Due Process, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to the physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

7)  On Plaintiff's Fourth Cause of Action, which is a Cause of Action for breach of contract against Defendant Oberlin College and Defendant Oberlin College Board of Trustees, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to the physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

8)  On Plaintiff's Fifth Cause of Action, which is a cause of action against Defendant Oberlin College and Defendant Oberlin College Board of Trustees, for breach of the covenant of good faith and fair dealing, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to the physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

9)  On Plaintiff's Sixth Cause of Action for negligence, which is cause of action

against all of the Oberlin College Defendants, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to the physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

10) On Plaintiff's Seventh Cause of Action for promissory estoppel, which is a cause of action against Defendant Oberlin College and Defendant Oberlin College Board of Trustees, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to the physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

11) Awarding Plaintiff such other and further relief as this Honorable Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Respectfully Submitted,

LARRY W. ZUKERMAN, Esq. (0029498)
S. MICHAEL LEAR, Esq. (0041544)
BRIAN A. MURRAY, Esq. (0079741)
ADAM M. BROWN, Esq, (0092209)
Zukerman, Lear & Murray Co. L.P.A.
3912 Prospect Ave., East
Cleveland, Ohio 44115

77

(216) 696-0900 telephone
(216) 696-8800 facsimile
lwz@zukerman-law.com
sml@zukerman-law.com
bam@zukerman-law.com
amb@zukerman-law.com
Counsel for Plaintiff John Doe

**VERIFICATION OF COMPLAINT**

STATE OF Georgia _____ )

_____ Glynn _____ COUNTY )  ss.  AFFIDAVIT

)

The undersigned, being first duly sworn according to law, hereby deposes and states:

1.    I am a Plaintiff in the within matter;

2.    I am over the age of 18 years and I am of sound mind.

3.    I have personal knowledge of the facts set forth in the *Verified Complaint* herein;

4.    I have read the Verified Complaint herein and I aver that the averments and allegations set forth herein are true and accurate as to the best of my knowledge.

FURTHER AFFIANT SAYETH NAUGHT.

BRANDON SIRES

SWORN TO BEFORE ME and subscribed in my presence this 20 day of March 2020 by

who appeared before me and, after being duly cautioned and sworn according to law, executed

this document in ___ Georgia ___ COUNTY, ___ Glynn _____ .

NOTARY PUBLIC

79

IN THE COURT OF COMMON PLEAS
LORAIN COUNTY, OHIO

| | | |
|---|---|---|
| JOHN DOE, | ) | Case No.: |
| Plaintiff, | ) | JUDGE |
| vs. | ) | |
| OBERLIN COLLEGE, *et al*. | ) | **PLAINTIFF'S NOTICE OF FILING OF EXHIBITS TO PLAINTIFF'S VERIFIED COMPLAINT** |
| Defendants. | ) | |

Plaintiff, by and through undersigned counsel, Larry W. Zukerman, Esq., S. Michael Lear, Esq., Brian A. Murray, Esq., and Adam M. Brown, Esq. hereby gives Notice to this Honorable Court of Plaintiff's filing of the Exhibits to Plaintiff's Verified Complaint.

Respectfully Submitted,

LARRY W. ZUKERMAN, Esq. (#0029498)
S. MICHAEL LEAR, Esq. (#0041544)

BRIAN A. MURRAY, Esq. (#0079741)
ADAM M. BROWN, Esq. (#0092209)
ZUKERMAN, LEAR & MURRAY CO., L.P.A.
3912 Prospect Avenue
Cleveland, Ohio 44115
(216) 696-0900 phone
(216) 696-8800 fax
lwz@zukerman-law.com
sml@zukerman-law.com
bam@zukerman-law.com
amb@zukerman-law.com
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing NOTICE OF PLAINTIFF'S FILING OF EXHIBITS TO PLAINTIFF'S VERIFIED COMPLAINT was sent to the following individual this 20th day of March 2020:

Donica Varner, Esq.
Vice President, Secretary and General Counsel for Oberlin College
Cox Administration Building, Suite 100
70 N. Professor St.
Oberlin, OH 44074
Donica.Varner@oberlin.edu

LARRY W. ZUKERMAN, Esq. (#0029498)
S. MICHAEL LEAR, Esq. (#0041544)
BRIAN A. MURRAY, Esq. (#0079741)
ADAM M. BROWN, Esq. (#0092209)

2

# OBERLIN COLLEGE SEXUAL MISCONDUCT POLICY

**Approved on October 16, 2019**



# Table of Contents

Table of Contents ................................................................................................ 2

EMERGENCY INFORMATION AND RESOURCE GUIDE ...................................... 4

    Emergency Assistance ...................................................................................... 4

    Confidential Resources and Support ................................................................. 5

    Reporting Options .............................................................................................. 5

1.  INTRODUCTION ............................................................................................. 5

    Executive Summary ........................................................................................... 5

    Statement of Purpose ........................................................................................ 9

    Introduction: Ensuring an Equitable Campus Free of Violence, Harassment, and
    Discrimination .................................................................................................... 9

    Academic, Intellectual, and Expressive Freedom ............................................ 12

    Scope of the Policy ......................................................................................... 12

    Statement of Non-Discrimination ..................................................................... 12

    Title IX Compliance:  Title IX Coordinator and Team ...................................... 14

    Privacy vs. Confidentiality ............................................................................... 16

2.  PROHIBITED SEXUAL MISCONDUCT ......................................................... 21

    Definitions of Prohibited Conduct .................................................................... 21

    Effective Consent , Coercion, and Incapacitation ............................................ 28

3.  RESOURCES AND SUPPORT ...................................................................... 30

4.  Reporting ..................................................................................................... 31

    Introduction ..................................................................................................... 31

    Emergency Reporting Options ......................................................................... 32

    Campus Reporting Options ............................................................................. 33

    Anonymous Reporting Options ........................................................................ 34

    Off Campus Reporting Options ....................................................................... 35

    Reporting Considerations ................................................................................ 35

5. Interim Measures ............................................................................................ 37

    Overview .......................................................................................................... 37

Range of Measures ..................................................................................... 38

Interim Suspension or Leave........................................................................ 39

6. *Title IX Review, Investigation, and Resolution* ......................................... 40

Overview ...................................................................................................... 40

The Role of the Title IX Team ..................................................................... 41

Advisors, Support Persons and Attorneys ................................................. 42

Initial Title IX Assessment .......................................................................... 43

Informal Resolution...................................................................................... 44

Investigation ................................................................................................ 46

Formal Resolution ....................................................................................... 48

Support for Parties after Formal Resolution................................................ 49

7.  Procedures for Formal Resolution of Reports .......................................... 50

Overview ...................................................................................................... 50

Conduct Conference .................................................................................... 51

Pre-Hearing Procedures ............................................................................. 52

Hearing Procedures ..................................................................................... 57

Sanctions ..................................................................................................... 61

Outcome Letter ............................................................................................ 64

Appeals Process .......................................................................................... 65

Integrity of Proceedings .............................................................................. 67

Records ........................................................................................................ 67

10. Primary Prevention, Education, and Training............................................. 67

Role and Scope ........................................................................................... 67

11.  Policy Review ............................................................................................ 69

Appendix 1 ....................................................................................................... 70

Key Policy Implementers ............................................................................. 70

# EMERGENCY INFORMATION AND RESOURCE GUIDE

Any student, employee, or member of the Oberlin College community who has experienced sexual misconduct or violence is encouraged to immediately notify law enforcement and/or seek immediate medical assistance. Oberlin College Safety and Security will provide transportation upon request.  You are also encouraged to report the misconduct or violence promptly to the College by notifying any of the on-campus reporting options listed here.

## Emergency Assistance

| Emergency Response | Health and Safety | Counseling/Crisis Response |
| --- | --- | --- |
| **911 (Emergency Services)** **Oberlin College Safety and Security** (440) 775-8911 (24 hours) | **The Nord Center Sexual Assault Care Unit** (800) 888-6161 (24 hour hotline) | **Lorain County Rape Crisis** (800) 888-6161 (24 hours) **Lorain County Mental Health Crisis Hotline** (800) 888-6161 (24 hours) |

Confidential Resources and Reporting Options:

All individuals are encouraged to make a prompt report to law enforcement and to the College. An individual may seek confidential support as designated below. Confidential resources will not share information with the College nor will speaking with a confidential resource trigger action by the College under most circumstances.  We encourage all individuals to make a prompt report to the College using the reporting options below, but we recognize that individuals may choose to make a report of sexual misconduct to any College employee. With the exception of confidential resources, all Responsible Employees, including student employees or volunteers who have a responsibility for student welfare, are trained and required to share the report with a central Title IX Team to ensure a prompt and equitable review, investigation and resolution.

## Confidential Resources and Support

| Students | Employees |
|---|---|
| **Oberlin College Counseling Center** (440) 775-8470 **Office of Religious and Spiritual Life** (440) 775-5191 **Confidential Student Advocate** (440) 204-4359 **Lorain County Rape Crisis** (800) 888-6161 (24 hour hotline) | **Lorain County Rape Crisis** (800) 888-6161 (24 hour hotline) **Employee Assistance Program** (800) 989 – 3277 |

## Reporting Options

| On Campus | Off Campus |
|---|---|
| **Safety and Security** ⎮(440) 775-8911 (24 hours) **Dean of Students** ⎮(440) 775-8462 **Title IX Coordinator** ⎮(440) 775- 8555 **Human Resources** ⎮(440) 775-8430 | **Oberlin Police Department** ⎮(440) 774-1061 **Mercy Allen Hospital** ⎮(440) 775-1211 **Lorain County Prosecutor** ⎮(440) 329-5389 |

# 1. INTRODUCTION

## Executive Summary

**Purpose**

Oberlin College will not tolerate any type of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, which are referred to in this policy as sexual misconduct. The College is committed to taking all appropriate steps to eliminate these forms of sexual misconduct,

prevent their recurrence, and address their effects. This policy outlines the College's institutional values, prohibited conduct, resources, reporting options, and processes for the review, investigation and resolution of reports of sexual misconduct.

## Scope of Policy

This policy applies to all members of the Oberlin College community, including students, employees, and visitors.  This policy applies to both on-campus and off-campus conduct. In particular, off-campus conduct is subject to this policy if the conduct occurred in the context of an education program or activity of the College or had continuing adverse effects on campus or in an off-campus education program or activity.

## Notice of Non-Discrimination

Oberlin College does not discriminate on the basis of race, color, sex, marital status, religion, creed, national origin, disability, age, genetic information, military or veteran status, sexual orientation, family relationship to an employee of Oberlin College, and gender identity and expression, or any other protected class.

## Title IX Coordinator

Rebecca Mosely, the Title IX Coordinator, oversees the College's central review, investigation and resolution of reports of sexual harassment, misconduct, stalking and intimate partner violence under the College's report processes and coordinates the College's compliance with Title IX.

## Title IX Review

Oberlin College's Title IX review consists of an inter-department team which includes, as appropriate, the Title IX Coordinator, the Deputy Title IX Coordinator(s), a designee from the Dean of Students, a designee from the Dean of the College or the Dean of the Conservatory, the Manager of Employee and Labor Relations, and the Director of Safety and Security and/or designee. This team, which is overseen by the Title IX Coordinator, is responsible for the prompt and equitable review and resolution of any reports under the Student, Staff, or Faculty Report Processes.   The members of the team will vary based upon the roles of the parties involved.  In all cases, the Title IX Team will be limited to a small number of individuals who need to be informed in order to provide effective and equitable review and timely resolution of reports while protecting the privacy of parties as fully as possible.

**Reporting**

Oberlin College will take immediate action in all allegations of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, to protect the safety of the college community and individuals involved. The College encourages anyone who has experienced, witnessed or has information pertaining to a potential violation of the Sexual Misconduct Policy to take an active role in reporting this behavior.

Students and employees are encouraged to report information regarding an incident of sexual misconduct to designated employees of the College. These reporting options are: Safety and Security, the Title IX Coordinator, the Deputy Title IX Coordinator(s), the Dean of Students Office, or the Manager of Employee and Labor Relations. The College recognizes, however, that an individual may choose to report to *any* College employee, even those not specifically designated as a reporting option. Consistent with this policy, any Responsible Employee who receives such a report is required to share the report with a central review team to ensure consistent application of College policy for all individuals.

Oberlin College encourages all college community members to take reasonable and prudent actions to prevent or stop an act of sexual misconduct. Community members who exercise this obligation will be supported by the College and protected from retaliation.

**Statement Against Retaliation**

It is a violation of Oberlin College policy to retaliate in any way against a student or employee because they have brought forward or been the subject of allegations of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, or participated in the College's resolution of the report. The College will take immediate and responsive action to any report of retaliation.

**Privacy Statement**

In any report, investigation, or resolution of an allegation of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, every effort will be made to protect the privacy and confidentiality interests of the individuals involved in a manner consistent with the need for a thorough review of the allegation and the protection of the parties involved and the broader campus community.

**Confidential Resources**

Oberlin College realizes that not every individual is prepared to make a formal report for resolution. There are several confidential resources available for both students and employees who are seeking assistance but do not wish to make a report to the College or law enforcement.

**Resources**

Oberlin College is committed to providing on campus resources and support to Reporting Parties and Responding Parties, whether or not an individual wishes to pursue formal disciplinary action. There are also many off-campus resources available to individuals who experience sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence.

**Interim Measures**

Upon receipt of a report, the College will take interim measures to protect the parties involved. These may include no-contact directives, changes in class or work schedules, changes in living arrangements, interim suspension, College-imposed leave, or any other measures that the College deems appropriate in consultation with the parties.

**Formal Resolution Procedures**

- Reports against a student will be resolved by the Student Formal Resolution Process.

- Reports against a non-faculty employee will be resolved by the Staff Formal Resolution Process.

- Reports against a faculty member will be resolved by the Faculty Formal Resolution Process.

**Appendices**

The Appendices contain a chart which provides a visual overview of the process of resolution of reports of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, and a list of key implementers named in this policy along with contact information.

## Statement of Purpose

Oberlin College students, employees, alumni, guests, and visitors have the right to be free from sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, on campus and in their interactions with each other.  Sexual misconduct is the term used in this policy for sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, as well as other forms of prohibited conduct as defined in this policy.

Because all members of the Oberlin College community have a right to and a stake in creating a campus free of violence, harassment, and discrimination, this policy applies to all students, employees, and visitors to campus.

## Introduction: Ensuring an Equitable Campus Free of Violence, Harassment, and Discrimination

Oberlin College seeks to ensure an equitable and inclusive campus free of violence, harassment, and discrimination.  Therefore, Oberlin College will not tolerate sexual and/or gender-based harassment, discrimination, and violence, including sexual violence, stalking, and intimate partner violence, in any College program or activity, including the academic, employment or residential setting.  When used in this policy, sexual misconduct includes sexual violence, intimate partner violence, and stalking.  This prohibition also includes all forms of discrimination or harassment based on sex, marital status, sexual orientation, and/or gender identity and expression.  Such conduct violates community expectations and is prohibited by state and federal law. The Sexual Misconduct Policy affirms the Oberlin community's commitment to these principles and describes the process the College uses to resolve reports of sexual misconduct.

Reports of sexual misconduct will be investigated and resolved in a timely and equitable fashion.  Because sexual misconduct has such a grave impact on the kind of community required to ensure the fullest educational and occupational opportunities, parties who are found responsible for violating the Sexual Misconduct Policy will be subject to appropriate sanctions.  These sanctions are intended to ensure that such forms of misconduct do not continue and may include suspension, termination, and expulsion.

Oberlin College will provide appropriate support to all college community members who are involved in the reporting or investigation of sexual misconduct in order to ensure access, provide equitable resolution, and to stop and address the effects of discrimination. In particular, the College is committed to ensuring that anyone who experiences sexual misconduct receives appropriate support, reporting options, and resolution to reports to ensure access to the full range of educational and occupational opportunities.   Appropriate interim remedies and support are available even if an individual chooses not to pursue any action under this Policy.

Oberlin College views this policy as a primary resource in preventing and responding to sexual misconduct.  Therefore, retaliation against anyone who makes a report, cooperates with an investigation, or participates in a grievance procedure is a violation of College policy.  Retaliation should be reported promptly to the Title IX Coordinator for investigation pursuant to this policy and may result in disciplinary action independent of any sanction or interim measures imposed in response to the underlying allegations of sexual misconduct, discrimination, and/or harassment.

All members of the campus community are expected to play a role in preventing and responding to sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence.  Reporting any knowledge of sexual misconduct is especially important, since it allows the College to connect a Reporting Party to resources and support and to foster individual and campus safety.  Members of the community have different expectations in regard to reporting, described as follows:

- *Responsible Employees* who become aware of potential misconduct are **required** to report it promptly to the Title IX Coordinator.  Such reporting ensures timely support for all parties and enables an effective and consistent institutional response.  Responsible Employees include all employees who serve in supervisory positions, whether paid or unpaid.  A supervisor is anyone who has the authority to hire, promote, discipline, evaluate, grade or direct faculty, staff or students.  This includes everyone who manages or supervises others, including (but not limited to) faculty department program chairs, teaching faculty, resident advisors, coaches and anyone who leads, administers, advises or directs University programs.  It also includes student employees or student volunteers who have the responsibility for the welfare of other students.

- *All other employees* are **expected** to report any information about potential misconduct to the Title IX Coordinator, in recognition of the community understanding that centralized reporting is an important tool to address, end, and prevent sexual misconduct and other forms of gender- and/or sexual-related discrimination and harassment.
- *Students* who are not Responsible Employees are **strongly encouraged** to report any information about sexual misconduct, including reports or partial reports, to the Title IX Coordinator.
- *Confidential professional resources*, including professional and pastoral counselors, are **not permitted** to report any information about sexual misconduct without the consent of the patient/client, unless the information involves suspected abuse of a minor or there is an imminent risk of harm to self or others.
- A *Confidential student advocate* is available to support students and only reports general information about incidents of sexual misconduct (what types of misconduct, when and where the incident took place) in a way that does not identify the student, unless the student consents to report identifying information.

Required reporting is not meant to undermine a Reporting Party's agency to choose how to respond to experiences of sexual misconduct, but rather to ensure that all community members are fully empowered and informed about options for support and safety and information is shared with the College so that it may take immediate corrective action to eliminate, prevent and address a hostile environment.

Any member of the community who intervenes to prevent sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence (when safe to do so), seeks the support of peers or colleagues, or reports such conduct to the Title IX Coordinator or another Responsible Employee will be supported by the College and protected from retaliation.

This policy uses they, them, and theirs as third person singular gender-neutral pronouns, in recognition that individuals accessing this policy may have a range of gender identities and forms of self-identification.

## Academic, Intellectual, and Expressive Freedom

This policy recognizes the central importance of academic freedom to the campus community and embraces respect for intellectual and expressive freedom.  This policy upholds these values by prohibiting sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence.  As the American Association of University Professors notes, "the freedom to teach and to learn is inseparable from the maintenance of a safe and hospitable learning environment" (AAUP, "Campus Sexual Assault Procedures," 2012).  Further, this policy reflects guidance from the Office for Civil Rights which states that "the laws and regulations it enforces protect students from prohibited discrimination and do not restrict the exercise of any expressive activities or speech protected under the U.S. Constitution" (OCR Title IX and Sexual Violence FAQ L-1, 2014).  This policy recognizes that effective learning may include engagement with difficult, offensive, or historically charged materials, and that such pedagogical experiences do not constitute violations of this policy, which is designed to stop, address, and prevent the recurrence of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence.

## Scope of the Policy

The policy applies to all Oberlin College community members, including students, faculty, administrators, staff, volunteers, vendors, independent contractors, visitors, alumni and any individuals regularly or temporarily employed, studying, living, visiting, conducting business or having any official capacity with the College or on College property.  This policy applies to sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, both on and off campus.  In particular, off-campus conduct is subject to this policy if the conduct occurred in the context of an education program or activity of the College or had continuing adverse effects on campus or in an off-campus education program or activity.

## Statement of Non-Discrimination

Oberlin College is committed to creating an institutional environment free from discrimination and harassment for students and employees. Thus, discrimination and

harassment based on the following categories are prohibited: race, color, sex, marital status, religion, creed, national origin, disability, age, genetic information, military or veteran status, sexual orientation, family relationship to an employee of Oberlin College, and gender identity and expression.  In addition, should any applicable law be enacted in the future prohibiting discrimination and/or harassment based on a category not listed above, or should there be other changes in the applicable law governing discrimination and/or harassment, this Policy will be deemed amended to the extent necessary to reflect such changes.  In affirming the prohibition against discrimination and harassment on these bases, Oberlin College also affirms its compliance with applicable laws.

The Sexual Misconduct Policy covers conduct prohibited under Title VII of the Civil Rights Act of 1964, which prohibits employment discrimination based on race, color, religion, sex, or national origin, and Title IX, the 1972 amendment to the Higher Education Act of 1965 which prohibits discrimination based on sex in higher education.  This policy also reflects the provisions of the Jeanne Clery Disclosure of Campus Security and Campus Crime Statistics Act (Clery Act), 20 U.S.C. § 1092(f), a federal statute enacted in 1990, and the Campus Sexual Violence Elimination (SaVE) Act, which was passed as part of the reauthorization of the Violence Against Women Act (2013).  Oberlin policy also aligns with Ohio law, including Ohio Revised Code Chapter 2907: Sex Offenses and Chapter 4112, which prohibits discrimination in various contexts based on race, color, religion, sex, military status, national origin, disability, age, or ancestry. Section 1185.02 of the Codified Ordinances of Oberlin prohibits discrimination in housing based on race, color, religion, sex, sexual orientation, ancestry, handicap, familial status, or national origin of any prospective owner, occupant or user of the housing.

The Oberlin College non-discrimination statement includes all forms of gender- and/or sex-based discrimination and affirms that the College does not discriminate on the basis of sex in its educational, extracurricular, athletic, or other programs or in the context of employment.  The Sexual Misconduct Policy implements the College non-discrimination statement by prohibiting sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence.  Oberlin College's Sexual Misconduct Policy, in keeping with this federal law, reflects the understanding that sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, can and do affect individuals of all genders.   These protections thus apply to all Oberlin community members and visitors of any gender, gender identity, gender expression or sexual

orientation.  Oberlin College will respond promptly and equitably to reports of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, in order to eliminate the harassment, prevent its recurrence, and address its effects on any individual or the community.

Other forms of discrimination and harassment prohibited by the College are addressed under the Oberlin College Policy on Discrimination and Harassment.

## Title IX Compliance:  Title IX Coordinator and Team

Rebecca Mosely serves as the college's Title IX coordinator and can be reached at:

> (440) 775-8555
> rebecca.mosely@oberlin.edu
> Carnegie 204

The Title IX Coordinator oversees the College's central review process for receiving, investigating, and resolving reports of sexual misconduct to ensure that the College has taken prompt and equitable action to eliminate any hostile environment, prevent its recurrence, and address its effects.  The Title IX Coordinator promotes overall institutional compliance with Title IX and related laws, including adherence to procedural time frames, documenting and reporting data, and providing training and education to policy implementers and to the campus community for prevention purposes.  Members of the community are encouraged to consult the Title IX Coordinator regarding questions and concerns about reporting, support and interim measures for anyone experiencing or affected by sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, and regarding information about options and processes to resolve the report.  The Title IX Coordinator is trained in relevant applicable laws and the dynamics of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence.

The Title IX Coordinator is assisted by Title IX Deputy Coordinators.  The Title IX Deputy Coordinators are available to meet with any member of the community and assist the Title IX Coordinator in ensuring institutional compliance.  Deputy Title IX Coordinators are chosen to reflect the diversity of the Oberlin community, including roles as faculty, staff, and students, and help increase access to College Title IX programs and processes.

Information about the Deputy Title IX Coordinators can be found online at:
https://www.oberlin.edu/equity-diversity-inclusion/staff

The Title IX Coordinator also manages the Title IX Team. The Title IX Team supports the
Title IX Coordinator and enables institutional compliance by ensuring effective and prompt
response to reports as well as reviewing and implementing plans for education, prevention,
and training. At a minimum, this group includes the Title IX Coordinator, Title IX Deputy
Coordinators, and the Director of Safety and Security. Depending on the roles of the parties
involved in a report, a designee from the appropriate divisional dean (Dean of Students,
Dean of the College or Dean of the Conservatory) or the Manager of Employee and Labor
Relations may join the group. In all cases, the Title IX Team will be limited to a small
number of individuals who need to be informed in order to provide effective and equitable
review and timely resolution of reports while protecting the privacy of parties as fully as
possible.

Students, employees, or other individuals may direct questions or reports related to the
application of Title IX to the Title IX Coordinator, Deputy Title IX Coordinators, and/or the
U.S. Department of Education Office for Civil Rights:

> Office for Civil Rights   Cleveland Office
> 1350 Euclid Avenue, Suite 235
> Cleveland, OH 44115
> (216) 522 – 4970
> OCR.Cleveland@ed.gov

Questions or reports involving employees may also be directed to the U.S. Equal
Opportunity Employment Commission:

> U.S. Equal Employment Opportunity Commission
> Cleveland Field Office
> Anthony J. Celebrezze Federal Building
> 1240 E. 9th Street, Suite 3001
> (800) 669 – 4000

## Privacy vs. Confidentiality

The College is committed to protecting the privacy of all individuals involved in a report or an investigation filed under the Sexual Misconduct Policy. All College employees who participate in the College's Title IX response, including the Title IX Coordinator, Title IX Deputy Coordinators, Title IX Team members, investigators, and Hearing Panel members receive specific instruction about respecting and safeguarding private information. Throughout the process, every effort will be made to protect the privacy interests of all involved individuals in a manner consistent with the need for a thorough review of the report. All College proceedings are conducted in compliance with the requirements of the Family Educational Rights and Privacy Act (FERPA), the Clery Act, Title IX, and state and federal law. No information shall be released from such proceedings except as required or permitted by law and College policy.

To ensure all members of the community understand how the College protects the privacy of individuals, please be aware that privacy and confidentiality have distinct meanings.

- Privacy generally means that information related to a report of misconduct will only be shared with a limited circle of individuals. The use of this information is limited to those College employees who "need to know" in order to assist in the active review, investigation or resolution of the report, including the issuance of interim measures. While not bound by confidentiality, these individuals will be discreet and respect the privacy of all individuals involved in the process.

- Confidentiality means that information shared by an individual with designated campus or community professionals cannot be revealed to any other individual without the express permission of the individual. These designated campus and community professionals include mental health providers, ordained clergy, trained rape crisis counselors and attorneys, all of whom have legally protected confidentiality. In addition, by policy, the College has designated a Confidential Student Advocate who is an employee of the Nord Center Sexual Assault Services staff and therefore has legally protected confidentiality with whom students, staff, and employees may consult or seek support. All of these professionals are prohibited from breaking confidentiality unless there is an imminent threat of harm to self or others or the report involves suspected abuse of a minor. Sharing

information with the Confidential Student Advocate will not trigger a College investigation into an incident against the person's wishes.

**Limits on Confidentiality**

State and federal law as well as the ethical obligation to provide an educational and occupational environment free of violence and discrimination place some limits on confidentiality for most members of the community, with the exception of those with legally-protected confidentiality.  Members of the community should be aware of their reporting responsibilities in the following areas:

The College Requirement to Report

Responsible Employees who receive information, including partial information, about sexual misconduct are required to report all information, including the names of the parties and any known details of the incident, to the Title IX Coordinator.  This requirement applies when the misconduct either occurred to or was done by any student, staff or faculty member of the college.  Required reporting is an important tool for enabling the College to respond effectively and prevent sexual misconduct in a manner that is supportive of individual autonomy and respectful of individual and campus safety.  Sharing all reports with the Title IX Coordinator helps to ensure that individuals affected by sexual misconduct receive prompt remedies to stop, prevent, and address discrimination and harassment, and that individuals are fully informed about remedies, accommodations, resources and options.  Sharing this information also enables the College to tailor our education and prevention programs to the types of sexual misconduct reported on campus.  Individual reports are vital to seeing patterns of misconduct, which will, in turn, help the College as an educator and employer respond to community needs.

Required reporting also helps to ensure that a Reporting Party and all other members of the community are connected to appropriate resources. Thus, required reporting helps to increase a Reporting Party's choices and create a campus climate that challenges silence about sexual misconduct.

Required reporting helps ensure that sexual misconduct is always treated in a serious manner.  Required reporting also helps the Title IX Coordinator to ensure that every member of the campus community is provided with consistent information about resources, accommodations, options; to ensure that individual and campus safety are

addressed; and, to allow the College to tend to its many obligations under Title IX, the Campus SaVE Act, the Clery Act, and other state and federal laws.

Under Title IX, the College is required to take immediate and corrective action if a Responsible Employee knew or, in the exercise of reasonable care, should have known about sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, which creates a hostile environment.  In general, a Responsible Employee includes any employee who:

- Has the authority to take action to redress the harassment; or

- Is required to report to appropriate school officials sexual harassment or any other misconduct by students or employees; or

- A student could reasonably believe that the employee has the authority or responsibility to take action.

Thus, all employees with supervisory and leadership responsibilities on campus are considered Responsible Employees. This includes, for example, faculty, coaches, administrators, Resident Advisors and other student employees or student volunteers with a responsibility for student welfare.  The only employees who are exempt from the requirement to report are those with legally-protected confidentiality.

Community-wide reporting ensures that anyone who experiences such misconduct is quickly connected to resources and options and enables the College to address patterns of misconduct.  Therefore,

- All other employees are **expected** to report any knowledge of sexual misconduct.

- All students who are not Responsible Employees are **strongly encouraged** to report any knowledge of sexual misconduct.

The Protection of Minors

All members of the Oberlin community are required to report any reasonable cause to suspect that a minor (under 18 years old) is experiencing abuse or neglect based on information shared by the minor, any other individual, or one's own observations or knowledge. An Oberlin community member suspecting abuse or neglect is required to bring all suspicions to the immediate attention of the Title IX Coordinator or the Director of

Safety and Security.   College policy should be understood to align with any mandatory reporting requirements under Ohio law.

Ohio Felony Reporting Requirements

Under Ohio law, all residents of Ohio must report felonies, including sexual assault.  This legal requirement means that the Title IX Coordinator or Safety and Security will report any potential felony or any crime of violence to the Oberlin Police Department.  An individual who experiences potential felony sexual misconduct may choose how to participate in any subsequent criminal investigation.

Ohio Medical Professional Reporting Requirements

In Ohio, medical professionals also have legally mandated reporting responsibilities. However, the medical professional must deem the patient medically stable before reporting and must communicate to the patient that the patient does not have to report and/or speak to the police. If the patient chooses not to speak to police at the time of the medical examination, the medical professional does not need to report the patient's name - only the date, general time, and general location of the incident.

**Requests to Protect the Confidentiality of Reporting Parties**

If a person who reports an incidence of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence (in this policy called the Reporting Party) requests that their name or other identifiable information not be shared with the person alleged to have engaged in such conduct (in this policy called the Responding Party), or requests that the College take no formal action in response to a report, the College will honor the Reporting Party's request to the extent possible based on a careful balancing of such requests with any legal reporting requirements, the risk of harm to any individual and the College's duty to maintain a safe and non-discriminatory environment for all.

The Title IX Coordinator, with the assistance of the Title IX Team, will assess such requests by examining the seriousness of the reported conduct, whether the reported misconduct was perpetrated with a weapon, the respective ages and roles of the Reporting and Responding Parties, whether there have been other reports of misconduct or discrimination by the Responding Party, whether the College possesses other means to obtain relevant evidence of sexual misconduct, whether the report reveals a pattern of misconduct (e.g., via illicit use of drugs or alcohol) at a given location or by a particular

group, and the rights of the Responding Party to receive notice and relevant information before disciplinary action is initiated.

Where possible, the Title IX Team will honor requests for confidentiality or that no action be taken so long as the College can meet its obligation to stop, address, and prevent the recurrence of the discriminatory conduct. If the College is unable to take action consistent with the wishes of the Reporting Party, the Title IX Coordinator will inform the Reporting Party about the chosen course of action, which may include an investigation and potential disciplinary action against the Responding Party. The Reporting Party will not be compelled to participate in a formal hearing if they choose not to participate. The College, however, may choose to move forward with an investigation and potential disciplinary action if there is an individual or public safety concern and sufficient independent information exists to establish that this Policy has been violated. Any action taken by the College will be designed to stop any sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, address its effects, and prevent its occurrence. In all instances, the College will take immediate action as necessary to protect and assist the Reporting Party.

If the College honors the request for confidentiality, the Reporting Party must understand that the College's ability to meaningfully investigate the incident and pursue disciplinary action against a Responding Party may be limited.

**Public Awareness Events**
Public awareness events such as "Take Back the Night," the Clothesline Project, candlelight vigils, protests, survivor speak outs, or other forums in which community members disclose experiences with sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, are not considered to be reporting events. Disclosing one's personal experience in this context does not serve as notice to the College of sexual misconduct and will not trigger its obligation to investigate or take action with respect to information shared. Such events, however, inform the need for campus-wide education and prevention efforts, and the College will provide information about Title IX, support, resources and option for resolution to attendees at these events.

**Timely Warning**

If a report of sexual misconduct discloses a serious or continuing threat to the Oberlin community, the College may issue a campus-wide timely warning notice to protect the health or safety of the community. The timely warning will not include any identifying information about the Reporting Party.  Even where there is no imminent threat, the College may provide campus-wide notifications on reported sexual misconduct.  At no time will the College release the name of the Reporting Party to the general public without the express written consent of the Reporting Party. The release of the Responding Party's name to the general public is guided by Family Educational Rights and Privacy Act (FERPA) and the Clery Act.

# 2.  PROHIBITED SEXUAL MISCONDUCT

## Definitions of Prohibited Conduct

Oberlin College prohibits all forms of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence.  Each of these terms encompasses a broad range of behaviors.  In general, sexual violence refers to physical sexual acts perpetrated without a person's consent or where a person is incapable of giving consent for any reason, including incapacitation.  Intimate partner violence refers to any act of violence or threatened act of violence (sexual, physical, verbal, emotional, economic, or otherwise) against a person who is or has been involved in a sexual, dating, domestic or other intimate relationship with that person.  Conduct which prevents or impairs an individual's access to educational or occupational benefits or opportunities based on sex, gender identity and/or expression, or sexual orientation, constitutes harassment and is also prohibited.

Sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, may vary in their severity. The following descriptions represent behaviors that violate community standards and a person's rights, dignity and integrity (please note that this is not an exhaustive list):

**Sexual Harassment or Gender-Based Harassment:**

Sexual harassment is any unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and/or other verbal, nonverbal, or physical

conduct of a sexual nature.  Sexual harassment occurs when any of the following conditions are present:

- Submission to or rejection of such conduct is made, either explicitly or implicitly, a term or condition of an individual's employment, evaluation of academic work, or participation in any aspect of a College program or activity;  or,

- Submission to or rejection of such conduct by an individual is used as the basis for decisions affecting the individual; or

- Such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance, i.e. it is sufficiently serious, pervasive or persistent as to create an intimidating, hostile, humiliating, demeaning, or sexually offensive working, academic, residential, or social environment under both the subjective perspective of the person who experiences such conduct and objective standard of a reasonable person's perception of such conduct.

A single isolated incident of sexual harassment may create a hostile environment if the incident is sufficiently severe. The more severe the conduct, the less need there is to show a repetitive series of incidents to establish the existence of a hostile environment, particularly if the harassment is physical.  Conduct which is pervasive or persistent, even if not severe, may also create a hostile environment.

Gender-based harassment may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on gender, sex or gender and/or sex or gender stereotyping, even if those acts do not involve conduct of a sexual nature.

Sexual and gender-based harassment:

- May be blatant and involve an overt action, a threat or reprisal, or may be subtle and indirect, with a coercive aspect that is unstated.

- May or may not include intent to harm, be directed at a specific target, or involve repeated incidents.

- May be committed by anyone, regardless of gender, age, position or authority. While there is often a power differential between two persons, perhaps due to differences in age, social, educational or employment relationships, harassment can occur in any context.

- May be committed by a stranger, an acquaintance, or someone with whom the Reporting Party has an intimate or sexual relationship.

- May be committed by or against an individual or group.

- May occur by or against an individual of any sex, gender identity, gender expression or sexual orientation.

- May occur in the classroom, in the workplace, in athletic facilities, in residential settings, or in any other setting.

- May be a one-time event or part of a pattern of behavior.

- May be committed in the presence of others, when the parties are alone, or through the use of technology.

- May affect the Reporting Party and/or third parties who witness or observe harassment and are affected by it.

Examples of conduct that may constitute sexual or gender-based harassment as defined above may include a severe, persistent or pervasive pattern of unwelcome conduct that includes one or more of the following:

**Physical conduct:**
- Unwelcome touching, sexual/physical assault, impeding, restraining, or blocking movements

- Unwanted sexual advances

**Verbal conduct:**
- Making or using derogatory comments, epithets, slurs or humor

- Intentionally using incorrect pronouns or an incorrect name when a person has clearly stated their preferred name and pronouns.

- Verbal abuse of a sexual nature, graphic verbal commentaries about an individual's body, sexually degrading words used to describe an individual, suggestive or obscene letters, notes or invitations

- Objectively offensive comments of a sexual nature, including persistent or pervasive sexually explicit statements, questions, jokes, or anecdotes

**Visual conduct:**
- Leering, making sexual gestures, displaying of suggestive or demeaning objects or pictures, cartoon or posters in a public space or forum

- Severe, persistent, or pervasive visual displays of suggestive, erotic, or degrading images.  This example should not be understood to constrain academic freedom in teaching, research, or creative activity, or to limit intellectual and/or expressive rights.

- Letters, notes or electronic communications containing comments, words, or images described above

**Quid pro quo conduct:**
- Direct propositions of a sexual nature between those for whom a power imbalance or supervisory or other authority relationship exists

- Offering educational or employment benefits in exchange for sexual favors

- Making submission to sexual advances an actual or implied condition of employment, work status, promotion, grades, or letters of recommendation, including subtle pressure for sexual activity, an element of which may be repeated requests for private meetings with no academic or work purpose

- Making or threatening reprisals after a negative response to sexual advances

**Sexual Assault:**
Having or attempting to have sexual intercourse or sexual contact with another individual without consent.  This includes sexual intercourse or sexual contact achieved by the use or threat of force or coercion, where an individual does not consent to the sexual act, or where an individual is incapacitated and thus incapable of consent.

Sexual assault includes the following acts:
- *Related to Non-consensual Sexual Intercourse*: Having or attempting to have sexual intercourse with another individual without consent. Sexual intercourse includes

vaginal or anal penetration, however slight, with a body part or object, or oral copulation by mouth-to-genital contact.

- *Related to Non-consensual Sexual Contact*:  Having or attempting to have sexual contact with another individual without consent.  Sexual contact includes kissing, touching the intimate parts of another, causing the other to touch one's intimate parts, or disrobing of another without permission. Intimate parts may include the breasts, genitals, buttocks, mouth or any other part of the body that is touched in a sexual manner.

## Sexual Exploitation:

Occurs when an individual takes non-consensual or abusive sexual advantage of another for one's own advantage or benefit, or to benefit or advantage anyone other than the one being exploited. Examples of sexual exploitation include, but are not limited to:

- surreptitiously observing another individual's nudity or sexual activity or allowing another to observe consensual sexual activity without the knowledge and consent of all parties involved;

- non-consensual sharing or streaming of images, photography, video, or audio recording of sexual activity or nudity, or distribution of such without the knowledge and consent of all parties involved;

- exposing one's genitals or inducing another to expose their own genitals in non-consensual circumstances (such behavior may also constitute *Public Nudity*);

- knowingly exposing another individual to a sexually transmitted infection without their knowledge;

- hazing and/or bullying related to sex or gender; and

- inducing incapacitation for the purpose of making another person vulnerable to non-consensual sexual activity.

## Intimate Partner Violence

Intimate partner violence is often referred to as dating violence, domestic violence or relationship violence. Intimate partner violence includes any act of violence or threatened act of violence against a person who is, or has been involved in, a sexual, dating, domestic

or other intimate relationship with the Responding Party. Intimate partner violence can encompass a broad range of behavior including all of the above categories of sexual misconduct. It may involve one act or an ongoing pattern of behavior. Intimate partner violence may take the form of threats, assault, property damage, violence or threat of violence to one's self, one's sexual or romantic partner, or to the family members or friends of the sexual or romantic partner. Intimate partner violence affects individuals of all genders, gender identities, gender expressions, and sexual orientation and all racial, social, and economic backgrounds.

**Stalking**

A course of conduct directed at another individual that could be reasonably regarded as likely to alarm, harass, or cause fear of harm or injury to that person or to a third party. A course of conduct consists of at least two acts. The feared harm or injury may be physical, emotional, or psychological, or related to the personal safety, property, education, or employment of that individual. Stalking includes cyber-stalking, a particular form of stalking in which electronic media such as the Internet, social networks, blogs, cell phones, texts, or other similar devices or forms of contact are used to pursue, harass, or to make unwelcome contact with another person in an unsolicited fashion.

**Retaliation**

Any adverse action or attempt to retaliate or seek retribution against a Reporting Party, Responding Party, or any individual or group of individuals involved in a report, investigation and/or resolution of an allegation of sexual misconduct or as a result of knowledge about a potential violation of this policy which has not been reported. Retaliation can be committed by any individual or group of individuals. Retaliation can take many forms, including threats, intimidation, pressuring, continued abuse, violence or other forms of harm to others, and in varying modes, including in person and in electronic and online communication. Retaliation can also include adverse employment or educational actions made or taken against an individual because of their good faith participation in the reporting, investigation, and/or resolution of an alleged violation of this policy and/or any conduct that would discourage a reasonable person from engaging in further protected activity.

**Public Nudity**

Public nudity occurs when a person exposes one's private parts or engages in sexual conduct or masturbation in any public place or in any place where the person's conduct is

likely to be viewed by and affront others who are in the person's physical proximity.  This prohibition aligns with Ohio law on public indecency (Ohio Revised Code 2907.90).  This policy's prohibition against public nudity should be understood as a strategy to prevent the development of hostile environments.  It is not intended to place constraints on academic freedom, which protects intellectual and expressive representations of the body and classroom materials which may include nudity.

**Evaluation of spouses, intimate partners, or family members**

Because of the concern with power dynamics as well as the importance of addressing conflicts of interest, Oberlin College prohibits employees from participating in evaluative personnel decisions (including those related to hiring, performance review, compensation, and termination) about other employees with whom they are in a sexual, intimate, and/or familial relationship.

**Prohibited Relationships by Persons in Authority**

Because of the potential negative impact on individuals as well as the College learning and working community, faculty and staff members are prohibited from engaging in sexual relationships with students to whom they are not married or in formal domestic partnerships, even when both parties believe the conduct is consensual.  This prohibition reflects an understanding that power inequalities due to role differences between faculty/staff and students affect the possibilities of effective consent.  This prohibition also reflects the College's commitment to respecting the integrity and character of the unique teaching relationship that exists between faculty and students.  Sexual relations between persons occupying asymmetrical positions of power, even when both consent, raise suspicions that the person in authority has violated standards of professional conduct and potentially subject the person in authority to charges of sexual harassment based on changes in the perspective of the individuals as to the consensual nature of the relationship. Similarly, these relationships may impact third parties based on perceived or actual favoritism or special treatment based on the relationship. Retaliation against persons who report concerns about consensual relationships is prohibited and constitutes a violation of this policy.  In cases where there is a pre-existing relationship between an employee and a student, that employee must disclose the relationship to the Office of Human Resources prior to beginning employment so that appropriate communication and support can occur.

## Effective Consent , Coercion, and Incapacitation

Obtaining effective consent of all sexual partners is crucial in order to prevent sexual violence and is required by the Sexual Misconduct Policy.  Effective consent must be based on mutually understandable communication that clearly indicates a willingness to engage in sexual activity. It is the responsibility of both parties who engage in sexual activity to ensure that effective consent is obtained for each sexual act and over the entire course of each sexual encounter.  The mere fact that there has been prior intimacy or sexual activity does not, by itself, imply consent to future acts.  Consent may be withdrawn at any time, and at that time, all sexual activity must cease unless and until additional unambiguous consent is given.

The following are essential elements of effective consent:

- *Informed*: all parties demonstrate a clear and mutual understanding of exactly what they are consenting to.

- *Freely and actively given*: there is no coercion, force, threats, intimidation, or pressure.

- *Mutually understandable:* expressed in words or actions that indicate a clear willingness to participate in each sexual act.  Silence does not equal consent.

- *Specific to a given situation*: consent is not indefinite. Even in the context of a current or previous intimate relationship, each party must consent to each instance of sexual contact each time.

Because consent should be positively communicated through words or actions in an ongoing fashion, consent cannot be inferred or assumed based on silence, lack of verbal objection, lack of physical resistance, previous sexual relationships, and/or a current sexual relationship.

### Barriers to Effective Consent

Effective consent cannot be obtained through the use of fraud or force (actual or implied), threats, intimidation, or coercion.  A lack of perceptible resistance (verbal or physical attempts to communicate a lack of consent) does not constitute evidence that consent was given.  Under the following conditions, effective consent is not possible:

- **Age:**  In the state of Ohio, consent to sexual activity cannot be given by minors under the age of 16.

- **Force:** Force is the use or threat of physical violence or intimidation to overcome an individual's freedom of will to choose whether or not to participate in sexual activity. For the use of force to be demonstrated, there is no requirement that a Reporting Party resists the sexual advance or request. However, resistance by the Reporting Party will be viewed as a clear demonstration of non-consent.

- **Coercion:** Coercion is the improper use of pressure to compel another individual to initiate or continue sexual activity against their will. Coercion can include a wide range of behaviors, including intimidation, manipulation, threats and blackmail. Examples of coercion include threatening to disclose private information about someone's sexual orientation, gender identity or gender expression and threatening to harm oneself if the other party does not engage in the sexual activity.

- **Incapacitation:**  Incapacitation is a state where an individual cannot make an informed and rational decision to engage in sexual activity because they lack conscious knowledge of the nature of the act (e.g., to understand the who, what, when, where, why or how of the sexual interaction) and/or is physically helpless. An individual is incapacitated, and therefore unable to give consent, if they are asleep, unconscious, or otherwise unaware that sexual activity is occurring.   The use of alcohol or other drugs does not, in and of itself, negate a person's ability to give consent, but a level of intoxication can be reached, short of losing consciousness, in which a person's judgment is so impaired that they become incapacitated and thus are not capable of giving consent.   The impact of alcohol and drugs varies from person to person, and evaluating incapacitation requires an assessment of how the consumption of alcohol and/or drugs impact an individual's:

  - decision-making ability;
  - awareness of consequences;
  - ability to make informed judgments; or
  - capacity to appreciate the nature and the quality of the act.

Because the use of alcohol and other drugs can have a cumulative effect over time, a person who may not have been incapacitated at the beginning of sexual activity may become

incapacitated and therefore unable to give effective consent as the sexual activity continues.

Evaluating incapacitation also requires an assessment of whether a Responding Party, or a sober, reasonable person in the Responding Party's position, knew or should have known, that the Reporting Party was incapacitated.  If the person who wants to engage in sexual activity is too intoxicated to judge another's communications about consent, that person has an obligation to cease the activity.  A person's responsibility for obtaining consent is not diminished by use of alcohol and/or other drugs. Being intoxicated or impaired by drugs or alcohol is never an excuse for sexual harassment, sexual violence, stalking or intimate partner violence and does not diminish one's responsibility to obtain consent.

## 3. RESOURCES AND SUPPORT

The College is committed to treating all members of the community with dignity, care and respect. Any student, staff or faculty member who experiences or is affected by sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, whether as a Reporting Party, a Responding Party, or a third party, will have equal access to support and counseling services through the College. Interim remedies are also available to all parties regardless of what course of action a Reporting Party chooses.

The College recognizes that deciding whether or not to report sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, either to the College or law enforcement, can be difficult.   All individuals are encouraged to seek the support of trained professionals on campus and in the local community, regardless of when or where the incident occurred.  These professionals can provide guidance in making decisions, information about available resources and procedural options, and assistance to any party in the event that a report and/or resolution under this policy is pursued.

As detailed online at https://www.oberlin.edu/equity-diversity-inclusion, there are Confidential Resources which by law cannot share information without the consent of the individual seeking assistance. There are also a variety of College resources that will be discreet and private, but are not considered confidential. These resources will maintain the privacy of

an individual's information within the limited circle of those involved in the resolution of a report under this policy.

# 4. Reporting

## Introduction

To report a violation of the Sexual Misconduct Policy, contact the Title IX Coordinator or other designated administrator below.  These administrators are specifically trained in the dynamics of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, and Oberlin College's Sexual Misconduct Policy.   A report can be made in person, by telephone, by email, or online using an intake form (available on the website of the Office of Equity Concerns).  A report can also be made anonymously.

Oberlin College encourages timely reporting of sexual misconduct.  Prompt reporting helps ensure the preservation of evidence and timely investigation.  The College does not, however, limit the time frame for reporting, and will respond to a report regardless of when or where the incident occurred.

When the College becomes aware of a report of sexual misconduct, it is committed to offering prompt, effective, and sensitive assistance to a Reporting Party (student or employee) and to protecting the community from harm.  The College recognizes its legal obligation to take immediate and effective steps in response to an allegation of sexual misconduct, including an initial Title IX assessment of the allegation, instituting interim measures to protect the Reporting Party, and, based on the outcome of informal or formal resolution, taking action to end any sexual misconduct, prevent its recurrence, and address its effects on the Reporting Party or any other member of the college community. The College is committed to providing a fair, equitable, and timely process to all parties.

The College strives to empower a Reporting Party by allowing as much personal control over various steps of the sexual misconduct response process as the circumstances of the reported misconduct and legal and policy requirements allow.  Choosing to make a report, and deciding how to proceed after making the report, can be a process that unfolds over time.  Oberlin College strongly encourages anyone who has experienced sexual misconduct to report it for their own protection and support as well as for the safety of the College

community.   At the time a report is made, a person does not have to decide whether or not to request any particular course of action, nor does a person need to know how to label what happened. The College provides support that can assist each individual in making these important decisions, and to the extent legally possible, will respect an individual's autonomy in deciding how to proceed. At all times, the College will balance respect for the stated preferences of the Reporting Party with its obligation to protect individual and campus safety.

Pursuing Oberlin College's process does not mean a Reporting Party waives the right to a criminal or other legal process and vice versa.  To the contrary, the College encourages a Reporting Party to explore all options, including resolving a report through both Oberlin's processes and external law enforcement.   Individuals who report a violation of the Oberlin College Sexual Misconduct policy will be informed about the process of reporting sexual misconduct to law enforcement.  The College will assist parties who are reporting sexual misconduct to make contact with community agencies that provide advocates to people who are seeking civil protection orders.  The College will honor any such order of protection or similar lawful order issued by a criminal or civil court. Participation in a College investigation or adjudication process does not supersede any rights or obligations of participating parties in any other legal processes.

On receiving a report, the Title IX Coordinator will reach out to the Reporting Party in order to provide a written explanation of the individual's rights and options and offer to meet with the person to further discuss these options.

## Emergency Reporting Options

In case of a safety or health emergency, the following resources can provide or connect you to emergency services:

- **Emergency Services**
  **911 (24 hours)**
- **Oberlin Police Department**
  (440) 774-1061
- **Safety and Security**
  (440) 775-8911 (24 hours)

Safety and Security will seek to honor any request for the gender of an officer who receives a report, staffing permitting.

- **Lorain County Rape Crisis/Nord Sexual Assault Care Unit**
  (800) 888-6161 (24 hours)

- **Genesis House**
  (440)244-1853
  or
  (440)323-3400
  Genesis House provides a comprehensive range of family-focused services for Lorain County Victims of Domestic Violence. Such services provide the tools to maximize their opportunity to survive, obtain physical and mental well-being and independence, and minimize the trauma involved in coping with family violence.

- **Lorain County Mental Health Crisis Hotline**
  (800) 888-6161 (24 hours)

## Campus Reporting Options

All of the following offices and individuals are prepared to receive reports of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence.  On weekends and after business hours on weekdays, Safety and Security is available to help members of the community access reporting options and support resources such as the Dean on Call.

Each of these administrators are Responsible Employees, which means that they are required to share the known details of the report with the Title IX Coordinator in order to connect the Reporting Party to information and support through the central review process.

- **Title IX Coordinator**
  Rebecca Mosely, Title IX Coordinator
  440-775-8555
  Available during weekday working hours to coordinate a fair and equitable response to reports of sexual misconduct.

- **Safety and Security**
  (440) 775 – 8911 (emergency); (440) 775-8444 (non-emergency)
  Available as a first option to report an incident of sexual. Also provides an escort service on campus to any student and can reach the on call staff at any time. Available 24 hours a day, 7 days a week.

- **Office of the Dean of Students**
  (440) 775-8462
  The Office of the Dean of Students is open during weekday working hours.

- **Human Resources**
  (440) 775-8430
  The Office of Human Resources is available during weekday working hours to provide assistance to employees on a range of issues.

## Anonymous Reporting Options

Any individual may make an anonymous report concerning an act of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence. An individual may report the incident without disclosing their name, identifying the Responding Party or requesting any action. Depending on the extent of information available about the incident or the individuals involved, however, the College's ability to respond to an anonymous report may be limited. Currently, an anonymous report can be made by submitting a written document through campus mail to the Rebecca Mosely, Title IX Coordinator, Carnegie 204.

The Title IX Coordinator will receive the anonymous report and will determine any appropriate steps, including individual or community remedies as appropriate, and in consultation with the Director of Safety and Security, compliance with all Clery Act  and Campus SaVE Act obligations.

## Off Campus Reporting Options

Conduct that may be criminal in nature can be reported to local law enforcement.

- **Oberlin Police Department**
  Non-emergency: 440-774-1601
  Emergency: 911

- **Lorain County Prosecutor**
  (440) 329-5389

Conduct that may implicate civil rights can be reported to external regulatory agencies.

- **Office for Civil Rights, Cleveland Office**
  **(216) 522 – 4970**
  OCR.Cleveland@ed.gov
  The OCR serves students and employees facing discrimination and promotes systemic solutions to civil rights problems. An important responsibility is resolving reports of harassment, discrimination and retaliation.

- **U.S. Equal Employment Opportunity Commission, Cleveland Field Office**
  (800) 669 – 4000
  The U.S. Equal Employment Opportunity Commission (EEOC) is responsible for enforcing federal laws that make it illegal to discriminate against a job applicant or an employee because of the person's race, color, religion, sex (including pregnancy), national origin, age   (40 or older), disability or genetic information.

## Reporting Considerations

**Timeliness and Location of Incidents**

Reporting Parties and third-party witnesses are encouraged to report sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, as soon as possible in order to maximize the College's ability to respond promptly and effectively.  Timely reporting enables the College to provide greater options for support, investigation and adjudication, especially as relates to crisis counseling, the preservation of evidence, and security and law enforcement responses.  The College does not, however, limit the time frame for reporting.

The College encourages reporting, regardless of when or where the incident occurred, and regardless of whether the Responding Party is a student or employee of Oberlin College.  In every report, the College will support the Reporting Party and provide information and assistance.  If the Responding Party is not a member of the Oberlin community, or is no longer a student or employee, the College will still seek to meet its Title IX obligations by taking steps to end the harassment, prevent its recurrence, and address its effects.  While the College's ability to take disciplinary action may be limited given the participants' current standing, the College will assist a Reporting Party in identifying any external reporting options, including law enforcement.

An incident does not have to occur on campus to be reported to the College.   Off-campus conduct is subject to this policy if the conduct occurred in the context of an education program or activity of the College or had continuing adverse effects on campus or in an off-campus education program or activity.

If an individual experiences sexual and/or gender harassment online, in a public space like a street, or in a private space like a house party and doesn't know who is responsible for the conduct, that person is still encouraged to report their experience to the Title IX Coordinator to ensure they are offered appropriate support.  These reports also enable the College to keep track of any patterns related to such events and thus identify effective interventions, such as increased lighting, online bystander training, or other education and prevention campaigns.

**Amnesty for Alcohol or Other Drug Use**
Oberlin College will most effectively be able to prevent, stop, and address the effects of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, when as many people who experience such conduct and those who witness it share what they know. To encourage reporting and honest participation in an investigation, an individual who reports sexual misconduct, either as a Reporting Party or a third-party witness, and an individual who is a Responding Party, will not be subject to disciplinary action by the College for their personal consumption of alcohol or drugs at or near the time of the incident, provided that any such violations did not and do not place the health or safety of any other person at risk. The College may, however, initiate an educational discussion or pursue other educational remedies regarding alcohol or other drugs.

**Coordination with Law Enforcement**

The College will inform a Reporting Party about the option to pursue criminal action for incidents of sexual misconduct that may also be crimes under Ohio law. If requested, the College will assist a Reporting Party in making a criminal report and cooperate with law enforcement agencies to the extent permitted by law.  Either party may also choose to seek professional legal advice if they are navigating both College and legal processes.

The College's policy, definitions and burden of proof may differ from Ohio criminal law.  In some respects, College policies offer greater protection than state law.  A Reporting Party may seek recourse under this policy and/or pursue criminal action. Neither law enforcement's determination whether or not to prosecute a Responding Party, nor the outcome of any criminal prosecution, are determinative of whether a violation of this policy has occurred. Proceedings under this policy may be carried out prior to, simultaneously with, or following civil or criminal proceedings off campus.

At the request of law enforcement, the College may agree to defer its Title IX fact gathering until after the evidence gathering stage of a criminal investigation. The College will nevertheless communicate with the Reporting Party regarding Title IX rights, procedural options and the implementation of interim measures to assure safety and well-being. The College will promptly resume its Title IX fact gathering as soon as it is informed that law enforcement has completed its initial investigation. The College may not, by federal law, wait to address reports of sexual misconduct until any external legal processes are resolved.

# 5. Interim Measures

## Overview

Upon receipt of a report of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, the College will impose reasonable and appropriate interim measures designed to protect the parties and the integrity of any investigation.  In imposing these measures, the College will make reasonable efforts to communicate with the parties to ensure that all safety, emotional and physical well-being concerns are being addressed.  Interim measures are available, as

appropriate, regardless of whether a Reporting Party seeks an investigation or formal resolution.

Interim measures, in of themselves, are not a resolution to a report.  They are temporary actions taken by the College to foster a more stable and safe environment during a period of ongoing exploration of options, investigation and/or adjudication. Interim measures are initiated based on information gathered during a report and are not intended to be permanent resolutions; hence, they may be amended or removed as additional information is gathered.

Interim measures may be requested by the parties or imposed by the College on its own initiative.  For example, a Reporting Party or a Responding Party may request a no contact notice or other protection, or the College may choose to impose interim measures at its discretion to ensure the safety of all parties, the broader College community and/or the integrity of the process.

All individuals are encouraged to report concerns about the failure of another individual to abide by any restrictions imposed by an interim measure. The College will take immediate and responsive action to enforce a previously implemented measure.  Failure of the parties to comply with interim measures may result in disciplinary action, even if the initial report of sexual misconduct is later not proven.

The College supports the right of students and employees to seek a protection order from a civil or criminal court.  The College honors any existing protection orders provided to Safety and Security by members of the College community.

## Range of Measures

Interim measures will be implemented at the discretion of the College.  Potential measures, which may be applied to the Reporting Party and/or the Responding Party, include:

- Access to counseling services and assistance in setting up an initial appointment, both on and off campus

- Providing medical services

- Imposition of a campus no contact order

- Imposition of a no trespass order

- Security assistance (examples might include security escorts, increased patrol; accompanying a student during an interview with OPD; transports to hospital or Nord, etc.)
- Transportation assistance
- Academic accommodations (with agreement of the appropriate faculty, who will not be informed of the specific reason for the request with permission of the student):
- Rescheduling of exams and assignments
- Providing alternative course completion options
- Change in class schedule or other academic accommodations, without penalty to the party
- Providing academic support services, such as tutoring
- Change in work schedule or job assignment
- Residence modifications:
- Change in on-campus housing
- Arranging to dissolve a housing contract and pro-rating a refund in accordance with campus housing policies
- Receive requests for assistance from College support staff in completing housing relocation
- Limit an individual or organization's access to certain College facilities or activities pending resolution of the matter
- Voluntary leave of absence
- Interim suspension or College-imposed leave
- Any other remedy that can be tailored to the involved individuals to achieve the goals of this policy.

## Interim Suspension or Leave

Where the report of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, poses a substantial and immediate threat of harm to the safety or well-being of an individual, members of the

campus community, or the performance of normal College functions, the College may place a student or student organization on interim suspension.  Employees may be placed on administrative leave or suspended depending on their employment classification.

Pending resolution of the report, the individual or organization may be denied access to campus, campus facilities and/or all other College activities or privileges for which the student or employee might otherwise be eligible, as the College determines appropriate. When interim suspension or leave is imposed, the College will make reasonable efforts to complete the investigation and resolution within an expedited time frame.

## 6. Title IX Review, Investigation, and Resolution

### Overview

Upon receipt of a report, the College's Title IX Team will conduct an initial Title IX assessment. The goal of this assessment is to provide an integrated and coordinated response to reports of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence.  The assessment will consider the nature of the report, the safety of the individual and of the campus community, and the Reporting Party's expressed preference for resolution in determining the appropriate course of action to eliminate the conduct at issue, prevent its recurrence and address its effects.

At the conclusion of the assessment, the Title IX Team may refer the report for informal resolution, which includes the identification of remedies to stop the sexual misconduct, address its effects, and prevent its recurrence.  Informal resolution does not involve disciplinary action against a Responding Party.  Alternatively, the Title IX Team may refer the matter for formal resolution.   Formal resolution begins with an investigation.  The goal of the investigation is to gather all relevant facts and determine if there is sufficient information to refer the report to an adjudication or grievance process in order to determine responsibility and impose disciplinary action if appropriate.

The initial steps for any resolution of a report of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, against a student, staff member, or faculty member will involve the same stages:

an initial assessment, investigation, and the determination to pursue either informal or formal resolution.  Informal resolution options are the same for reports against a student, staff or faculty member.  Similarly, the investigative process is the same for all three.  For formal resolution, the hearing procedures will differ somewhat based on who the responding party is in regards to the decision making individual or group, however the general procedures will remain the same.  The decision makers in each of these cases reflect the differing nature of each constituent's relationship to the College, but all contain similar hallmarks of prompt and equitable process.

The Title IX Coordinator will document each report or request for assistance in resolving a case involving charges of sexual misconduct, whether formal or informal, and will review and retain copies of all reports generated as a result of any investigation. These records will be kept confidential to the extent permitted by law.

## The Role of the Title IX Team

The Title IX Team, led by the Title IX Coordinator, assists in the review, investigation and resolution of reports.  At a minimum, this group includes the Title IX Coordinator, Title IX Deputy Coordinators, Share Coordinator and the Director of Safety and Security and/or designee.  Depending on the roles of the parties involved in a report, a designee from the appropriate divisional dean (Dean of Students, Dean of the College or Dean of the Conservatory) or the Manager of Employee and Labor Relations may join the group.  In all cases, the Title IX Team will be limited to a small number of individuals who need to be informed in order to provide effective and equitable review and timely resolution of reports while protecting the privacy of parties as fully as possible.  Regular members of the Title IX Team receive annual training in strategies to protect parties who experience sexual misconduct or other forms of sex- and/or gender-related harassment and discrimination and to promote individual and institutional accountability.

Although a report may be made to any Responsible Employee, all reports received by Responsible Employees will be referred to the Title IX Coordinator to ensure consistent application of the policy to all individuals and to allow the College to respond promptly and equitably to eliminate the sexual misconduct, prevent its recurrence, and address its effects.  The Title IX Team helps to meet these goals by overseeing the resolution of all reports under this policy. The Title IX Team will also ensure that all students and employees, whether Reporting Parties or Responding Parties, have appropriate guidance

throughout the investigation and resolution of the report.  The Title IX Team also reviews and implements interim remedies to provide protection and security while a resolution is being reached.

## Advisors, Support Persons and Attorneys

All parties are entitled to advice and support during the process.  In addition, the parties may consult the Title IX Coordinator, who does not participate directly in formal resolution. Attorneys may not participate in the proceedings outside of the role of advisor as described below.

### Advisor

In any hearing, the Reporting Party and Responding Party may choose to be assisted by an advisor of their choice. The parties may select their own advisor, or may select an advisor from a list of campus community members who have undergone Title IX training to guide a party through the pre-hearing and hearing process.  An outside advisor will be required to meet with the Hearing Coordinator or the Title IX Coordinator in advance of any participation in the proceedings to be informed about College expectations regarding confidentiality of the process.  The advisor may accompany the party to any College investigative, administrative meeting, or hearing. The advisor may not speak on the behalf of their advisee.  All communication regarding the process must come from the advisee to the college other than general questions regarding how the process and/or policy works. The advisor may not address the panel during the hearing, or otherwise delay, disrupt, or interfere with any meeting or proceeding.  Attorneys serving as advisors must adhere to the expectations of the role as described in this policy.

### Support Person

A Reporting Party and Responding Party may also choose to be assisted by an emotional support person of their choice.  To serve as a support person, the individual will be required to meet with the Hearing Coordinator or the Title IX Coordinator in advance of any participation in the proceedings to be informed about College expectations regarding confidentiality of the process.

The support person cannot be a witness in the proceedings. The support person is a silent and non-participating presence who is there solely to observe and provide moral support during the hearing itself. This person is not to address the Hearing Panel, except to ask for a

short recess if one of the parties requires some time to compose themself or collect their thoughts. The support person may not delay, disrupt, or interfere with any meeting or proceeding.  The Hearing Coordinator has the right at all times to determine what constitutes appropriate behavior on the part of a support person and whether the person may remain at the proceedings. While the support person may be present to hear testimony, no written materials are to be shared with support persons.

Absent extenuating circumstances, witnesses and others involved in an investigation or hearing are not entitled to have a support person present.

### Role of the Attorney/Outside Agreements

The College prohibits outside attorneys, or family members acting as attorneys, from participating in proceedings under this policy in any manner other than the role of advisor outlined above.  As noted, parties have a right to an advisor of their choice, and may choose an attorney to fill this role at their own expense.  The College will not recognize or enforce agreements between the parties outside of these procedures.

## Initial Title IX Assessment

In every report of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, the College will make an immediate assessment of any risk of harm to individuals or to the campus community and will take steps necessary to address those risks. These steps may include interim protective measures to provide for the safety of the individual and the campus community.

The initial review will proceed to the point where a reasonable assessment of the safety of the individual and of the campus community can be made. Thereafter, an investigation may be initiated depending on a variety of factors, such as the Reporting Party's wish to pursue formal or informal resolution, the risk posed to any individual or the campus community, and the nature of the allegation.

The first step of the assessment will usually be a preliminary meeting between the Reporting Party and the Title IX Coordinator or a member of the Title IX Team. The purpose of the preliminary meeting is to gain a basic understanding of the nature and circumstances of the report; it is not intended to be a full scale interview.  At this meeting,

the Reporting Party will be provided with information about support and advocacy resources, interim remedies and options for resolution.

At the conclusion of the Title IX assessment, the Title IX Team will determine the appropriate manner of resolution and, if appropriate, refer the report either for informal resolution or for further investigation and, if the appropriate threshold is met, formal resolution.

The determination as to how to proceed will be communicated to the Reporting Party in writing. Depending on the circumstances and requested resolution, the Responding Party may or may not be notified of the report or resolution.  A Responding Party will always be notified when the College seeks action that would directly impact a Responding Party, such as protective measures that restrict their movement on campus, the initiation of an investigation, or the decision to involve the Responding Party in informal resolution. If the Title IX Team recommends formal resolution, an Investigator will be assigned to facilitate the formal resolution process.  The Investigator will be trained in campus policy and the dynamics of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence.  The Investigator in collaboration with the Title IX Coordinator or designee will have the responsibility to ensure that procedures are timely and impartial and that all parties are informed appropriately at each step of the process.

## Informal Resolution

Informal resolution eliminates a potential hostile environment by identifying and implementing remedies to stop sexual misconduct, address its effects, and prevent its recurrence.  Because it does not involve a formal adjudication process, it does not result in disciplinary action against the Responding Party.

Where the Title IX assessment concludes that informal resolution may be appropriate, the College will take immediate and corrective action through individual and community remedies designed to maximize the Reporting Party's access to all employment, educational, and extracurricular opportunities and benefits at the College and to eliminate a potential hostile environment.

In addition to the range of interim measures previously described, the College may also:

- Provide targeted and/or broad-based training and educational programming for relevant individuals and groups;

- Provide increased monitoring, supervision or security at locations or activities where the misconduct occurred;

- Facilitate a meeting with the Responding Party with the agreement of both parties, with both parties present or through indirect action by the Title IX Coordinator; and,

- Any other remedy that can be tailored to the involved individuals to achieve the goals of this policy.

The College will not compel a Reporting Party to engage in mediation, to directly confront the Responding Party, or to participate in any particular form of informal resolution. Mediation or restorative justice practices may not be appropriate forms of resolution in all cases, and will only be used when both the college and the parties mutually agree that these processes are appropriate ways to resolve the report.  Depending on the form of informal resolution used, it may be possible to maintain anonymity of Reporting Parties and witnesses.

The decision to pursue informal resolution will be made when the College has sufficient information about the nature and scope of the conduct, which may occur at any time. Participation in informal resolution is voluntary for all parties, and a Reporting Party can request to end informal resolution at any time.  At that time, the report may be referred for formal resolution.  Factors that will shape the Title IX Team's recommendation will include the nature of the report, the Reporting Party's stated preference, and relevant evidence about patterns of conduct.

The Title IX Coordinator will maintain records of all reports and conduct referred for informal resolution. Informal resolution will typically be initiated within 30 business days of the initial report.

## Investigation

Based on the findings of the initial Title IX assessment, the College may initiate a prompt, thorough and impartial investigation. The Title IX Coordinator, in consultation with the Title IX Team, will oversee the investigation.  Information gathered during the investigation will be used to evaluate the appropriate course of action, provide for the safety of the individual and the campus community, and offer remedies as necessary to address the effects of the conduct cited in the report.  An investigation is also required if the Title IX Team believes that disciplinary action may be appropriate.

The investigation is designed to provide a fair and reliable gathering of the facts. All individuals involved in the investigation, including the Reporting Party, the Responding Party, and any third-party witnesses, will be treated with appropriate sensitivity and respect.  Throughout the investigation and resolution processes, both parties will receive timely notice of any meeting at which their attendance may be requested or required. Consistent with the need for a full assessment of the facts, the investigation will safeguard the privacy of the individuals involved.  Parties with documented disabilities have the right to request accommodations necessary to be able to fully participate in the investigation and resolution of reports.

The College will designate an investigator who has specific training and experience investigating allegations of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence.  The investigator may be an employee of the College or an external investigator engaged to assist the College in its fact gathering. Any investigator chosen to conduct the investigation must be impartial and free of any conflict of interest.

The investigator will gather information from the Reporting Party, the Responding Party, and any other individuals who may have information relevant to the determination. The investigator will also gather any available physical evidence, including documents, communications between the parties, and other electronic records as appropriate. The investigator may consider prior allegations of, or findings of responsibility for, similar conduct by the Responding Party. The Reporting Party and Responding Party will have an equal opportunity to be heard, to submit evidence, and to identify witnesses who may have relevant information.

The investigation will be completed expeditiously, usually within 30 business days, although the complexity of a report may require a longer time frame.  The time frame may be extended for good cause to ensure the integrity and completeness of the investigation, to accommodate the availability of witnesses, to address College breaks or vacations, or other legitimate reasons.  Any extension of the timeframes, and the reason for the extension, will be shared with the parties in writing.

Threshold Determinations and Request for Review from Insufficient Threshold
At the conclusion of the investigation, the investigator will prepare a written report synthesizing the facts for review by the Title IX Coordinator and a Hearing Coordinator. The investigator is not charged with reaching a determination as to responsibility, which is a function reserved for the Conduct Conference or the Hearing Panel/Administrator.

Upon receipt of the investigative report, the Hearing Coordinator, in consultation with the Title IX Coordinator, and as appropriate, the Title IX Team, will review the report and make a threshold determination as to whether there is sufficient factual information upon which a Hearing Administrator or Body could find a violation of this policy.   This threshold determination does not involve making a determination of responsibility, nor does it involve assessing the credibility of the parties.  If the threshold has been established, the Hearing Coordinator will issue a notification letter to the Responding Party and the Reporting Party and refer the report for the appropriate resolution procedures.
If the Hearing Coordinator, in consultation with the Title IX Coordinator, determines that this threshold has not been reached (that is, that there is not sufficient evidence which could support a policy violation), the Reporting Party and Responding Party will be notified in writing. The Reporting Party will have the opportunity to seek review by the appropriate divisional head or the Manager of Employee and Labor Relations (or their designee) by submitting a written request for review within 5 business days of receipt of the notification.  Where a designee is chosen, the identity of this individual will be shared with both parties.

If a request for review is filed, the Responding Party will be notified and have the opportunity to respond within 5 business days. The divisional head or the Manager of Employee and Labor Relations (or their designee) may affirm the threshold finding, reverse the finding or remand the matter for additional investigation as warranted. The divisional head or the Manager of Employee and Labor Relations (or their designee) will render a

decision in writing, to both parties, within 10 business days of receipt of the request for review and the response to such request. The decision of the divisional dean or the Manager of Employee and Labor Relations (or their designee) affirming the threshold finding that there is insufficient information to proceed is final.

The Title IX Team always has the discretion to determine if additional measures are necessary to achieve resolution or provide support for the parties. In a report where the investigation does not move forward to formal resolution, informal resolution may be an appropriate course of action.

## Formal Resolution

Disciplinary action against a Responding Party may only be taken through Formal Resolution procedures. Because the relationship of students, staff, and faculty to the College differ in nature, the individual(s) who will conduct the hearing process will also differ. Each of the procedures, however, is guided by the same principles of fundamental fairness and respect for all parties, which require notice, an equitable opportunity to be heard, and an equitable opportunity to respond to a report under this policy.

The specific procedures for Formal Resolution will vary based upon the role of the Responding Party:

- For a **report against a student**, disciplinary action may be taken by the Dean of Students or designee if the student accepts responsibility for the conduct, or after a Formal investigation when a hearing panel comprised of three trained staff members reaches a finding of responsibility and recommends appropriate sanctions.

- For a **report against a staff member**, disciplinary action may be taken at the conclusion of the review by the appropriate divisional head or their designee or Manager of Employee and Labor Relations, in consultation with the Title IX Coordinator.

- For a **report against a faculty member**, disciplinary action may be taken at the conclusion of a review by a panel composed of members of the General Faculty Professional Conduct Review Committee. The panel will recommend sanctions to

the appropriate academic dean or designee if the investigation results in a finding of responsibility.

**Time Frame for Resolution**

The College seeks to resolve all reports within 60 business days of the initial report. All time frames expressed in this policy are meant to be guidelines rather than rigid requirements. Extenuating circumstances may arise that require the extension of time frames, including extension beyond 60 business days. Extenuating circumstances may include the complexity and scope of the allegations, the number of witnesses involved, the availability of the parties or witnesses, the effect of a concurrent criminal investigation, any intervening school break or vacation, or other unforeseen circumstances.

In the event that the investigation and resolution exceed this time frame, the College will notify all parties of the reason(s) for the delay and the expected adjustment in time frames. Best efforts will be made to complete the process in a timely manner by balancing principles of thoroughness and fundamental fairness with promptness.

**The College as Reporting Party**

On some occasions, Oberlin College will assume the function of the Reporting Party.  This approach may be taken in instances of multiple reports about a single Responding Party, when a Reporting Party chooses not to participate in the hearing process, or other occasions when the College has sufficient evidence to reach a threshold determination that a report should be referred to formal resolution.  In these instances, the Title IX Coordinator will appoint an administrator as the institutional representative to serve as the Reporting Party.

## Support for Parties after Formal Resolution

The Title IX Coordinator is available to provide support and to identify campus and external resources to assist all parties and witnesses once a resolution has been reached. The goal of such support is to address any personal needs and to facilitate the participation of all individuals in the campus community in whatever ways are appropriate given any sanctions that may have been imposed.

# 7.  Procedures for Formal Resolution of Reports

## Overview

Formal resolution of a report under the Sexual Misconduct Policy will occur either through an investigation resulting in a finding about responsibility as described previously.  If a violation of the policy is found, sanctioning will be completed as previously described.

If resolution involves a Conduct Conference (for students only), the Hearing Coordinator will meet with the Reporting Party and Responding Party to determine responsibility and render a decision as to what sanctions, if applicable, should be implemented.  If resolution involves a Hearing Panel, the Hearing Coordinator will be responsible for facilitating the formal resolution process, including the appointment of the appropriate hearing bodies/administrator to conduct the hearing.  These appointments will take into account the need for a timely process and any conflicts of interest.  In addition, when hearing panels are utilized, the hearing coordinator will make an attempt to ensure that the panel represents a diverse set of campus and professional expertise.

Any parties who conduct investigations, make sanctioning determinations, or hear appeals must participate in annual training on non-discrimination; the dynamics of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence; the factors relevant to a determination of credibility; the appropriate manner in which to receive and evaluate sensitive information; the manner of deliberation; evaluation of consent and incapacitation; the application of the preponderance of the evidence standard; sanctioning and the College's policies and procedures. The training will be coordinated by the Title IX Coordinator in conjunction with campus and external partners.

The investigators, appeals officers, and sanctioning officers are supported by the Hearing Coordinator and Title IX Coordinator, who are present at Hearing Panel meetings, but are not voting members of the hearing body.  The Hearing Coordinator and Title IX Coordinator will meet with all involved parties prior to the hearing, be present during the hearing to serve as a resource for the Hearing Panel and the parties on issues of policy and procedure, and to ensure that policy and procedure are appropriately followed throughout the hearing.

In most cases, it should be possible to convene a Hearing Panel; however if the hearing must be heard at or after the end of the semester or academic year or during Winter Term and/or a full Hearing Panel cannot reasonably be convened, those cases may be heard by the Dean of Students (or designee) or the College may substitute an alternate method of adjudication at its discretion.

## Conduct Conference

A Reporting Party or Responding Party may request resolution through an administrative Conduct Conference, in which the Hearing Coordinator will meet with the Reporting Party and Responding Party to determine responsibility and, if applicable, render a decision as to what sanctions should be implemented. Both parties and the Hearing Coordinator must agree that the matter is appropriate for resolution by a Conduct Conference. Depending upon the nature and severity of the allegations, the Hearing Coordinator may decline to handle the matter administratively and refer the case to a Hearing Panel.

A Conduct Conference is appropriate when the Responding Party is a student, has admitted to the misconduct, and there is no discernible dispute in the relevant facts of the investigation report.

All parties must have notice, the opportunity to review the investigative report in advance, and the opportunity to present any additional relevant information to the Hearing Coordinator prior to conducting a Conduct Conference. Based on the outcome of the Conduct Conference, the Hearing Coordinator will issue an appropriate sanction.  The Hearing Coordinator may also recommend remedies for the Reporting Party and remedies for the Oberlin community.  On the conclusion of the Conduct Conference, the Title IX Coordinator is responsible for reviewing, adjusting, and implementing these remedies in order to eliminate the hostile environment and prevent its recurrence.

Both a Reporting Party and Responding Party may appeal the determination of the Hearing Coordinator as provided in the Appeal section below.

## Pre-Hearing Procedures

The pre-hearing process, described below, is crucial to ensuring a fair and equitable process.  The Hearing Coordinator is responsible for managing the pre-hearing process.  The timelines described below are designed to ensure that the parties have adequate notice to review information and submit related requests to the Hearing Coordinator, as well as to allow the Hearing Coordinator sufficient notice to arrange witnesses or address related concerns.  In consultation with the Title IX Coordinator, the Hearing Coordinator may make appropriate adjustments to the timeframes provided to achieve these goals as well as ensure a timely and equitable process.  The Hearing Coordinator will have the authority to designate reasonable time frames with respect to the notice provisions regarding witnesses, prior sexual history and/or pattern evidence.

### 1. Notice of Charges

Following the threshold determination that there is sufficient information to move forward with a hearing, the Hearing Coordinator will send a Notification Letter to both the Reporting Party and the Responding Party. The Notification Letter provides each party with a brief summary of the conduct at issue and the specific policy violation(s) that are alleged to have taken place.

### 2. Acceptance of Responsibility

If a Responding Party wishes to accept responsibility for the charges, they may request an administrative conference with the Hearing Coordinator.  In this instance, the Responding Party will provide a written acceptance of the facts of the allegation.  The Hearing Coordinator will then convene a Hearing Panel/Administrator (referred to as the Hearing Body from here forward).  The Hearing Body's role will be solely to determine appropriate sanctions.  The investigative report will serve as the primary evidence in making this determination.  The Reporting Party, the Responding Party, and the Hearing Body retain the right to call witnesses in order to assess sanctions and will follow the time frames and procedures described in this description of pre-hearing procedures.

### 3. Pre-Hearing Meeting with Reporting Party and Responding Party

Following the Notification Letter, the Hearing Coordinator will contact the Reporting Party and Responding Party to schedule separate meetings with each party. At this pre-hearing meeting, each party will receive an explanation of the hearing process and have the

opportunity to ask any questions. The Advisor is encouraged to accompany the Reporting Party or Responding Party to this initial meeting.

### 4. Notice of Hearing

Once each party has met with the Hearing Coordinator, a Notice of Hearing is sent to the Reporting Party and the Responding Party. The Notice provides the parties with the date, time, and place of the hearing, as well as the names of the individual panelists on the Hearing Panel or the Hearing Administrator.   In general, the hearing will be scheduled within 10 business days of the date of the Notice of Hearing. This time frame may be extended for good cause, with written notice to the parties of the extension and the reason for the extension.

### 5.  Composition of the Hearing Panel

The Reporting Party and the Responding Party may each submit a written request to the Hearing Coordinator that a member of the Hearing Panel be removed. The request must clearly state the grounds to support a claim of bias, conflict of interest or an inability to be fair and impartial. This challenge must be raised within 2 business days of receipt of the Notice of Hearing.  Panels for the student process will be chosen based on availability of the panelists and will attempt to include members who embody a diverse set of perspectives and identities.  Panels for processes involving the Professional Conduct Review Committee will be selected semi-randomly.  In general the Hearing Coordinator will attempt to make a faculty panel that includes at least one faculty member from the Conservatory and one from the College of Arts and Sciences.  ). If there are insufficient eligible members of the General Faculty Professional Conduct Review Committee available, the Hearing Coordinator and Title IX Coordinator will identify appropriately trained faculty alternates to serve on the review panel. The Hearing Coordinator will attempt to make sure that there is gender diversity on all panels.

### 6.  Pre-Hearing Review of Documents.

Both parties will be afforded similar and timely access to any documents and information used at a hearing.  The Reporting Party and the Responding Party will each have the opportunity to review all investigative documents, subject to the privacy limitations imposed by state and federal law, at least 10 business days prior to the hearing. The investigative documents will include the investigation report, any witness statements or interviews, statements from or interviews with both parties, and any other documentary information that will be presented to the Hearing Panel.  Review of these documents will

take place at a secure and private location on campus, with access facilitated by the Hearing Coordinator or Safety and Security.

The Hearing Panel must review all pertinent information regarding the incident in question prior to the date of the Hearing Panel.

Information and/or witnesses not provided as part of the investigation may not be introduced at the Hearing Panel without permission of the Hearing Coordinator.

## 7. Relevance

The Hearing Coordinator will review the investigative report, any witness statements and any other documentary evidence to determine whether the proffered information contained therein is relevant and material to the determination of responsibility given the nature of the allegation. In general, the Hearing Coordinator may redact information that is irrelevant, more prejudicial than probative, or immaterial. The Hearing Coordinator may also redact statements of personal opinion, rather than direct observations or reasonable inferences from the facts, and statements as to general reputation for any character trait, including honesty.

## 8. Witnesses

The Reporting Party, Responding Party, and the Hearing Panel all have the right to present witnesses.  Witnesses must have observed the conduct in question or have information relevant to the incident and cannot be called solely to speak about an individual's character.  In general, neither party will be permitted to call as a witness anyone who was not interviewed by the investigator as part of the College's investigation. If either party wishes to call witnesses, whether or not they were previously interviewed as part of the College's investigation, the following must be submitted to the Hearing Coordinator via e-mail or in hardcopy format:

- The names of any witnesses that either party intends to call;

- A written statement and/or description of what each witness observed, if not already provided during investigation;

- A summary of why the witness' presence is relevant to making a decision about responsibility at the hearing; and,

- The reason why the witness was not interviewed by the investigator, if applicable.

The Hearing Coordinator will determine if any proffered witness has relevant information and if there is sufficient justification for permitting a witness who was not interviewed by the investigator. The Hearing Coordinator may also require the investigator to interview the newly proffered witness.

If witnesses are approved to be present, the Reporting Party and the Responding Party are provided with a list of witnesses and any relevant documents related to their appearance at the hearing in advance of the hearing date, with the understanding that the Reporting Party and Responding Party will have the opportunity to submit additional witness information to the Hearing Coordinator in advance of the hearing date after reviewing any additional investigative documents.

### 9. Prior Sexual History and/or Pattern Evidence

Prior Sexual History of a Reporting Party: In general, a Reporting Party's prior sexual history, character or reputation is not relevant and will not be admitted as evidence at a hearing. Where there is a current or ongoing relationship between the Reporting Party and the Responding Party, and the Responding Party alleges consent, the prior sexual history between the parties may be relevant to assess the manner and nature of communications between the parties. As noted in other sections of this policy, however, the mere fact of a current or previous dating or sexual relationship, by itself, is not sufficient to constitute consent. Any prior sexual history of the Reporting Party with other individuals is not relevant and will not be permitted. In addition, prior sexual history may be considered under very limited circumstances to explain injury or demonstrate motive or intent.

Pattern Evidence by a Responding Party: Where there is evidence of a pattern of conduct similar in nature by the Responding Party, either prior to or subsequent to the conduct in question, regardless of whether there has been a finding of responsibility, this information may be deemed relevant and probative to the panel's determination of responsibility and/or assigning of a sanction in cases where the pattern of behavior itself is what would cause the violation (i.e. in cases where one needs to prove persistent or pervasive behavior). In all other cases, behavior that would create a stand-alone violation of policy may only be used in the sanctioning phase of a hearing if the responding party was previously found responsible for violating college policy. The determination of relevance will be based on an assessment of whether the previous incident was substantially similar to the conduct cited in the report and indicates a pattern of behavior and substantial

conformity with that pattern by the Responding Party.  Pattern evidence may also be relevant to prove intent, state of mind, absence of mistake or identity.  Where there is a prior finding of responsibility for a similar act of sexual misconduct, the finding may not be considered in making a determination as to responsibility but will be considered in the assigning of a sanction.

The Hearing Coordinator, in consultation with the Title IX Coordinator, may choose to introduce this information, with appropriate notice to the parties.  Alternatively, a party may request in writing that information under this section be admitted. A request to admit such information must be submitted to the Hearing Coordinator. The Hearing Coordinator, in consultation with the Title IX Coordinator, will assess the relevance of this information and determine if it is appropriate for inclusion at the hearing.

To aid in an advance determination of relevance of prior sexual history and/or pattern evidence, the following must be submitted before the hearing to the Hearing Coordinator via e-mail or in hardcopy format:

- A written statement and/or description of the proposed information, if not already provided during investigation; and

- A summary of why this information is relevant to making a decision of responsibility at the hearing.

If this information is approved as appropriate for presentation at the hearing, the Reporting Party and Responding Party will be provided with a brief description of the approved information before the hearing.

## 10. Request to Reschedule Hearing

Either party can request to have a hearing rescheduled. Absent extenuating circumstances, requests to reschedule must be submitted to the Hearing Coordinator with an explanation for the request at least 3 business days prior to the hearing.  The Hearing Coordinator in consultation with the Title IX Coordinator will review the request and determine whether a delay in the hearing is warranted, and will notify all parties of their decision.

## 11. Consolidation of Hearings

At the discretion of the Hearing Coordinator, in consultation with the Title IX Coordinator, multiple reports may be consolidated against a Responding Party in one hearing, if the

evidence related to each incident would be relevant and probative in reaching a determination on the other incident. Matters may be consolidated where they involve multiple Reporting Parties, multiple Responding Parties, or related conduct that would regularly have been heard under the Code of Student Conduct.

## Hearing Procedures

The Hearing Coordinator is responsible for the administration of all procedures related to the panel hearing.

### 1. Attendance at Hearing

If a party does not attend a hearing for any non-emergency or non-compelling reason, the hearing may be held in their absence at the discretion of the Hearing Coordinator.  The College will not require a Reporting Party to participate in or attend a hearing, although the College's ability to present evidence may be limited in the instance that a Reporting Party chooses not to participate in the hearing.

If a Responding Party who is a student withdraws from the College prior to the conclusion of an investigation or formal resolution under this policy, the Responding Party's academic transcript will be marked Withdrawal Pending Disciplinary Action. If a Responding Party who is a student chooses not to participate, the College will move forward with the resolution of the report and imposition of sanction, if any, in absentia.  If the report is finally resolved while the Responding Party is absent, the Responding Party's academic transcript will be marked with the final outcome in accordance with regular practice under this policy.

A Reporting Party or Responding Party may also request alternative testimony options that would not require physical proximity to the other party.  Options include placing a privacy screen in the hearing room or allowing the Reporting Party or Responding Party to speak outside the physical presence of the other by using appropriate technology to facilitate participation. The Hearing Coordinator must review any proposed alternative in advance of the hearing to ensure that it is consistent with the goals of a fair and equitable process. While these options are intended to help make the Reporting Party or Responding Party more comfortable, they are not intended to work to the disadvantage of the other party.

Thus, when one party requests alternative testimony options, the other party may participate in a similar manner.

## 2. Participants in Hearing Procedures

The Hearing Panel is a closed hearing and is not open to the public. The individuals who may appear before the Hearing Panel are: the Reporting Party; the Responding Party; any individuals serving as an approved advisor or support person; any individuals appearing as witnesses; and any relevant administrators necessary to facilitate the hearing.

## 3. Safeguarding of Privacy

All parties involved in a hearing are required to keep the information learned in preparation for the hearing and at the hearing private. No copies of documents provided are to be made or shared with any third parties. All copies provided must be returned to the College at the conclusion of the hearing and any appeals. Any breach of this duty is subject to further disciplinary action by the College.  The College expectation of privacy during the hearing process should not be understood to limit any legal rights of the parties during or after resolution.  The College may not, by federal law, prohibit the Reporting Party from disclosing the final outcome of a formal process (after any appeals are concluded).  All other conditions for disclosure of hearing records and outcomes are governed by FERPA and any other applicable privacy laws.

## 4. Hearing Panel Protocol

The hearing is intended to provide a fair and ample opportunity for each party to present relevant information and witnesses.  The Hearing Body will make factual findings, determine whether College policy was violated, and recommend appropriate sanctions and remedies. The hearing is not comparable to a criminal trial; it is not designed to be adversarial in nature.  The Hearing Body is the mechanism by which the College assesses whether College policy has been violated, and as appropriate, takes formal disciplinary action regarding a violation of College policy.

The Hearing Panel will choose one member of the panel to serve as chair, and in cases where there is a single Hearing Administrator that person will fill this role.  A hearing will be called to order by the chair. The chair will explain the hearing process and will provide an opportunity to all parties to ask procedural questions prior to initial statements and the presentation of information.

The investigator will provide a brief statement summarizing the investigation. The statement should focus on the areas of agreement and disagreement in order to assist the Hearing Body in prioritizing areas of inquiry. The Hearing Body, Reporting Party, or Responding Party may make brief inquiries of the investigator at this juncture, as there will be additional opportunity to ask questions of the investigator after the Hearing Body has heard from the Reporting Party, the Responding Party, and any witnesses.

The Reporting Party has the option to supplement the information provided to the Body with a brief statement. This is not intended to be a retelling of the event. The Hearing Body may pose questions to the Reporting Party, including questions submitted in writing to the Hearing Body by the Responding Party. The Responding Party will not be permitted to question the Reporting Party directly. In the event that the College serves as the Reporting Party, the designated institutional representative will have the same opportunity to make a statement.

After the Reporting Party is finished, the Responding Party has the option to make a brief statement. The Hearing Body may pose questions to the Responding Party, including questions submitted in writing to the Hearing Body by the Reporting Party. The Reporting Party will not be permitted to question the Responding Party directly.

The Body may hear from witnesses on behalf of the Reporting Party and the Responding Party. Each witness will be questioned by the Hearing Body, and, as appropriate, the Reporting Party and the Responding Party may submit questions in writing to be asked by the panel.

The Hearing Body, the Reporting Party, and Responding Party may then question the investigator. The investigator is not permitted to offer an opinion on the credibility of any individual or as to the ultimate issue.

At the conclusion of the presentation of all witnesses, the Reporting Party and Responding Party will have the option to address briefly any outstanding issues of fact.

## 5. Questioning of Witnesses

It is the responsibility of the Hearing Body to assure that the information necessary to make an informed decision is presented. The Body members may play an active role in

questioning both parties and witnesses involved in the case.  At times, the Body members may need to ask difficult or sensitive questions in order to understand areas of factual dispute or gain a full understanding of the context.

The Reporting and Responding parties are encouraged to prepare a written list of questions in advance. The parties may also submit questions in writing to the chair throughout the course of the hearing. The chair, in consultation with the Body, will determine the appropriateness and relevance of the questions.

Parties and other individuals who offer information at a hearing are expected to respond honestly, and to the best of their knowledge. The Hearing Body reserves the right to recall any party or witness for further questions and to seek additional information necessary to make a decision.

## 6. Deliberation

After all of the information has been presented, all parties will be dismissed and the hearing will be formally concluded.

The Hearing Body will conduct their deliberations in private. The Body must complete their deliberations within 2 business days. The Hearing Coordinator and Title IX Coordinator can remain for deliberations, but cannot participate in the deliberations or vote.

The Hearing Body will determine a Responding Party's responsibility by a preponderance of the evidence. Under this standard, individuals are presumed not to have engaged in the conduct reported unless a preponderance of the evidence supports a finding that sexual misconduct occurred.  This means that the Hearing Body will decide whether it is "more likely than not," based upon all of the relevant information, that the Responding Party is responsible for the alleged violation. The Hearing Body must reach a decision on responsibility by majority vote. The votes of individual Body members will not be shared with the parties.

If the Body finds the Responding Party responsible, the Body will then recommend appropriate sanctions to the Hearing Coordinator. The Hearing Coordinator, in consultation with the Title IX Coordinator, will review the recommendations for fairness and consistency and the designated administrator will impose an appropriate sanction.

The findings of the Hearing Body will be documented in writing by the Hearing Body chair. The findings will detail the findings of fact and the basis/rationale for the decision of the Hearing Body, making reference to the evidence that led to the finding.  This report will be submitted by the Hearing Body chair to the Hearing Coordinator at the time of the decision.

## Sanctions

A Hearing Body that finds a Responding Party responsible for a violation of this policy will recommend appropriate sanctions that may include, but are not limited to, those set forth below.  Sanctions may be issued individually, or a combination of sanctions may be imposed.  The Reporting Party and Responding Party will each have the opportunity to present a written statement about impact and/or request sanctions to the Hearing Coordinator in advance of the hearing. The Hearing Body will review these statements only if the Responding Party has been found responsible for one or more violation.

In general:
- Any person who is determined to have committed non-consensual sexual intercourse may receive a sanction ranging from suspension to expulsion/termination.  As a general expectation, suspensions should last at least until the Reporting Party has graduated (or otherwise separated) from the College.

- Any person who is determined to have committed non-consensual sexual contact or any other prohibited form of conduct may receive a sanction ranging from a warning to expulsion/termination.

The Hearing Body may deviate from the range of recommended sanctions, based upon a full consideration of the following factors:

- the impact of the conduct on the Reporting Party;

- the impact of the conduct on the community, its members, or College property;

- the nature and violence of the conduct at issue;

- prior misconduct by the Responding Party, including the Responding Party's prior discipline or criminal history, both at the College or elsewhere, if known

- whether the Responding Party has accepted responsibility for their actions;
- how the College has sanctioned similar incidents in the past, based upon information about such similar incidents that the Hearing Coordinator will provide upon request;
- maintenance of a safe and respectful environment conducive to learning;
- protection of the College community; and,
- any other mitigating, aggravating or compelling circumstances in order to reach a just and appropriate resolution in each case.

The Hearing Body may also consider educational strategies that, taking into account the impact on the Reporting Party and the safety of the community as a whole, allows a Responding Party to learn about the origins of their behavior, their responsibility for this behavior, and how they can change this behavior.  Such strategies may be suggested in addition to, but not in place of, the recommended sanctions.

The Hearing Body will make a recommendation about the appropriate sanction.  The Hearing Coordinator and Title IX Coordinator will review the Body's recommendations and take reasonable steps to foster consistency for similar violations and circumstances.   The Hearing Coordinator or Designated Administrator will then affirm or modify the recommended sanction.

Sanctions that may be imposed under this policy include, but are not limited to, the following:

- **Warning:** Notice, in writing, that continuation or repetition of prohibited conduct may be cause for additional disciplinary action.
- **Disciplinary Probation:** A written reprimand for violating College policy. This status specifies a period of time during which the party's or organization's good standing with the College may be in jeopardy. The party is officially warned that continuation or repetition of prohibited conduct during this period may be cause for additional conduct action including probation, suspension, or expulsion from the College.

- **Training:** A requirement that the Responding Party receive specific training within a designated time period and at their own expense to prevent further misconduct or discrimination or harassment. Failure to submit documentation of completion of the training within the specified time period may lead to further disciplinary action.

- **Limits on Participation:** Exclusion from participation in privileged activities for a specified period of time. For students, privileged activities may include, but are not limited to, elected or appointed student offices, student research, athletics, some student employment, and study abroad. Additional restrictions or conditions may also be imposed. Violations of the terms of disciplinary probation or any other College policy violations may result in further disciplinary action.

- **Restitution:** Repayment to an affected party, including the College, for damages resulting from a violation of this policy. To enforce this sanction, the College reserves the right to withhold its transcripts and degrees or to deny a student participation in graduation ceremonies and privileged events.

- **Removal from Campus Housing:** Students may be removed from College housing and/or barred from applying for campus housing due to disciplinary violations of this policy.

- **Suspension:** Exclusion from College premises, attending classes, and other privileges or activities for a specified period of time, as set forth in the suspension notice. Notice of this action will remain in the student conduct file or employee file and will be permanently recorded on a student's academic transcript unless specified otherwise in the suspension notice.

- **Expulsion:** Permanent termination of student status and exclusion from College premises, privileges, and activities. This action will remain in the student conduct file and will be permanently recorded on the student's academic transcript.

- **Termination:** Permanent separation of the faculty or staff member from the College.

- **Withholding Degree:** The College may withhold awarding a degree otherwise earned until the completion of the process set forth in this policy, including the completion of all sanctions imposed, if any.

- **Revocation of Admission and/or Degree:** Admission to, or a degree awarded by, the College may be revoked for fraud, misrepresentation in obtaining the degree or violation of College policies, the Student Code of Conduct or for other serious violations committed by a student prior to enrollment or graduation.

Other sanctions may be imposed instead of, or in addition to, those specified here. Service, education or research projects may also be assigned. More than one of the sanctions listed above may be imposed for any single violation.

The Hearing Body may also recommend remedies for the Reporting Party and remedies for the Oberlin community.  On the conclusion of the hearing, the Title IX Coordinator is responsible for reviewing, adjusting, and implementing these remedies in order to eliminate the hostile environment and prevent its recurrence.

## Outcome Letter

The outcome of the Hearing Body will be communicated to the Reporting Party and Responding Party simultaneously and in writing, usually within 4 business days from the date the hearing is concluded. The notification of each party should occur at or near the same time.

The letter to each party will include the outcome and the rationale for the outcome.  It will also set forth each party's appeal rights, including the time frame for submitting an appeal. Any change in the outcome before it becomes final will also be communicated to the parties in writing.

In addition, the Responding Party will be fully informed of any sanctions.

For reports involving sexual violence, the Reporting Party will be fully informed of any sanctions.  For all other reports under this policy, the Reporting Party will be informed of only those sanctions that directly relate to the Reporting Party, consistent with FERPA and other applicable law.

Sanctions imposed are implemented immediately unless the Dean of Students (or their designee) stays implementation in extraordinary circumstances, pending the outcome of

the appeal.  For students, pending graduation, study abroad, internships/externships, or other events do not typically constitute extraordinary circumstances

The College reserves the right to notify parents/guardians of dependent students regarding any health or safety risk, change in student status or conduct situation, particularly alcohol and other drug violations. The College may also notify parents/guardians of non-dependent students who are under age 21 of alcohol and/or drug policy violations. Where a student is not dependent, the College will contact parents/guardians to inform them of situations in which there is a significant and articulable health and/or safety risk. The College also reserves the right to designate which College officials have a need to know about individual conduct reports pursuant to FERPA requirements.

## Appeals Process

Either party may appeal the final outcome in writing to their Division Head (or their designee) or for students to the Dean of Students (or their designee), who will serve as the Appeals Officer.   The appeal must be filed in writing within five business days of receiving the written outcome. The appeal shall consist of a plain, concise and complete written statement outlining the grounds for appeal and all relevant information to substantiate the basis for the appeal.

The Reporting Party and/or Responding Party may appeal only the parts of final outcome directly relating to themselves.  Dissatisfaction with the outcome of the hearing is not grounds for appeal. The only grounds for appeal are:

- A procedural or substantive error occurred that significantly affected the outcome of the hearing (e.g. substantiated bias, material deviation from established procedures, etc.).
- New evidence, unavailable during the original hearing or investigation despite the reasonable efforts of the party, that could substantially impact the original finding or sanction (a summary of this new evidence and its potential impact must be included).
- Sanctions were significantly disproportionate to the violation.

The receipt of the appeal will be acknowledged in writing (which can include email). The written appeal document will be shared with the other party, and the other party will be given the opportunity to respond in writing should they choose to do so. Any response must be submitted to the Appeals Officer within 3 business days from receipt of the appeal. The appeals documents from each party will be considered together in one appeal review process.

In any request for an appeal, the burden of proof lies with the party requesting the appeal, as the original determination and sanction are presumed to have been decided reasonably and appropriately. The Appeals Officer shall first consider whether the appeal is timely filed and if so, whether the appeal is properly framed based on the three grounds. If the Appeals Officer determines that the appeal does not properly fit within one of the three grounds, the appeal will be denied.

If the appeal is based on procedural or substantive error, the Appeals Officer may return the report to the original Hearing Body with instructions to reconvene to cure the error, or in rare cases where the error cannot be cured, the Appeals Officer can ask that a new hearing occur before a newly constituted Hearing Body.  In the instance that a new hearing occurs, the parties would have the right to appeal that finding.

In the case of new and relevant information, the Appeals Officer can recommend that the case be returned to the original Hearing Body to assess the weight and effect of the new information and render a determination after considering the new facts. The reconsideration of the Hearing Body is final.

Appeals are not intended to be full rehearing of the report. In most cases, appeals are confined to a review of the written documentation or record of the original hearing, and pertinent documentation regarding the grounds for appeal. This is not an opportunity for the Appeals Officer to substitute their judgment for that of the original hearing body merely because they disagree with its finding and/or sanctions. Appeals decisions are to be deferential to the original hearing body, making changes to the finding only where at least one of the three specified grounds for appeal is established. The Appeals Officer can affirm or alter the original findings, depending on the basis of the requested appeal.

Sanctions imposed are implemented immediately unless the appropriate Division Head (or designee) stays implementation in extraordinary circumstances, pending the outcome of the appeal.  For students, pending graduation, study abroad, internships/externships, or other events do not typically constitute extraordinary circumstances. In cases where the appeal results in reinstatement to the institution or of privileges, all reasonable attempts will be made to restore the party to their prior status, recognizing that some opportunities lost may be irretrievable in the short term.

The Appeals Officer will render a written decision on the appeal simultaneously to the Reporting Party and Responding Party within 15 business days from the date of the submission of all appeal documents by both parties.  Appeal decisions are final.

## Integrity of Proceedings

These procedures are entirely administrative in nature and are not considered legal proceedings. Neither party may audio or video record the proceedings, nor are attorneys allowed to participate except as outlined in the section on "Advisors, Support Persons, and Attorneys."  The Hearing Coordinator will audio tape the proceedings for College records.

At the Hearing Coordinator's discretion, anyone disrupting the hearing may be removed.

## Records

All records related to complaints filed with the Office of Equity Diversity and Inclusion will be maintained in accordance with the records retention policy found on the website here: go.oberlin.edu/SMPolicy

# 10. Primary Prevention, Education, and Training

## Role and Scope

Oberlin College recognizes that the most effective way to achieve a campus free of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence is to equip all community members with the skills

to recognize and prevent sexual misconduct.  The College wants to ensure that all members of the community understand and participate in our shared standards of equity, inclusion, civility, and respect.

In order to achieve these goals, Oberlin College offers regular primary prevention programs and ongoing education and awareness programs for all students and employees. Employees who play a key role in implementing the policy, including those faculty and staff who are likely to receive reports of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, will receive in-depth annual training to ensure a timely, sensitive, respectful, and effective intuitional response.   The College is committed to ensuring that all employees understand how to respond to reports of sexual misconduct.

In particular:
All new and transfer students and all new employees will receive education in primary prevention and awareness of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence.  These training programs will include:

- A statement that the institution prohibits sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence

- The definition of prohibited conduct, including sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, under College policy and state law

- The definition of consent in reference to sexual activity under College policy and state law

- A description of safe and positive options for bystander intervention

- Information on risk reduction

- Information on how to recognize warning signs of abusive behavior in order to mitigate the likelihood of perpetration, victimization, or bystander inaction

- Options and resources for reporting sexual and/or gender-based harassment,

discrimination and violence, including sexual violence, stalking, and intimate partner violence

All continuing students, staff, and faculty will receive regular opportunities to review this information, become acquainted with new policies and best practices, and practice key skills.  All employees of the college are expected to complete training on a bi-annual basis.

The Title IX Coordinator is responsible for oversight, coordination, and assessment of prevention and training programs on campus, in collaboration with the appropriate departments and personnel.  The Title IX Team should review campus education and prevention programs on an annual basis to ensure quality and address staffing and resource needs.  Training and education may be provided by appropriately trained campus personnel and/or external partners.

## 11.  Policy Review

The Title IX Team is authorized to make minor changes to this policy, such as updating contact information and professional roles or major changes required to align policy language with any new legal requirements.  Such changes should be reported to the General Faculty at least once a year.  Major changes to the policy beyond those required by law should be submitted to the General Faculty for approval, or, as appropriate, to the General Faculty Council acting as the executive body of the General Faculty.  In addition, the Title IX Team will review the policy annually, based on experiences of people involved with the policy, to determine if major changes are required.  Any community member with concerns about the policy should contact the Title IX Coordinator to discuss their concerns.

# Appendix 1

## Key Policy Implementers

**Title IX Coordinator**
Rebecca Mosely
Carnegie 204
(440) 775-8555
rebecca.mosely@oberlin.edu

**Director of Safety and Security**
Mike Martinsen
159 West Lorain Street
(440) 775-5782
mike.martinsen@oberlin.edu

**Student Advocate**
Melissa Counts
Peters G24
440-204-4359
College_advocate@nordcenter.org

**Hearing Coordinator (for Reports Involving Students)**
Thom Julian
Wilder 105
(440) 775-8462
Thom.julian@oberlin.edu

**Divisional Deans**
David Kamitsuka
Acting Dean of Arts and Sciences
Cox Administration Building 101
(440) 775-8410
David.kamitsuka@oberlin.edu

Bill Quillen
Acting Dean of the Conservatory of Music
Bibbins 113
(440) 775-8200
william.quillen@oberlin.edu

**Manager of Employee and Labor Relations**
Kim Wiggerly
Service Building, Second Floor
(440) 775-5570
Kim.wiggerly@oberlin.edu

**Members of the General Faculty Professional Conduct Review Committee**
See College website for the most current membership

How to respond to new federal Title IX regulations being published soon (opinion)                    3/19/20, 10:38 AM

News & Views   Careers   Events   Reports & Data

Online Education Helped or Hurt?   Science During COVID-19

Enrollment Fears

Admissions   Digital Learning   Fund-Raising   Diversi

Free Newsletters   Advertise   Hire Faculty & Staff   Find a

Login



**EXHIBIT**

**_B_**

# OCR Is About to Rock Our Worlds

> Brett A. Sokolow offers advice for how to respond to the new Title IX regulations that will be
> published soon.

By   Brett A. Sokolow   // January 15, 2020

38 COMMENTS
(/VIEWS/2020/01/15/HOW-
RESPOND-NEW-FEDERAL-
TITLE-IX-REGULATIONS-
BEING-PUBLISHED-SOON-
OPINION#DISQUS_THREAD)



(https://www.insidehighered.com/sites/default/server_files/styles/large/public/media/Title_IX_2.png?
itok=WzLm_eXX)

ATIXA, the association of Title IX administrators I serve as president, anticipates publication of the final Title IX regulations
in the _Federal Register (https://www.regulations.gov/)_ within the coming weeks. The federal government last issued Title IX
regulations in 1975, so this is somewhat unprecedented. The proposed changes are far more sweeping than the 2011
Dear Colleague letter (https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html) promulgated by the
Office for Civil Rights (OCR). The changes coincide with a due process revolution
(https://www.insidehighered.com/news/2019/10/03/students-look-federal-courts-challenge-title-ix-proceedings)
occurring in some federal courts, as well, with respect to college and university disciplinary processes.

**What Will These Changes Mean for Higher Education?**

Perhaps 75 to 80 percent of the proposed regulations mandate neutral or beneficial changes or clarifications. Many of the
more controversial changes will probably be addressed by a future Congress (https://www.newsweek.com/dems-aim-
block-devos-title-ix-rule-changes-say-they-could-have-chilling-effect-students-1476537) or through litigation. Some of the
proposed changes included in the draft (https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf) that OCR
shared publicly last November may not make it into the final rule.

WANT TO ADVERTISE? CLICK HERE
(HTTPS://WWW.INSIDEHIGHERED.COM/ADVERTISE)

**COLLEGE PAGES**

College Name                                SEARCH

**Featured college pages**

 SNU        (/college/southern-
nazarene-university

        (/college/northern-
wyoming-communi
college-district)

(/college/164641/t
state-college)

Bay State College

**POPULAR RIGHT NOW**

How to respond to new federal Title IX regulations being published soon (opinion)                                    3/19/20, 10:38 AM

Most of the changes revolve around due process, which protects all of us, regardless of our campus role or status. They include provisions requiring more substantive written notice to the respondent of the nature of sexual misconduct allegations, the right of the parties to review investigation materials prior to a final determination and the right to a written rationale for the outcome and any sanctions assigned. For the most part, these are rights you would want to protect you if you were accused – rightfully or wrongfully – of sexual misconduct.

**What Do We Do Now?**

We at ATIXA suggest that colleges and universities continue to honor "best practices" commonly adopted by the higher education field, while moving gradually toward implementing the changes that the regulations will require. Some changes, like equitable interim resources and supports for responding parties, can be implemented now without radical alteration of programs. In its 2011 guidance, OCR was explicit about the need for institutions to provide broad-based supports and resources to victims of sex discrimination, such as counseling services, academic accommodation and housing changes. Now, OCR is making clear its expectation that those supports and resources also be offered to respondents. Many colleges already do so, but OCR wants to ensure uniform provision of services by all funding recipients.

Similarly, colleges can act now to extend all VAWA Section 304 (https://www.federalregister.gov/documents/2014/10/20/2014-24284/violence-against-women-act) rights to parties in sexual harassment cases. In 2014, Congress enacted amendments to the Violence Against Women Act (VAWA), which now are incorporated into the federal Clery Act. These changes codified as law some provisions of Title IX that were previously only proffered as regulatory agency guidance and added many provisions requiring training and prevention by colleges. Oddly, the protections of VAWA Section 304 only extended to what have become known as the "big four" offenses of sexual violence, dating violence, domestic violence and stalking. That created an asymmetry because Title IX protections include not only these four offenses but also conduct like sexual harassment and disparate-treatment sex discrimination that VAWA does not. Institutions were left with two competing laws that did not fully parallel each other. OCR's proposed regulation logically aligns VAWA and Title IX so that rights do not vary by the type of sex offense alleged.

Thus, institutions can take steps such as providing written notice of the outcome of an allegation to all parties, not just in the big four offenses, but for sexual harassment, too. Additionally, institutions can ensure equitable provision of advisers across all cases impacted by Title IX, not just for those involving the big four.

These kinds of changes will give administrators a head start on compliance before the regulations are even released. Once released, there will be an implementation grace period of perhaps 90 days to as much as 12 months from publication of the final rule to allow colleges and universities time to move toward compliance. So we're still some months from an enforcement deadline, even if we are unsure what that deadline is.

**What Do We Do When the Regulations Are Published?**

Higher education needs to move toward compliance or to decide to litigate the validity of the regulations against the U.S. Department of Education – or both. OCR is obligated to address, in aggregate, the nearly 130,000 comments it received during the public notice-and-comment period. The pressure is on for OCR to make it clear in its responses that its rules are rationally related to the statute, especially with a U.S. Supreme Court that appears increasingly hostile (https://slate.com/news-and-politics/2019/11/kavanaugh-nondelegation-gundy-supreme-court.html) philosophically to agency rules.

Once OCR publishes the final rule, it will expect good-faith efforts to comply. With respect to litigation, it's unlikely that a federal judge will enjoin the regulations fully, and if there is a partial injunction, colleges and universities will still need to comply with those elements of the regulations that are not enjoined. Unless and until a judge says that they don't have to comply, colleges and universities will need to become compliant.

It took the higher education field three to four years to fully implement the 2011 guidance, but that kind of lethargy won't be an option with these new regulations. They will have the force of law behind them rather than simply serving as guidance. Drag your feet on implementation and responding parties will sue the minute you are not according them the full panoply of rights OCR has promised them. Fail to provide the responding party with a copy of the investigation report or sufficient

LIVE UPDATES: Latest news on coronaviru and higher education (http://www.insidehighered.com/news/20 updates-latest-news-coronavirus-and-high education)

Most teaching is going remote. Will that h or hurt online learning? (http://www.insidehighered.com/digital-learning/article/2020/03/18/most-teachir going-remote-will-help-or-hurt-online-learn

'I Will Survive' Teaching Online (http://www.insidehighered.com/quicktak will-survive%E2%80%99-teaching-online)

10 strategies to support students and hel them learn during the coronavirus crisis (opinion) (http://www.insidehighered.com/advice/2 strategies-support-students-and-help-ther learn-during-coronavirus-crisis)

How to make online learning more intimat and engaging for students (opinion) (http://www.insidehighered.com/advice/2 make-online-learning-more-intimate-and-engaging-students-opinion)

How institutions are approaching scientifi research during COVID-19 (http://www.insidehighered.com/news/20 institutions-are-approaching-scientific-research-during-covid-19)

Shifting unexpectedly to remote instructic requires as many human solutions as tecl solutions (opin (http://www.insidehighered.com/advice/2 unexpectedly-remote-instruction-requires-many-human-solutions-tech)

Pomona students denied emergency hous push alternatives (http://www.insidehighered.com/news/20 students-denied-emergency-housing-push alternatives)

Practical advice for instructors faced with abrupt move to online teaching (opinion) (http://www.insidehighered.com/advice/2 advice-instructors-faced-abrupt-move-onli teaching-opinion)

time to prepare for a hearing and you should expect a motion for a temporary restraining order from their lawyer.

The catch-22 is that when you move to compliance, activists will sue to argue that the regulations are ultra vires (https://fas.org/sgp/crs/misc/R44699.pdf) and anti-victim expansions of agency authority. They will surely challenge provisions that require disclosure to responding parties all evidence provided by reporting parties, even when that evidence is not admissible or used to support a decision. This rule will create a chilling effect on reporting parties and, it will be argued, is beyond the scope of OCR's authority to enact under the statute. Similar arguments could be made to collaterally attack OCR's proposed requirements for live hearings and cross-examination facilitated by the parties' advisers. In fact, activists aren't the only cohort likely to attack such provisions, as some private colleges (https://www.pepperlaw.com/resource/35026/22G2) are also planning to litigate any attempt to impose a live hearing requirement on them, and have already funded a significant war chest to do so.

Within this highly politicized crucible where any action or inaction will catalyze litigation, institutions need to form committees, task forces and Title IX teams now, so that administrators can study the regulations and commentary when they are published and change what needs to be changed. Faculty grievance processes will be an issue that administrators will have to face and resolve now, if they didn't back in 2011. OCR is forcing the issue, and Title IX offices are probably going to be between a rock and a hard place — with faculty members who advocate for additional protections, such as clear and convincing evidence as a standard of proof for those accused of sexual assault, while others strongly advocate for preponderance of the evidence.

**What Do We Do If We Don't Agree With Some Provisions Within the Regulations?**

About 20 to 25 percent of the regulations are potentially very detrimental to the cause of sex and gender equity in education, and we will need as a field to find ways to work within those requirements, challenge them in court or find clever work-arounds. Proposed provisions on notice, mediation, mandated reporting, live hearings and cross-examination could create significant chilling effects on the willingness of those who experience discrimination, harassment and sexual violence to report it to administrators and pursue formal resolution pathways.

Let's drill down on each of these proposed provisions a bit. OCR seeks to limit the ways in which recipients are legally put on notice of sex discrimination. Institutions might see this as a welcome safe harbor, but why would colleges and universities want to make it harder to report and respond to incidents? The opening of access and "no wrong doors" approach to intake has been one of the most valuable and enduring legacies of the 2011 guidance, and it has resulted in substantial increases in reporting of incidents for most colleges.

OCR also now plans to remove the "soft ban" on mediation of sexual violence it implemented in 2011. The vast majority of sexual harassment claims can and should be resolved informally, but we need to be sure that the parties are participating voluntarily and not being pressured to minimize the severity of what has happened to them. And many in the field are rightfully concerned about whether colleges and universities have access to mediators skilled enough to resolve allegations of violence. Lower-level sexual harassment is very amenable to resolution via mediation, but the data on whether the same is true for violent incidents is much less conclusive.

Live hearings and cross-examination are the most controversial provisions of the proposed regulations. Of the nearly 130,000 comments submitted to OCR on the draft regulation, most were negative, with a particular targeting of OCR's desire to turn educational resolution processes into mini-courtrooms that mirror criminal trials. Part of the reason many victims/survivors don't choose to report campus sexual violence to law enforcement is because they prefer the less formal and less adversarial resolution processes in place at schools and colleges. It will take a strong person to be willing to go through a process where they will be subject to cross-examination by the other party's lawyer. And, importantly, no research (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1100090) indicates that cross-examination creates more accurate results than other ways of allowing the parties in a sexual misconduct allegation a full and fair opportunity to review and contest all evidence prior to a final determination.

In light of all of this tumult, perhaps the healthiest mind-set is to view the regulations mostly as setting a floor for compliance and to institutionally commit to aim for the ceiling of best practices. Many organizations, including ATIXA, will

continue to offer the field extensive guidance on how to evolve exemplary programs within the framework OCR is establishing, and outside it, where we can.

What is clear is that the pendulum is about to swing too far, again. The regulations have the potential to create significant public backlash, especially if colleges are seen as institutionally deprioritizing Title IX compliance in the coming months and years. Potential victims need to see you strengthening your program, not backing down. They are likely to perceive barriers to coming forward in the new rules, and administrators need to do everything possible to reassure potential victims that the Title IX office is still here for them, and that you'll do everything not prohibited by the regulations to make reporting easier, offer services and resources, establish a process that is transparent and user-friendly, and avoid revictimization.

Regardless, some activists may turn some of their frustration with OCR on you, and we encourage you to be sympathetic, to encourage their voices and to be thoughtful about the ways that remedies-only and informal resolutions may be used to ameliorate or exacerbate the effects of the changes that OCR is catalyzing.

One thing is for sure -- defining and maintaining sex and gender equity programmatic excellence in an environment of regulatory change, politicization of Title IX and fervent litigation will be among the most pressing challenges facing colleges and universities in 2020 and for some time to come.

# Bio

*Brett A. Sokolow is the president of ATIXA (http://www.atixa.org/), the 3,500-member Association of Title IX Administrators.*

*Read more by  Brett A. Sokolow*



(/print/views/2020/01/15/how-respond-new-federal-title-ix-regulations-being-published-soon-opinion)

**Be the first to know. (https://www.insidehighered.com/content/sign-inside-higher-eds-newsletters)**
Get our free daily newsletter.
(https://www.insidehighered.com/content/sign-inside-higher-eds-newsletters)

Work/School Email*                        Job Title*

I have read & agree to the terms of
Inside Higher Ed's Privacy Policy.*

Keep Me Informed »

## *Inside Higher Ed Careers*

Faculty Jobs(#tab-facultyjobs)   Administrative(#tab-      Executive        (#tab-       Jobs
                                 administrative)Administration  executiveadministration)Outside  (#tab-
                                 Jobs           Jobs                                 Higher    jobsoutsidehighereducation)
                                                                                     Education

## Browse Faculty Jobs

How to respond to new federal Title IX regulations being published soon (opinion)                                      3/19/20, 10:38 AM

Arts & Humanities (https://careers.insidehighered.com/jobs/arts-and-humanities/)

Education (https://careers.insidehighered.com/jobs/education/)

Engineering & Mathematics (https://careers.insidehighered.com/jobs/engineering-and-mathematics/)

Health & Medical (https://careers.insidehighered.com/jobs/health-and-medical/)

Professional Fields (https://careers.insidehighered.com/jobs/professional-fields/)

Science & Technology (https://careers.insidehighered.com/jobs/science-and-technology/)

Social Sciences (https://careers.insidehighered.com/jobs/social-sciences/)

Technical & Vocational Fields (https://careers.insidehighered.com/jobs/technical-and-vocational-fields/)

Hide comments

How to respond to new federal Title IX regulations being published soon (opinion)                                                3/19/20, 10:38 AM

# Opinions on Inside Higher Ed



(/views/2020/03/18/prisoner-describes-his-and-other-inmates-struggles-access-higher-education-opinion)

**Resilience and Resistance: Fighting for Higher Education in Prison**

(/views/2020/03/18/prisoner-describes-his-and-other-inmates-struggles-access-higher-education-opinion)



(/views/2020/03/18/new-study-illuminates-why-barriers-higher-education-incarcerated-people-confront)

**Rejected**

(/views/2020/03/18/new-study-illuminates-why-barriers-higher-education-incarcerated-people-confront)



(/views/2020/03/17/pros-and-cons-having-regional-accreditors-go-national-opinion)

**Will Regional Accreditation Go National?**

(/views/2020/03/17/pros-and-cons-having-regional-accreditors-go-national-opinion)

# Inside Higher Ed's Blog U

Call to Action. Marketing and Communications in Higher Education (/blogs/call-action-marketing-and-communications-higher-education)
**Taking Stock of Crisis Response (/blogs/call-action-marketing-and-communications-higher-education/taking-stock-crisis-response)**

GradHacker (/blogs/gradhacker)
**Money Talks (/blogs/gradhacker/money-talks)**

Rethinking Higher Education (/blogs/rethinking-higher-education)
**Big Idea 2: Destiny Solutions (/digital-learning/blogs/rethinking-higher-education/big-idea-2-destiny-solutions)**

Rethinking Higher Education (/blogs/rethinking-higher-education)
**Big Idea 2: Destiny Solutions (/digital-learning/blogs/rethinking-higher-education/big-idea-2-destiny-solutions)**

Learning Innovation (/blogs/learning-innovation)
**COVID-19, Remote Learning and the Beauty of All Hands on Deck (/digital-learning/blogs/learning-innovation/covid-19-remote-learning-and-beauty-all-hands-deck)**

Learning Innovation (/blogs/learning-innovation)
**COVID-19, Remote Learning and the Beauty of All Hands on Deck (/digital-learning/blogs/learning-innovation/covid-19-remote-learning-and-beauty-all-hands-deck)**

How to respond to new federal Title IX regulations being published soon (opinion)                                    3/19/20, 10:38 AM

keyword

News & Opinion

(https://oberlinreview.org/feed/rss/) (https://www.instagram.com/ocreview) (https://twitter.com/oberlinreview) (https://www.facebook.com/oberlinreview) 

Wednesday, March 18, 2020

Search 🔍

# The Oberlin Review

(https://oberlinreview.org)

NEWS (https://oberlinreview.org/category/news/)          ARTS (https://oberlinreview.org/category/arts/)

OPINIONS (https://oberlinreview.org/category/opinions/)          SPORTS (https://oberlinreview.org/category/sports/)

THIS WEEK (https://oberlinreview.org/category/this-week/)          ABOUT (https://oberlinreview.org/about/)

PRINT EDITION (https://issuu.com/theoberlinreview/docs/1206final)          CONTACT US (https://oberlinreview.org/contact-us/)

**EXHIBIT C** tables*

# Oberlin Engages In Wider Conversations About Sexual Misconduct

Julia Peterson (https://oberlinreview.org/staff_profile/julia-peterson/), Arts and Culture Editor | March 9, 2018

 (https://www.facebook.com/sharer/sharer.php?u=https%3A%2F%2Foberlinreview.org%2F15771%2Fnews%2Foberlin-engages-in-wider-conversations-about-sexual-misconduct%2F)  (https://twitter.com/intent/tweet?text=Oberlin Engages In Wider Conversations About Sexual

Misconduct&url=https%3A%2F%2Foberlinreview.org%2F%3Fp%3D15771)  (//oberlinreview.org/15771/news/oberlin-engages-in-wider-conversations-about-sexual-misconduct//?print=true)

*Editor's note: This article contains discussion of sexual harassment and sexual assault.*

The #MeToo movement — started in 2006 by Tarana Burke to support women and girls of color who have survived sexualized violence — became a household phrase in the waning months of 2017 when a number of prominent men across multiple industries were accused of sexual harassment or assault, and the hashtag went viral on Twitter. During this time, people spoke up about sexual misconduct perpetrated by the likes of Harvey Weinstein, Kevin Spacey, Larry Nassar, and Roy Moore, among many others. The #MeToo movement has also prompted difficult conversations about gendered power dynamics, the limits of acceptable sexual behavior, and whether art can or should be separated from the artist. The movement has proven itself to be as relevant on Oberlin's campus as it has been everywhere else.

For Director of Equity, Diversity, and Inclusion and Title IX Coordinator Rebecca Mosely, the #MeToo movement has coincided with a number of conversations and efforts that have already been in motion on campus for a number of years.

"I think Oberlin has been in a space on campus where the awareness has been here for a

number of years now, and so I would say within the student population here, I think it has had less impact, though it brings support to the work that students were already doing," Mosely said. "I would say the impact to me is supporting more [alumni] of the College as they become aware of the #MeToo movement outside of what we're doing here, because they don't have the same privilege to be part of what we're already doing here on campus. They're not getting that education in their daily life. #MeToo, I think, has brought awareness beyond our campus, and that has definitely had an impact for [alumni] to feel like they can finally speak up and speak their truth."

The Office of Equity, Diversity, and Inclusion has engaged in concrete efforts to reduce gender-based discrimination and violence on campus with the Preventing and Responding to Sexual Misconduct Program, a peer education program in which student trainers host workshops to teach students about issues including consent, intimate partner violence, bystander intervention, and supporting survivors.

"Our PRSM trainers … also created a number of other workshops to take it beyond [the mandatory trainings]," Mosely said. "Fall semester, an additional workshop that they did was Consent for Men, and they had over 50 men show up to that workshop, which I think just speaks to the interest of our students in making sure that people are trying to get it right."

College junior and PRSM trainer Kira Findling said that PRSM navigates one of the many conflicts raised by the #MeToo movement — namely, that some people feel unwanted pressure to share their stories.

"One thing that we emphasize a lot in PRSM is supporting people who've been harmed, so that means telling people that it's OK if they want to share their stories, and it's also OK if they don't want to share their stories," Findling said. "It's been really interesting hearing people talk about the #MeToo movement, some people feeling pressure to share things they don't want to share and other people feeling really empowered by it. So I'm definitely happy to see that the larger world is reflecting conversations that we have all the time here."

Within the #MeToo movement, people have been sharing stories of experiencing sexual misconduct and violence both as their own narratives and through artistic mediums, which can be an empowering but also a deeply challenging experience.

"How do you as a performer, or a writer, but especially as a performer — as a survivor, personally — how do you work to be healthy in the way you go about exploring your character's experiences and your past experiences?" asked College junior Chloe Falkenheim, who recently starred as Girl Angel in the Oberlin production of *Angel's Bone*, an opera about human trafficking. "That's a main thing that performers will need to keep in mind, as I hope that there are more and more pieces that explore sexual violence in a sensitive way. Everyone will have to figure this out. How do we as actors work with that in a way that's healthy for ourselves?"

For PRSM trainer and College senior India Wood, one of the most telling moments of the #MeToo movement was the conversation sparked by an article in *Babe* magazine about an anonymous woman, referred to as "Grace," who accused Aziz Ansari of sexual misconduct

while the two of them were on a date. In the article, Grace describes how Ansari repeatedly tried to initiate sex with her, despite her repeated indications that she did not want to — including repeatedly moving away and verbally telling him to "chill". In response to the Babe article, Ansari released a statement saying that he viewed his encounter with Grace as "by all indications, completely consensual."

"I think especially with the Aziz Ansari case, that really freaked people out because some people didn't even know why what he did wasn't OK," Wood said. "That, in my opinion, goes to show the ways in which we completely misunderstand people's cues, and the way that we misunderstand having open conversations about preferences and what we want and what we don't want. Even on this campus, too, I really don't think people have the language skills around sex and sexuality and love and romance to be able to talk about these things in ways that allow for completely consensual and good interactions to occur."

The Aziz Ansari story also resonated with College senior Sarah Blum, especially as it relates to sexual behavior at Oberlin.

"I think, for me, the story [from the #MeToo movement] that I found to be the most teachable was when Aziz Ansari's interaction with a woman became viral," Blum said. "I remember reading this, and I remember thinking that this is about many Oberlin men I've encountered — feminist on the outside, but in their interpersonal relationships, they really still have a long way to go."

Blum, who noted that the #MeToo movement has led to important conversations and meaningful changes both large and small, also spoke about some of the ways in which it remains flawed.

"I'm conflicted about [the #MeToo movement], because I think it's a really great thing to bring to the surface," Blum said. "But I think that conversation needs to be moved to perpetrators. As someone who has been sexually assaulted myself, this movement brings nothing new to the table. Once I was sexually assaulted, it was very clear to me that almost nine out of ten of my friends had also been through something similar. I didn't need a #MeToo movement to know that. As a woman, oftentimes, in positions of supporting other women, you know. The #MeToo movement seems to be calling out men, generally, who do this — and anyone else who finds themselves in that position — but I feel like it's not enough."

For Blum, another major issue with the movement is how it places the burden on the people who have been harmed without sufficient accountability for allies who claim to support them.

"Typing #MeToo is a really easy action to do," Blum said. "And once again, putting that burden on the women that have been harassed and assaulted just perpetuates [a system where] the people that have been hurt are usually the ones doing the work. "

Faculty members have responded to #MeToo in a variety of ways, from including supplementary material in classes to expressing interest in more trainings.

"In the past, we've offered Title IX trainings and workshops for faculty, and there's been great interest in that," Oberlin-stem Associate Dean for Academic Support Chris Jenkins said

interest in that," Conservatory Associate Dean for Academic Support Chris Jenkins said. "That's something we're looking to do more of in the future, and making sure people have access not just to information, but also to new modes of thinking and interrogation about how they form their mentoring relationships as music educators."

"We're reading an article this week in my Chinese language class about the #MeToo movement in the context of Chinese women standing up to sexual harassment in academia," College senior Eliza Edwards said. "It's really powerful to watch #MeToo spread from Tarana Burke to Hollywood to Oberlin and beyond — it strikes me as pretty incredible that a movement can have such a swift impact not only on an intensely personal level, but also on a global stage."

One of the most visible ways that the #MeToo movement has manifested on campus was when former Associate Professor of Creative Writing Bernard Matambo abruptly resigned last semester after multiple accusations of sexual misconduct toward students had been made against him ("Matambo Resigns Amid Sexual Misconduct Allegations," *The Oberlin Review*, Dec. 1, 2017). As the accusations against Matambo came to light, Creative Writing students had to wrestle both with this information about a widely-liked and widely-trusted professor, and the logistical issues raised by losing a faculty member midway through the year.

"I know a lot of students who either had [Matambo] as first-years last semester or who have been working with him for many years," said College sophomore Gillian Palsey, one of the newly-elected Creative Writing major representatives. "It was pretty shocking and threw a big wrench in the academic year to have [this person] who was once a beloved professor just leave very abruptly. I think there was a lot of confusion surrounding that. At first people were like, 'Did the school do something to wrong him?' But then as news started to come out and rumors started to spread, it became more of a talk about sexual harassment on campus and from the faculty at large. And I feel like it makes sense that it came out during this time, because of the #MeToo movement. I think that probably had an effect, perhaps, on why the person who came forward decided to come forward when they did."

As Jenkins noted, one of the places where the #MeToo movement may continue to be especially resonant on college campuses is in discussing and addressing the ways that potentially harmful power dynamics can manifest in mentorship relationships.

"Historically, we haven't really talked about issues of sexual abuse and exploitation that sometimes have been a feature of music life and musical training," Jenkins said. "So it's especially important, I think — not just at Oberlin, but in general, and in all genres of music — that people grapple with these issues and have these discussions about the kind of exploitation that can go on. I don't want to say it's common, but I don't know that it's uncommon historically for this type of exploitation to occur in some of the mentoring relationships between musicians."

#MeToo has also manifested on campus in one of the current exhibitions at the Allen Memorial Art Museum: *Handle with Care: Embracing Fragility*, curated by Olivia Fountain, OC '17, a curatorial assistant for Academic Programs. The exhibit features a number of works by

contemporary artists, including a portrait by Chuck Close. In late December, shortly before the show was going to open, Close was accused of sexual misconduct by multiple women. Fountain chose to leave the work in the exhibition, but added an additional label that explained this new context to the work, as well as a comment book for people to leave their reactions.

"My original instinct was to remove the piece, and there were a number of reasons why I ultimately decided that that wasn't the best idea, one of them being purely logistical — the show was literally ready to be mounted," Fountain said. "But, after having this conversation [with other museum curators] and talking with a lot of my peers and doing a lot of soul-searching on my own, I decided that the most effective way to force this kind of conversation to happen in the Allen — the conversation being whether or not we can separate the art from the artists in a museum space — would be to definitely not shy away from what happened, but also to leave the work up. And so I decided to recontextualize it, to write an additional label being pretty explicit about what happened. The label says something to the effect of, 'If this information had been available sooner, it would not have been included in the show,' and that's true. If I ever curate anything again, I will never include something by Chuck Close."

For Fountain, her experience raises wider issues about the ways that museum curators and audiences can respond to the #MeToo movement.

"I don't think a lot of museums are going to be taking works down," she said. "Maybe in the context of Chuck Close they will, but there are so many artists that this could apply to — the question becomes, once you start, how do you stop? Where do you draw the line? And I think that by instead recontextualizing these pieces and being very, very up-front in your label text or whatever literature you're providing in the gallery about the artist's background, especially as it relates to sexual harassment and abuse, I think that's crucial. That's a museum's job, so by recontextualizing this Chuck Close piece, I wanted to demonstrate something that museums can do. If taking things down feels like a bad idea for a bunch of different reasons, we can put more stuff up. But I also think, moving forward — the thing I just said about when you start taking stuff down — where do you draw the line? That speaks to the fact that museum galleries are filled with art by men that have abused women, and that's a problem. It's something that we as museum professionals need to actively work to counter."

*Full transcripts from the interviews included in this article can be found here (https://oberlinreview.org/15800/news/full-interview-transcripts-metoo-movement-remains-relevant-for-oberlin-community/).*

#metoo (https://oberlinreview.org/tag/metoo/)

bernard matambo (https://oberlinreview.org/tag/bernard-matambo/)

eliza edwards (https://oberlinreview.org/tag/eliza-edwards/)

india wood (https://oberlinreview.org/tag/india-wood/)

Julia Peterson (https://oberlinreview.org/tag/julia-peterson/)

PRSM (https://oberlinreview.org/tag/prsm/)

Rebecca Mosely (https://oberlinreview.org/tag/rebecca-mosely/)

Leave a Comment

Campus News (https://oberlinreview.org/category/news/campus_news/)

### Tensions Between College, UAW Not New (https://oberlinreview.org/between-college-uaw-not-new/)

The current campus controversy around the proposal to outsource campus and dining services is not the first time that significant tensions have erupte...


(https://oberlinreview.org/20734/news/covid-19-outbreak-continues-college-moves-to-remote-campus/)

### COVID-19 Outbreak Continues, College Moves to Remote Campus (https://oberlinreview.org/20734/news/covid-19-outbreak-continues-college-moves-to-remote-campus/)


(https://oberlinreview.org/20742/news/students-discuss-uaw-concerns-with-trustees/)

### Students Discuss UAW Concerns with Trustees (https://oberlinreview.org/20742/news/students-discuss-uaw-concerns-with-trustees/)

### Congressional Candidates Campaign in Oberlin (https://oberlinreview.org/candidates-campaign-in-oberlin/)

Despite fears over the novel coronavirus — or COVID-19 — community spread, Democratic candidates running in Ohio's fourth Congressional district...

### College Announces New Music Minor (https://oberlinreview.org/congression-music-minor/)

Oberlin is offering a new minor in Music following recommendations put forth by the One Oberlin report to expand *opportunities for private lessons,...

NEWS (https://oberlinreview.org/category/news/)

### Tensions Between College, UAW Not New (https://oberlinreview.org/between-college-uaw-not-new/)

The current campus controversy around the proposal to outsource campus and dining services is not the first time that significant tensions have erupte...


(https://oberlinreview.org/20734/news/covid-19-outbreak-continues-college-moves-to-remote-campus/)

### COVID-19 Outbreak Continues, College Moves to Remote Campus (https://oberlinreview.org/20734/news/covid-19-outbreak-continues-college-moves-to-remote-campus/)


(https://oberlinreview.org/20742/news/students-discuss-uaw-concerns-with-trustees/)

### Students Discuss UAW Concerns with Trustees (https://oberlinreview.org/20742/news/students-discuss-uaw-concerns-with-trustees/)

### Congressional Candidates Campaign in Oberlin (https://oberlinreview.org/candidates-campaign-in-oberlin/)

Despite fears over the novel coronavirus — or COVID-19 — community spread, Democratic candidates running in Ohio's fourth Congressional district...


(https://oberlinreview.org/20754/news/exposure-reactions-raise-questions-in-scientific-community/)

### Drug Exposure Reactions Raise Questions in Scientific Community (https://oberlinreview.org/exposure-reactions-raise-questions-in-scientific-community/)

## The Oberlin Review (https://oberlinreview.org)

(https://oberlinreview.org/feed/rss/) (https://www.instagram.com/ocreview) (https://twitter.com/oberlinreview) (https://www.facebook.com/oberlinreview)   

*Established 1874.*

Search

 Gmail

---

## Fwd: Possible Sexual Misconduct Policy Violation

Begin forwarded message:



**From:** ████████████████ >

**Subject: Fwd:  Possible Sexual Misconduct Policy Violation**

Begin forwarded message:

**From:** Erica Rau <erau@oberlin.edu>
**Date:** February 4, 2020 at 2:18:03 PM EST
**To:** ██████████████ @oberlin.edu>
**Subject: Possible Sexual Misconduct Policy Violation**

████ ,

My name is Erica, and I'm a DeputyTitle IX Coordinator at Oberlin.  I have received
a report about behavior that, if proven, would constitute a violation of
the Sexual Misconduct Policy.  Specifically, ████████ shared with me that you engaged in
behavior that could be a violation of sexual misconduct policy.

Please know that I am required to share with you what has been shared with me regarding
this report and that sharing this information in no way indicates that you have violated
the sexual misconduct policy.  With that in mind, I'd like to learn what happened from your
perspective, offer some resources, and share some information about College policy that may
apply (which, of course, depends on what happened, which has not been determined yet).
Could you please suggest several possible meeting times for this week? I'll write back to
confirm the meeting time and location.

Also, it is important for you to know that the Sexual Misconduct Policy prohibits retaliation
against anyone who has filed a report with my office, or who is participating in a resolution
process with my office.  With that in mind, if you experience any form of retaliation, please let
me know.  Conversely, please be mindful of what you say regarding this incident.

If you have any questions, please feel free to ask them.  I look forward to hearing from you
soon.

Erica

--
Erica Rau

Head Volleyball Coach
Assistant Athletics Director
Senior Woman Administrator
Deputy Title IX Coordinator for Athletics
Oberlin College
Cell:  954-288-2972
Blog | Twitter | Facebook | Instagram



# Oberlin College Athletics



Rau Named Senior Woman Administrator
General
Posted: 6/8/2016 1:05:00 PM
**Oberlin, Ohio -** Oberlin College Delta Lodge Director of Athletics *Natalie Winkelfoos* announced the appointment of Head Volleyball Coach *Erica Rau* as the department's senior woman administrator (SWA).

Winkelfoos, who has been serving as the SWA in addition to her duties as the director of athletics, is certain Rau will excel in this role.

"Erica continues to prove herself as a trusted, thoughtful and valued member of our department and greater community," she noted. "This promotion is well deserved. She will continue to serve our student-athletes and senior management team very well."

Rau, who enters her sixth season as the head volleyball coach at Oberlin, will become a member of the athletics senior staff and will serve as the deputy title IX coordinator for athletics for the institution.

"I would like to thank Natalie and the rest of the athletics senior management team for this opportunity," Rau said. "It is a really exciting time to be part of Oberlin athletics and I am looking forward to having a hand in shaping the future of the department and being an advocate for all student-athletes."

On the court, Rau has led the Yeowomen to 33 wins over the last three seasons and has produced wins in the conference tournament in three out of the last four years.

The SWA is the highest-ranking female in each NCAA athletic department or member conference. The purpose of the position is to encourage and promote the involvement of female administrators in meaningful ways in the decision-making process in intercollegiate athletics. The designation is intended to enhance representation of female experience and perspective at the institutional, conference and national levels and support women's interests.

Copyright ©2020 Oberlin College Athletics

3/18/2020          Zukerman Daiker & Lear, Co. LPA Mail - Title IX Investigation



Adam Brown <amb@zukerman-law.com>

## Title IX Investigation
4 messages

**Adam Brown** <amb@zukerman-law.com>      Thu, Feb 6, 2020 at 9:00 AM
To: "Erica.Rau@oberlin.edu" <Erica.Rau@oberlin.edu>
Bcc: "Larry W. Zukerman" <lwz@zukerman-law.com>, Lisa Kovit <mal@zukerman-law.com>

Ms. Rau,

Please be advised that the undersigned and Attorney Larry W. Zukerman represent ▓▓▓▓▓▓▓▓ . I am emailing you to let you know that Attorney Zukerman and I are going to be present this afternoon during the administrative meeting with Mr. ▓▓▓ , as his advisors.

Finally, it has come to my attention that although you are a Deputy Title IX Coordinator, you are also the Reporting Party's volleyball coach. Accordingly, to avoid the appearance of any bias with respect to this process, we are asking you to recuse yourself from any further participation in this matter.

If you would like to meet with us prior to the meeting, please let me know you availability.

Sincerely,

Larry W. Zukerman, Esq. & Adam M. Brown, Esq.
—
Adam M. Brown, Esq.
Zukerman Lear & Murray Co., LPA
3912 Prospect Ave. East
Cleveland, Ohio 44115
(216) 696-0900



### STATEMENT OF CONFIDENTIALITY

The information contained in this electronic message and any attachments are covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 and is legally privileged.  Unauthorized review, use, disclosure, or distribution is strictly prohibited.  The information contained in this e-mail message is only intended for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and as such is privileged and confidential.  If you are not the intended recipient, please notify the Office Manager at 216-696-0900, immediately and destroy all copies of this message and any attachments.  Unintended disclosure does not in any manner whatsoever waive the attorney-client privilege.

Although this e-mail and any attachments are believed to be free of any virus or other defect that may affect a computer system into which it is received and opened, it is the responsibility of the recipient(s) to ensure that it is virus free and no responsibility is accepted by the sender or their employees for any loss or damage arising in any way from its use.

### METADATA NOTICE

This electronic message may contain information that is privileged or exempt from disclosure.  This applies whether the message is sent by e-mail or by fax.  Documents which accompany this electronic message may contain metadata.  Unless privileged or exempt from disclosure, it is my express intention to only deliver the document in its plainly visible form.  I do not authorize your access to, nor waive any privilege or exemption to, any information contained in the metadata.  Any access to metadata is unauthorized and is considered an unethical examination.  By reviewing any attachment I provide, you are consenting in advance to my express conditions above.

**Erica Rau** <erau@oberlin.edu>      Thu, Feb 6, 2020 at 10:40 AM
To: Adam Brown <amb@zukerman-law.com>
Cc: Rebecca Mosely <rmosely@oberlin.edu>, ▓▓▓▓▓▓▓▓▓ >

Hi Adam,

Thank you for your email.  I have no issue stepping away from the report.  However, ███████ will have to reschedule a new time to meet with Rebecca Mosely our Title IX Coordinator.  She was not planning to be present at our 1:00p meeting today. I have cc'd her on this email as well as ████████ so they are aware.

Thanks, Erica

[Quoted text hidden]
--
Erica Rau
Head Volleyball Coach
Assistant Athletics Director
Senior Woman Administrator
Deputy Title IX Coordinator for Athletics
Oberlin College
Cell:  954-288-2972
Blog | Twitter | Facebook | Instagram

---

**Adam Brown** <amb@zukerman-law.com>                                   Thu, Feb 6, 2020 at 10:49 AM
To: "Larry W. Zukerman" <lwz@zukerman-law.com>

See response
[Quoted text hidden]

---

**Adam Brown** <amb@zukerman-law.com>                                   Thu, Feb 6, 2020 at 10:56 AM
To: Erica Rau <erau@oberlin.edu>
Cc: ███████████████████████ >, "Larry W. Zukerman" <lwz@zukerman-law.com>, Rebecca Mosely
<rmosely@oberlin.edu>

Ms. Rau,

In light of your email, it is our understanding that today's meeting will not proceed and Mr. ████ will not appear. I would ask Ms. Mosley to contact us directly with her availability to reschedule the meeting. Thank you.

Adam Brown
[Quoted text hidden]



Adam Brown <amb@zukerman-law.com>

## Fwd: Reaching out

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮

EXHIBIT
G

▮▮▮

Begin forwarded message:

**From:** Rebecca Mosely <rebecca.mosely@oberlin.edu>
**Date:** February 6, 2020 at 11:18:32 AM EST
**To:** ▮▮▮▮▮▮▮▮ @oberlin.edu>
**Subject: Reaching out**

▮▮▮▮  ,

My name is Becky Mosely, and I am the Title IX Coordinator here at Oberlin. I received an email from Erica Rau that you would like to have a different person handling the report about you which I am happy to do. I also understand that you may have hired an attorney to act as your advisor. I am pasting the information from the policy regarding advisors below. You are allowed to have an advisor of your choice, but before that individual can act in this role I will need two things. The first, is a signed FERPA waiver from you allowing me to speak with them and include them on correspondence. I am attaching the form here, but you are also welcome to stop by my office in Carnegie 204 to get one you can fill out if you don't want to print it out. The second thing is that once you complete the form, I will need to speak with your advisor to make sure they understand how our process works and their role in the process. I look forward to hearing from you and meeting you soon.

**Advisor**
*In any hearing, the Reporting Party and Responding Party may choose to be assisted by an advisor of their choice. The parties may select their own advisor, or may select an advisor from a list of campus community members who have undergone Title IX training to guide a party through the pre-hearing and hearing process. An outside advisor will be required to meet with the Hearing Coordinator or the Title IX Coordinator in advance of any participation in the proceedings to be informed about College expectations regarding confidentiality of the process. The advisor may accompany the party to any College investigative, administrative meeting, or hearing. The advisor may not speak on the behalf of their advisee. All communication regarding the process must come from the advisee to the*

*college other than general questions regarding how the process and/or policy works.  The advisor may not address the panel during the hearing, or otherwise delay, disrupt, or interfere with any meeting or proceeding.  Attorneys serving as advisors must adhere to the expectations of the role as described in this policy.*

Rebecca Mosely, Ph.D.
Title IX and ADA Coordinator and Director of Equity, Diversity, and Inclusion
Oberlin College
440-775-8555



---

📎 **EDI student consent to share information updated.pdf**
77K

ZUKERMAN LEAR & MURRAY CO. LPA

3912 PROSPECT AVE.
CLEVELAND, OHIO 44115

216.696.0900
216.696.8800

February 18, 2020

Rebecca Mosely
Director for Equity, Diversity, and Inclusion
Title IX Coordinator
Office of Equity, Diversity, and Inclusion
Carnegie Building 204
Rebecca.Mosely@oberlin.edu
440-775-8555



**EXHIBIT**

**H**

RE:    *Title IX Report Involving* ▮▮▮▮▮▮▮

Dear Ms. Mosely,

As you are aware, the undersigned and the law firm of Zukerman Lear & Murray Co., L.P.A., represents ▮▮▮▮▮▮ with respect to the Title IX allegation that has been made against him.

While we would like this process to proceed informally, as per the Reporting Party's wishes, we must nevertheless inquire about several issues that have come to our attention with respect to this matter.

• **Exculpatory Evidence in the College's Video Surveillance Systems:**

It is our understanding that the alleged incident in question occurred sometime in mid-November to early December 2019. As you are aware, Mr. ▮▮▮ was not notified of the existence of the Title IX complaint until February 4, 2020 — some 6 to 8 weeks subsequent to the date of the alleged incident.

We are concerned that this delay by either Oberlin College and/or the Reporting Party has resulted in the loss of certain video surveillance evidence that we believe would be exculpatory evidence.

Specifically, we believe that any and all video surveillance footage from the night in question, which will be more fully described below, would constitute exculpatory evidence.

We believe that if this evidence has been deleted, recorded over, not retained, and/or otherwise lost due to this delay and/or is otherwise unavailable, and said loss and/or unavailability was the result of the above-referenced delays by the Reporting Party or the

ZUKERMAN

1

College, that such delay may constitute a violation of Mr. ██████' right to due process in these proceedings under the Fifth and Fourteenth Amendments to the United States Constitution. As you are aware, "Procedural due process imposes constraints on governmental decisions which deprive individuals of `liberty' or `property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Doe v. Miami University*, 882 F. 3d 579, 600- Court of Appeals, 6th Circuit 2018 citing *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Procedural due process is "implicated by higher education disciplinary decisions." see *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017). "Suspension `clearly implicates' a protected property interest, and allegations of sexual assault may `impugn [a student's] reputation and integrity, thus implicating a protected liberty interest.'" *Univ. of Cincinnati*, 872 F.3d at 399.

As recognized in Oberlin College's *Sexual Misconduct Policy*, "Oberlin College encourages timely reporting of sexual misconduct. Prompt reporting helps ensure the preservation of evidence and timely investigation." *Id*. at 31. Furthermore, pursuant to the College's *Sexual Misconduct Policy*, it is the duty of the assigned investigator to "gather any available physical evidence, including documents, communications between the parties, and other electronic records as appropriate." *Id*. at 46. Thus, in light of this duty, it is Oberlin College's duty, pursuant to its own policy, to preserve and collect any available relevant evidence, including, but not limited to, the video surveillance evidence in question.

As such, please allow this letter to constitute a notice to immediately preserve and produce the following video surveillance evidence, which we believe to be exculpatory in nature:

- Any and all interior and exterior video surveillance recordings of Burton Hall;

- Any and all interior and exterior video surveillance recordings of Wilder Hall, including "The SCO";

- Any and all video surveillance recordings of the interior of "The SCO", including, but not limited to "The Dionysus Disco", aka, "The Dionysus Club";

- Any and all video surveillance recordings of the area between Burton Hall and Wilder Hall, known as "The Quad";

- Any and all exterior surveillance of:

2

-     Bailey House (French House)

-     Zechiel House

-     Noah Hall

-     East Hall

-     Barrows Hall

-     Barnard House

-     Wright Laboratory of Physics

-     Science Center (Science Library)

-     Severance Hall

As the exact date of the alleged incident underlying the Title IX Complaint is unknown to us at this time, we are requesting the preservation and disclosure of the above-listed video surveillance evidence from the night in question, if said date is known to Oberlin College and, if the night in question is unknown to Oberlin College, we would respectfully request that any and all such video surveillance recordings from the dates of November 1, 2019 through December 14, 2019, between the hours of 9:00 p.m. and 1:00a.m., be immediately preserved and produced to the undersigned.

• **Failure to Adhere to College's Privacy Statement**

Furthermore, it has come to our attention that the existence of the Title IX Report against Mr.     has been disclosed by the Complainant to other students on Oberlin's campus. As Oberlin College is aware, the Oberlin College *Sexual Misconduct Policy's* Privacy Statement provides:

**Privacy Statement**

In any report, investigation, or resolution of an allegation of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, every effort will be made to protect the privacy and confidentiality interests of the individuals involved in a manner consistent with the need for a thorough

3

review of the allegation and the protection of the parties involved and the broader campus community.

*See Oberlin College Sexual Misconduct Policy,* at 7.
Additionally, Oberlin College *Sexual Misconduct Policy* further provides

> The College is committed to protecting the privacy of all individuals involved in a report or an investigation filed under the Sexual Misconduct Policy. All College employees who participate in the College's Title IX response, including the Title IX Coordinator, Title IX Deputy Coordinators, Title IX Team members, investigators, and Hearing Panel members receive specific instruction about respecting and safeguarding private information. Throughout the process, every effort will be made to protect the privacy interests of all involved individuals in a manner consistent with the need for a thorough review of the report. All College proceedings are conducted in compliance with the requirements of the Family Educational Rights and Privacy Act (FERPA), the Clery Act, Title IX, and state and federal law. No information shall be released from such proceedings except as required or permitted by law and College policy.

*See Oberlin College Sexual Misconduct Policy,* at 16.

Thus, in light of Oberlin College's policies aimed at maintaining the privacy of all of the parties involved, including the Responding Party, and considering that "every effort will be made to protect the privacy interests of all involved individuals", to ensure Mr. ▮▮ reputation is not needlessly diminished as a result of violative campus gossip, we would respectfully encourage and request that Oberlin College take any and all measures available to protect Mr ▮▮ right to privacy by advising the Reporting Party and/or anyone else that has knowledge of this Title IX matter, to cease and desist from disclosing the existence of the Title IX allegation and/or the Title IX proceedings to other Oberlin College students and/or anyone who is not involved with this process.

• **Recording Process for Statements and Interviews**

Finally, with respect to the administrative meetings wherein Mr. ▮▮ is expected to provide a statement to Title IX Investigators, as well as all interviews of witnesses conducted by the College during its investigation, we would like to ensure that Mr. ▮▮' statements and all witness interviews will be recorded by video and/or audio recording, or by a court reporter. Essentially, we want to ensure that Mr. ▮▮ statement and/or witness statements are not merely summarized by another individual, such as an investigator, but actually recorded in full.

4

As Oberlin College is aware, when a statement is merely summarized as opposed to recorded, the summarizing individual may take certain liberties, whether consciously or unconsciously, when deciding what information to include in the summary and what information to omit.

The importance of an accurate record is not only essential in light of the significant deprivations Mr. ████ may face as a result of these proceedings, but also, given the numerous, readily available means of electronic recording in today's world, such a minor step to ensure accuracy would be of great benefit to both Mr. ████ and Oberlin College and place only a minimum to non-existent burden upon the College.

Seeing that the process of recording statements protects both the speaker and the investigator/summarizer against a later allegation of inaccuracies or incompleteness, we do not expect the College to have any issue with the recording of Mr. ████ statements and all witness statements, and would respectfully request the College to confirm, in writing, the same.

The failure to record statements when it can be done with such ease, could be seen as an attempt to leave open the opportunity to mischaracterize and/or manipulate the accuracy of the summarized statement during a subsequent proceeding.

If you have any questions or concerns regarding these matters, please feel free to contact me at your earliest convenience.

Very truly yours,

Larry W. Zukerman, Esq.

5



**EXHIBIT**
**I**

From:
Subject:
Date:
To:



Begin forwarded message:

**From:** Rebecca Mosely <rebecca.mosely@oberlin.edu>
**Date:** February 26, 2020 at 10:42:52 AM EST
**To:** ▮▮▮▮▮
**Cc:** Larry Zukerman <lwz@zukerman-law.com>
**Subject: Following up**

▮▮▮▮

It was a true pleasure meeting with you yesterday.  As I shared with you during our meeting, I had a follow up meeting scheduled with ▮▮▮ late yesterday as well.  Since our meeting yesterday, ▮▮▮ has informed me that she is no longer interested in using an informal resolution process to resolve her report.  She has asked that I begin a formal resolution process.

With that in mind, I am writing to provide you with notice that the College is investigating ▮▮▮'s report that you engaged in behavior that could be a violation of the sexual misconduct policy, and specifically the sexual harassment and assault portion of the policy.  To reach this decision, her report was reviewed by the Title IX team, which determined that this report falls within the purview of the Sexual Misconduct Policy and that the College should pursue further investigation and, if the appropriate threshold is met, formal resolution.

My role is to make sure the process of resolving the report is fair, equitable, and impartial, and I am available to help you throughout.  If you would like to schedule additional meetings to discuss the process or other concerns, please let me know.

The full College Sexual Misconduct Policy, which describes the College process for receipt and resolution of reports related to gender-based harassment, is available here. The Policy also provides protection against retaliation for people who make reports or are involved in resolving a report:

https://www.oberlin.edu/sites/default/files/content/office/equity-diversity-inclusion/documents/final_oberlin_college_sexual_misconduct_policy_2019.pdf

You can find the definitions of conduct prohibited by College policy on pages 21-30 of the policy.

The investigation process is described on pages 46-48 of the policy.

The formal process for resolving complaints, if the investigation finds sufficient information to move forward with a formal process, starts on page 48 of the policy.

As you know, you may choose an advisor of your choice to assist you throughout the process. This person is welcome to participate in any meetings you have with College personnel related to this process and it is my understanding that you wish to continue to use Larry Zukerman as your advisor.  More information about the role of the advisor is available on pages 42-43 of the Sexual Misconduct Policy.

This investigation is a fact-finding process conducted by a fair and impartial investigator. I am working to identify who the investigator will be and once I do, I will write another email to introduce you to them.  They will schedule a time to speak with you to discuss the report. You are welcome to bring your adviser to any meeting you have with an investigator, per the Policy.

Please let me know what questions you have, or how I can be helpful to you.

Rebecca Mosely, Ph.D.
Title IX and ADA Coordinator and Director of Equity, Diversity, and Inclusion
Oberlin College
440-775-8555

EXHIBIT

March 2, 2020

Rebecca Mosely
Director for Equity, Diversity, and Inclusion
Title IX Coordinator
Office of Equity, Diversity, and Inclusion
Carnegie Building 204
Rebecca.Mosely@oberlin.edu
440-775-8555

     *RE:    Title IX Investigation*

Dear Ms. Mosely,

     As you are aware, on February 25, 2020 I, and my personal advisor, Larry W. Zukerman, Esq., met with you in regard to a Title IX allegation that I was first notified of on or about February 4, 2020. Prior to this meeting, you had informed Mr. Zukerman that the Oberlin College Title IX Team and the reporting student, ▮▮▮▮▮, had determined that an informal resolution of the Title IX report was appropriate. Further, on February 25, 2020, you confirmed to me that an informal resolution of the Title IX complaint in question was appropriate and, accordingly, I agreed to an informal resolution of the complaint.

     Pursuant to representations made by you to both Mr. Zukerman and myself, it is my understanding that the student that has alleged the Title IX incident, ▮▮▮▮▮, initially made the report sometime in mid-December, 2019 and, by her admission, said report related to an incident that she believed occurred sometime in mid-November, 2019. Although Oberlin College does not limit the time frame for reporting, I am concerned about the timing of Ms. ▮▮▮' report, among other concerns that I have.

     I am also concerned that Oberlin College was complicit with Ms. ▮▮▮' in deciding to withhold notification of this report to me until February 4, 2020. Given what I now know about Ms. ▮▮▮' allegations, I know that there is, or was if it is no longer in existence, exculpatory evidence – specifically, security video recordings, which would have shown Ms. ▮▮▮ and I having a cigarette within the view of a security video camera mounted on the exterior door of Burton Hall. I have enclosed herein a photograph of this door with the clearly visible security camera in question. This video recording will establish, or would have established if this evidence is no longer in existence, that Ms. ▮▮▮ was not in any way noticeably impaired on the evening in question. In fact, she exhibited no appearance of being under the influence of alcohol or any other substance, at that or any other time that she was in my presence on that evening.

     Given the nature of Ms. ▮▮▮' allegation, Oberlin College and/or the Oberlin College Title IX Team's decision to conspire with Ms. ▮▮▮ in withholding the submission of her false report has not only evidenced Oberlin College and/or the Oberlin College Title IX Team's bias in favor of Ms. ▮▮▮ and prejudice against me, it has prevented and/or severely impaired my ability to obtain

evidence favorable to me. Make no mistake – this intentional decision has violated my rights under the Oberlin College Title IX Policy and/or has violated my constitutional rights to due process of law.

Based on Oberlin College's Title IX policies, in relevant part, it was incumbent on the Title IX Team to conduct an immediate assessment of the report at the time that Ms. ▇ made her initial report. As stated in the policy:

> The initial review will proceed to the point where a reasonable assessment of the safety of the individual and of the campus can be made. Thereafter, *an investigation may be initiated depending on a variety of factors, such as* the Reporting Party's wish to pursue formal or informal resolution, the risk posed to any individual or the campus community, and *the nature of the investigation.*

Despite Ms. ▇ initial request for "informal resolution" – a request that she reportedly made at the time of the initial report and maintained until on or about February 26, 2020 – I am quite confident that Oberlin College, recognizing the severity of the allegations made by her and recognizing its duty to also protect me from false reports, decided to initiate an immediate investigation, including, but not limited to, making sure to preserve and obtain any and all security video recordings of any video camera that could have captured Ms. ▇' alleged consumption of alcohol and/or that could have captured Ms. ▇' physical state on the night in question. Accordingly, I am confident that in following its own policy, the Oberlin College Title IX Team has already preserved and collected the security video recordings in question and, accordingly, I am respectfully requesting that I be provided with these recordings immediately.

I also wish to raise my concern that I have been retaliated against by ▇▇▇ herein. Again, as represented by you, ▇▇▇ reportedly made her initial Title IX complaint sometime in mid-December, 2019 and also reportedly requested an informal resolution relative to her complaint. It is my understanding, as reported by you to both myself and Mr. Zukerman, that ▇▇▇ maintained her request for informal resolution until after I had already agreed to the informal resolution. At the time that I agreed to an informal resolution, Mr. Zukerman, on my behalf, expressed to you my concern that Ms. ▇ had been slandering me by calling me a "rapist" to other Oberlin College students. This fact was made known to you on February 25, 2020 and, pursuant to my request, you indicated that you would address Ms. ▇' slander of me to her. Accordingly, it is my understanding based on the timing of your February 26, 2020 e-mail that ▇▇▇ "informed [you] that she is no longer interested in using an informal resolution process to resolve her report" during your meeting with her which occurred after our meeting. Thus, it appears that Ms. ▇' decision to change her mind was prompted by my complaint that she was slandering me to other Oberlin College students.

As you are well aware, the Oberlin College Title IX policy prohibits retaliation against a "Responding Party":

Any adverse action or attempt to retaliate or seek retribution against a Reporting Party, Responding Party, or any individual or group of individuals involved in a report, investigation and/or resolution of an allegation of sexual misconduct . . . Retaliation can take many forms, including threats, intimidation, pressuring, . . . or other forms of harm to others, and in varying modes, including in person and in electronic and online communication. Retaliation can also include adverse . . . educational actions made or taken against an individual because of their good faith participation in the reporting, investigation, and/or resolution of an alleged violation of this policy and/or any conduct that would discourage a reasonable person from engaging in further protected activity.

Accordingly, it is clear that Ms. ▮▮▮' decision to request a formal resolution amounts to retaliation against me due to my request communicated to you that she refrain from further slandering me.

As previously noted, despite Oberlin College and/or ▮▮▮▮ decision to withhold notice of the Title IX report to me until February 4, 2020 – thus preventing me from preserving and/or collecting exculpatory evidence that clearly existed, if Oberlin College followed its own policies, then Oberlin College has already preserved and collected security video recordings that I know to be favorable to me and exculpatory in nature.

If Oberlin College did not follow its own policy and/or did not immediately preserve such exculpatory security video recordings, my counsel and advisor, Larry W. Zukerman, Esq., has already previously sent you a specific request that any and all identified security video recordings be immediately preserved and collected.

Now that a formal resolution has been requested, an investigation has clearly been triggered and a "fair and impartial investigator" has been appointed. Pursuant to Oberlin College's Policy, the goal of an investigation is "a full assessment of the facts" (*See Oberlin College Sexual Misconduct Policy,* at 46) I am hereby respectfully requesting Oberlin College and/or the Title IX Team and/or the investigator to immediately preserve and immediately produce to me, or my counsel, the following security video evidence, that I believe is already in the College's possession, on the date and approximate time of the incident as reported by ▮▮▮▮ and/or from 8:00 p.m. on the night on which ▮▮▮▮ alleges the incident occurred until 2:30 a.m. on the early morning following day[1]:

- Any and all interior and exterior video surveillance recordings of Burton Hall;

---

[1] As the specifics of the date and time of the alleged incident have not been disclosed to me and/or were not even provided by ▮▮▮▮, if Oberlin College is unaware of the specific date and time, this request is for any and all security video recordings during dates and times that the incident could have happened.

3

- Any and all interior and exterior video surveillance recordings of Wilder Hall, including "The SCO";

- Any and all video surveillance recordings of the interior of "The SCO", including, but not limited to "The Dionysus Disco", aka, "The Dionysus Club";

- Any and all video surveillance recordings of the area between Burton Hall and Wilder Hall, known as "The Quad";

- Any and all exterior surveillance of:

  - Bailey House (French House)

  - Zechiel House

  - Noah Hall

  - East Hall

  - Barrows Hall

  - Barnard House

  - Wright Laboratory of Physics

  - Science Center (Science Library)

  - Severance Hall

As the exact date of the alleged incident underlying the Reporting Party's Complaint is unknown to me, I am demanding the immediate preservation and disclosure of the above-listed video surveillance evidence from the night in question if said date is known to Oberlin College, from 8:00 p.m. that night through 2:30 a.m. the following early morning. If the night in question is unknown to Oberlin College, I am demanding that any and all such video surveillance recordings listed above from the dates of November 1, 2019 through December 14, 2019, between the hours of 8:00 p.m. and 2:30 a.m., be immediately preserved and produced to me.

Based on the nature of the allegation as Reported to the College by Ms. ███, it is my belief that, in an eye towards a "fair and reliable gathering of the facts", and in all fairness to the Responding Party, the College exercised basic due diligence and immediately preserved the video footage referenced above on or about the time the Reporting Party made her initial report to the College, I am confident that the College's production of said footage to me will not be problematic or impose any burden on the College. *See Oberlin College Sexual Misconduct Policy*, at 46.

4

As it is my belief that the video footage referenced above was immediately preserved on or about the time the Reporting Party made her initial report, I am requesting the College to immediately disclose to me and/or my counsel copies of said footage. Again, I believe, and I believe that the College knew at the time the Reporting Party made the report, that this video footage is relevant, exculpatory, and will establish that the Reporting Party was not impaired on the evening in question.

**• Additional Evidence in The College's Possession and/or Control**

Furthermore, please allow this letter to constitute a formal request that Oberlin College and/or the Oberlin College Title IX Team and/or the investigator immediately preserve and provide to me additional evidence in its possession, so that I may effectively defend myself against ███████████' false and meritless allegations against me.

**(I)      The Written Report**

As an initial matter, I am specifically requesting the immediate preservation and disclosure of a copy of the written Complaint made by the reporting party against me. The only reason Oberlin College would not provide me with a copy of the Complaint against me would be to prevent me from identifying any inconsistent statements made by ████████ in the Complaint and elsewhere. Further, the identity of the date and time of the alleged incident is crucial to my ability to defend myself and/or in my ability to prove that Ms. ████ has made a false Title IX report.

**(II)     ████████████' Cell Phone, the Contents Thereof, and ████████████' Cell Phone**

**Records from November 1, 2019 through December 31, 2019**

Moreover, and as the College is aware, ████████████ has alleged that the interaction between her and I began after a series of text and/or Snapchat messages. To be clear, the it was ████████████ who contacted me first that night, and I believe that information, in addition to other electronic communications demonstrating the Reporting Party's intentions as well as her sobriety, are still contained on ████████████' cell phone.

Specifically, it is my understanding that ████████████ has alleged that on the night in question, she was suffering from a self-induced "selective blackout" i.e., that "she was impaired to the point where she doesn't remember certain events", including whether she consented to sexual activity. It is my belief that her cell phone contains evidence that contradicts that allegation, specifically including, but not limited to, her usage of Snapchat and/or Snapchat messaging on the evening in question, text messages sent and/or received by ████████████ that evening, any photographs and/or videos from that night, both before I saw her that night, and in the days and weeks following the alleged incident. I believe, and I believe the College knows, that any of these items discovered on ████████████' phone will contradict her allegations against me.

Considering Oberlin College's Title IX Policy and goal is to conduct thorough, unbiased investigations and, specifically, to "gather all relevant facts", it is my belief that Oberlin College and/or the Oberlin College Title IX Team and/or the investigator has already taken steps to preserve any and all evidence that is relevant to this complaint that is within ██████████' cell phone and/or is already in possession of the contents of ██████████'s cell phone and cell phone records. *See Oberlin College Sexual Misconduct Policy,* at 40, 46.

Accordingly, I am demanding that Oberlin College's investigator provide me with a copy of ██████████' cell phone and cell phone records, already in its possession, including, but not limited to the specific electronic information set forth above. If the College is not already in possession of the Reporting Party's cell phone (which, based on the facts alleged in the Complaint, would be in violation of the College's own policy and stated goals) I am requesting the investigator to compel ██████████ to sign a release to obtain and produce her phone records for the months of November and December 2019, including but not limited to call log, text log, call toll records, and billing records and I am further demanding that Oberlin College and/or the Oberlin College Title IX Team and/or the investigator immediately obtain and preserve the electronic evidence within ██████████' cell phone and produce a complete copy thereof to me and/or my counsel.

As noted, I believe that electronic evidence within ██████████' cell phone will establish that she initiated contact with me on the night in question, that she was not under the influence of alcohol and/or otherwise impaired as claimed by her on the night in question, contrary to her allegation herein.

Ms. Mosey, I think you would agree that the College's policies are designed to protect Responding Parties (such as myself) against meritless, retaliatory complaints. It is my belief that had the College complied with its policy, it would have preserved all of the evidence referenced herein at the time the report was made. However, if Oberlin College and/or the Oberlin College Title IX Team and/or the Investigator failed to follow its policies, I am demanding that immediate action be taken to preserve and obtain this obviously relevant evidence.

**(III)**   ██████████' **OCID Charge Card/Charge Account Records**

Furthermore, I am requesting that the Oberlin College Title IX Team and/or Investigator immediately preserve, obtain, and produce to me a complete itemization of the ██████████' student OCID charge card/ charge account, for the months of November and December 2019, or, for the specific night in question, if Oberlin College is aware of said date.

**(IV)**   **Schedule of Events at The Sco for November and December, 2019**

Additionally, I am requesting that the Oberlin College Title IX Team and/or Investigator immediately preserve, obtain, and produce to me a complete and accurate schedule of events that occurred and/or that were scheduled to occur at The SCO for the months of November and December 2019.

(V)     **Drug/Urine Test Records for** ████████ **and/or Relative to** ████████ '
**Participation on the Women's Volleyball Team and/or Disciplinary History
Report and/or Incident Reports**

The Oberlin College Title IX Policy includes amnesty for drug or other drug use and states,
in relevant part:

> . . . To encourage reporting and honest participation in an investigation, an
> individual who reports sexual misconduct, either as a Reporting Party or a third-
> party witness, . . . will not be subject to disciplinary action by the College for their
> personal consumption of alcohol or drugs at or near the time of the incident,
> provided that any such violations did not and do not place the health or safety of
> any other person at risk. . . .

Given that a Title IX Reporting Party has "amnesty" for alcohol and/or other drug use, I
am hereby respectfully requesting that the Oberlin College Title IX Team and/or Investigator
immediately preserve, obtain, and produce to me a complete copy of any and all drug/urine test
results relative to ████████ that are within the possession, custody, or control of Oberlin
College and/or that relate in any way to ████████ ' attendance at Oberlin College, including,
but not limited to, her participation in any extracurricular activities (including but not limited to
the Women's Volleyball Team), scholarships (athletic or otherwise), NCAA eligibility, and/or any
for any other reason.

Further, I am respectfully requesting that the Oberlin College Title IX Team and/or
Investigator immediately preserve, obtain, and produce to me a complete copy of ████████ '
disciplinary history.

Further, I am respectfully requesting that the Oberlin College Title IX Team and/or
Investigator immediately preserve, obtain, and produce to me a complete copy of any incident
reports that relate to any incident involving ████████ or any other witness involved in the
investigation of the within matter relating to the night in question and/or for which ████████
and/or any other witness invoked the "amnesty" clause of the Title IX Policy.

In light of the College's referral of the Complaint for informal resolution following its initial
assessment based on ████████ ' allegation that "She was so drunk that she doesn't remember
if she gave consent"[2] (thus demonstrating the College's uncertainty in the merits of the complaint
and ████████ ' credibility), the disclosure of the evidence referenced herein is essential to
prevent violations of my right to due process and my rights under Oberlin College's policy.

---

[2] As the College has not provided me with a copy of the Complaint against me, this is my
understanding of the nature of the allegation against me, as described to me and my counsel by
you during our meeting to discuss informal resolution on February 25, 2020.

Further, I believe it is imperative that Oberlin College investigate the within false complaint, as it is crucial for Oberlin College to know about the existence of a false Title IX Report. Finally, as noted below, alongside ██████████' retaliatory intent in deciding to pursue formal resolution (after repeatedly stating that she wished to pursue informal resolution), renders Oberlin College's failure or refusal to disclose to me this evidence nothing short of prejudicial to the administration of justice.

Please disclose the above referenced evidence, much if not all of which I believe is already in the College's possession, to me and/or my counsel, immediately.

**• Reporting Party's Decision to Proceed Formally as Retaliation for Me Bringing her *Per Se* Slanderous Statements Against Me to The College's Attention**

To be straightforward, the timing of the Reporting Party's sudden change of heart, i.e., her decision to abandon informal resolution and pursue formal resolution after initially, repeatedly reaffirming that's she only wished to pursue informal resolution, makes clear that the Reporting Party's decision (to pursue formal resolution) was made for the improper and illegal purpose of retaliation against me.

Additionally, I believe that the Reporting Party's decision to proceed with Formal Resolution, was a direct result of my advisor bringing to your attention (in their written correspondence of February 18, 2020, during the February 25, 2020 telephone call and again during our February 26, 2020 in person meeting) the *per se* slanderous statements ██████ published to others, specifically, that ██████████ told other students that I "raped" her. As you are aware, the College's policy prohibits such retaliation and provides:

> **Statement Against Retaliation**
> It is a violation of Oberlin College policy to retaliate in any way against a student or employee because they have brought forward or been the subject of allegations of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, or participated in the College's resolution of the report. The College will take immediate and responsive action to any report of retaliation.

*See Oberlin College Sexual Misconduct Policy,* at 7.

As Oberlin College is aware, the Oberlin College *Sexual Misconduct Policy's* Privacy Statement provides:

> **Privacy Statement**
> In any report, investigation, or resolution of an allegation of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, every effort will be made to protect the privacy and confidentiality interests of the individuals involved in a manner consistent with the need for a thorough

review of the allegation and the protection of the parties involved and the broader campus community.

*See Oberlin College Sexual Misconduct Policy,* at 7.

Accordingly, please allow this letter to constitute a formal complaint against ████████ for her violation of the College's "Statement Against Retaliation". Clearly, in response to my decision to bring to the College's attention the Reporting Party's *per se* slanderous statements against me and thus my decision to exercise my legal and administrative rights through obtaining counsel, ████████ opted, in wield her virtually unfettered ability to pursue formal resolution against me, "at any time" as a retaliatory sword. This is a clear violation of the College's Policy and as the Reporting Party, I look forward to being contacted by the College with respect to its initial assessment into my Report.

Thus, further demonstrating the "bad faith" of ████████ ' decision to proceed with formal resolution is her initial delay in reporting the allegations to the College. Moreover, I believe that her delay in reporting the allegations to the College was purposeful and designed to complicate and/or prevent preservation of and/or my collection of exculpatory evidence.

The College's subsequent decision to delay providing me with notice of the allegations was also purposeful and designed to complicate the preservation of and/or my collection of evidence, the College should have no problem immediately producing to me the evidence that it collected at the time the report was made (as referenced throughout), so that I can effectively defend myself against ████████ ' false and meritless allegations, as is consistent with the College's Policy.

- **Recent Title IX Litigation Demonstrates the College's Duty To Disclose the Evidence Referenced Herein and Investigate The Reporting Party's Meritless Allegations**

The importance of a thorough, fair, and unbiased investigation in my case cannot be understated, especially now, in light of recent Title IX related litigation. As you may, or may not, be aware, just last week on February 26, 2020, Syracuse University settled a federal Title IX based action filed against the University by an accused student on the grounds that the University engaged in gender-based discrimination against him, in violation of Title IX. *See John Noakes v. Syracuse University,* Case No. 5:18-cv-43 (N.D.N.Y 2018). Following a hearing, the Plaintiff in *Noakes* was found "responsible" by the University's Student Conduct Board for an alleged sexual assault on a female student. Plaintiff's appeal to the University's Appeals Board was, not surprisingly, unsuccessful.

In his federal lawsuit against the University, the Plaintiff alleged that the University's decisions in the hearing and appeal "were erroneous outcomes which were the direct result of a flawed and biased proceeding." *Id.*

9

In response to his lawsuit, Syracuse filed a Motion to Dismiss Plaintiff's claims on the grounds that the Plaintiff failed to state a claim for relief against the University. The Court denied the University's Motion to Dismiss Plaintiff's Title IX claim and found that Plaintiff's Complaint "presented allegations of facts supporting a minimal plausible inference of discriminatory intent" by the University against him in its decisions in the hearing and appeal. *Id*. In support of its decision to deny the University's Motion, the Court stated the following:

> Plaintiff has pointed to flaws in the investigation, assumptions made by investigators, and an unwillingness by investigators to consider evidence he had presented of his innocence in the attack. He also contends that Syracuse did not question Roe's credibility and did not require her to explain the circumstances of her identification of Plaintiff or her memory of the event at Plaintiff's hearing or in any investigation. Plaintiff's allegations could reasonably be read to support an understanding that the Investigator, the University Conduct Board, the Appeals Board, and other Syracuse officials ignored any evidence or contradictions in Roe's story and refused to investigate any evidence that supported Plaintiff's version of events.

*See Id. See Decision and Order, John Noakes v. Syracuse University,* Case No. 5:18-cv-43, Doc. 18 (N.D.N.Y 2018) February 26, 2019.

As an Oberlin College student, I am confident that Oberlin College, the Oberlin College Title IX Team, and the Investigator will adhere to its own policy, preserve and disclose the evidence requested herein (as much of it is already in the College's possession, pursuant to its own policy) and conduct a thorough, unbiased investigation of ██████████' false report. Furthermore, once concluded, I am confident that the College's investigation will reveal that this matter should be not referred for Formal Adjudication and ultimately, that I am not responsible for any violation of the College's policies. To be clear, I am the aggrieved party herein, and, accordingly, I am demanding that my rights as a student of Oberlin College and/or as a Responding Party be protected. I fully intend to hold Oberlin College, the Oberlin College Title IX Team, and any Investigator, to its and/or their policies. Anything less than preserving and obtaining and producing the herein requested evidence would clearly be in violation of my rights to an objective and impartial investigation, and I will respond accordingly if my rights are violated.

I look forward to hearing from you regarding my complaint against ██████████ for retaliation and the immediate preservation and disclosure of the evidence requested herein.

Sincerely





Adam Brown <amb@zukerman-law.com>

---

## Fwd: Introduction to investigator

████████████████████████████                          ███████████████████████

                                                      ┌─────────────────────┐
                                                      │      EXHIBIT         │
                                                      │        K             │
                                                      │ _____      │
                                                      └─────────────────────┘

███████████████████████

Begin forwarded message:

> **From:** "ebutcher@incomplianceconsulting.com" <ebutcher@incomplianceconsulting.com>
> **Date:** March 3, 2020 at 9:47:08 AM EST
> **To:** ████████@oberlin.edu>
> **Cc:** Larry Zukerman <lwz@zukerman-law.com>, Rebecca Mosely <rebecca.mosely@oberlin.edu>
> **Subject: RE:  Introduction to investigator**

Good Morning, ██████,

As Rebecca mentioned, I have been assigned to investigate the complaint raised by Ms. ██ against you for Oberlin.  I work for INCompliance Consulting, which contracts with colleges and universities to conduct independent investigations for Title IX matters.  I would like to set up a time to meet with you in person as soon as possible.  Do you have any availability to meet with me next week?  I can also be available this Saturday, March 7, if that works better for you and your advisor.  Please let me know what works for you and we can work out details.  I am also available for any questions in the interim by email or my direct phone at 614-227-2303 or cell phone at 614-285-8987.

Best,

Erin



**Erin E. Butcher**
Of Counsel
**INCompliance  |**  100 South Third Street   |   Columbus, OH 43215
**Direct Dial 614.227.2303   |   ebutcher@incomplianceconsulting.com   |**
   **www.incomplianceconsulting.com**

This electronic transmission contains information from The INCompliance Consulting Group, Ltd. which is
privileged, confidential or otherwise the exclusive property of the intended recipient or INCompliance. This
information is intended for the use of the individual or entity that is the intended recipient. If you have received this
electronic transmission in error, please notify us by telephone (614-227-8899) or by email

(**info@incomplianceconsulting.com**) and promptly destroy the original transmission. Thank you for your assistance.

**From:** Rebecca Mosely <rebecca.mosely@oberlin.edu>
**Sent:** Monday, March 2, 2020 10:56 AM
**To:** ▇▇▇▇▇▇▇▇@oberlin.edu>
**Cc:** Butcher, Erin <EBUtcher@bricker.com>; Larry Zukerman <lwz@zukerman-
law.com>
**Subject:** Introduction to investigator

**This Message originated outside your organization.**

▇▇▇▇,

I am writing to introduce you to Erin Butcher, the investigator who the college has retained to
complete the investigation I informed you of on February 26, 2020. She will schedule a time to
speak with you to discuss the report. You are welcome to bring your adviser to any meeting
you have with the investigator, per the Policy.  I have copied Larry here so that he is aware and
able to support you.  Please let me know if you have any questions, or how I can be helpful to
you.  Thanks.

Rebecca Mosely, Ph.D.
Title IX and ADA Coordinator and Director of Equity, Diversity, and Inclusion
Oberlin College
440-775-8555



EXHIBIT

L

March 4, 2020

Erin E. Butcher
Of Counsel
INCompliance
100 South Third Street
Columbus, OH 43215
Direct Dial 614.227.2303
ebutcher@incomplianceconsulting.com

RE:     *Response to March 3, 2020 Email & Scheduling of In Person Meeting*

Ms. Butcher,

　　　I am writing this letter in response to your email of March 3, 2020, for the purpose of scheduling an in-person meeting with you as requested.

　　　Since February 4, 2020, the date on which I was first notified of Ms. ███' Complaint against me, I have heard several inconsistent versions of Ms. ███' allegations. As a result, even though I was notified of the Complaint one (1) month ago, I am still wholly unaware of the substantive aspects of Ms. ███' Complaint against me.

　　　While I have no problem meeting with you regarding this matter, I am unable to do so until I am made aware of the specifics of Ms. ███' allegations against me. Specifically, please provide me with a copy of the written complaint made against me, and please advise me of the specific date, time, and location of the alleged incident and the nature of the alleged incident(s), that forms the basis for Ms. ███' Complaint against me.

　　　Simply put, in light of the lack of official notice of the specific allegations, I am not going to guess about what Ms. ███' may or may not have alleged that I did (or did not do), and when and/or where Ms. ███ claims the alleged incident(s) allegedly took place.

　　　As I think you would agree, it is a basic, fundamental aspect of the right to due process that I know and understand the nature of the allegation being made against me.

　　　The College's repeated refusal to advise me in writing of the specifics of Ms. ███' allegations is deeply concerning, as it prevents me from properly responding to and/or preparing a defense to the allegations. I cannot effectively defend myself against that of which I am unaware and although you and/or the College clearly want to force me to defend against an elusive, moving target, I will not forego by basic and fundamental rights to appease you and/or the College.

　　　Furthermore, the College's refusal to adhere this core Notice principle of due process, alongside your request for an in-person meeting with me, could be viewed as an attempt by you

and/or the College to surprise me with the allegation during the in-person meeting in the hopes that I would make inculpatory statements.

If this is not your and/or the College's intent, and it is not your and/or the College's hope that I will make inculpatory statements and aid the College in justifying its pre-determined decision to pursue formal adjudication, and ultimately, to impose disciplinary sanctions against me, then I am sure you and/or the College will have no problem disclosing to me a copy of the written complaint/report made against me and advising me of the specific date, time, and location of the alleged incident and the nature of the alleged incident(s), that forms the basis of Ms. ████ Complaint against me.

Further, as you are aware, based on what little knowledge I have gleaned from the inconsistent versions of the allegations that I have heard, there are and/or were electronically stored evidence that would be exculpatory in nature, including, but not limited to, security video recordings. Further, I believe that other electronically stored information would include exculpatory evidence, including, but not limited to, the contents of the Reporting Party's cell phone. The crucial nature of this evidence, and the crucial need to preserve and obtain it, was the subject of a letter that my advisor caused to be sent to Ms. Mosely and was the subject of the letter that I sent to Ms. Mosely, a copy of which was sent to you via e-mail by my advisor's office yesterday. *Please see Exhibits A & B, attached hereto*. If you have not already done so, I once again impress upon you the urgency of taking immediate measures to preserve this evidence, if that has not already been done. As the Investigator assigned to this matter, it is incumbent upon you to obtain this evidence. I would respectfully demand that you do so and that you produce to me such evidence for my review and use relative to this matter.

Finally, as you now know based on your review of my letter that was sent to you yesterday, it is my belief that the Reporting Party has retaliated against me in numerous ways. In the February 4, 2020 e-mail sent to me by Erica Rau, a Deputy Title IX Coordinator (and also the Reporting Party's Women's Volleyball Coach), I was reminded of the Oberlin College's prohibition against retaliation within the Sexual Misconduct Policy. In relevant part, Ms. Rau wrote:

> Also, it is important for you to know that the Sexual Misconduct Policy prohibits retaliation against anyone who has filed a report with my office, or who is participating in a resolution process with my office. With that in mind, if you experience any form of retaliation, please let me know. . . .

Prior to my meeting with Rebecca Mosely on February 25, 2020, I was made aware of certain retaliatory statements made by the Reporting Party to other Oberlin College students, wherein the Reporting Party slandered me by referring to me as a "rapist". When this was made know to Rebecca Mosely during my February 25, 2020 meeting with her (wherein she informed me that the Reporting Party and Oberlin College was going to proceed with an Informal Resolution and wherein I agreed to an Informal Resolution), Ms. Mosely assured me and my advisor that she would address this situation with the Reporting Party. On February 26, 2020, Ms. Mosely notified me that after her meeting with me, she met with the Reporting Party and, at that time, the Reporting Party abruptly changed her mind and requested a Formal Resolution.

2

As you can see, it is quite clear that the Reporting Party has retaliated against my complaints about her slanderous conduct by triggering a Formal Resolution process and this investigation. Accordingly, as part of your investigation, I would respectfully demand that you interview Rebecca Mosely about the Reporting Party's request for a Formal Resolution. I would also demand that you obtain from Ms. Mosely any and all recordings and/or notes regarding her meeting with the Reporting Party on or about February 25, 2020 – February 26, 2020.

Once this information is provided to me, I would be happy to schedule a meeting with you, as requested in your email, so that I can tell you, in person, that Ms. ███ allegations, whatever they may be, are meritless and false, that I have done nothing wrong and Ms. ███ false allegations and defamatory statements against me to others, has caused me significant harm.

Accordingly, please provide the information requested as soon as possible. I look forward to hearing from you regarding this matter.

Sincerely,

/s/ ██████████

██████████

3

ZUKERMAN LEAR & MURRAY CO.LPA      3912 PROSPECT AVE.
CLEVELAND, OHIO 44115

216.696.0900
216.696.8800

February 18, 2020

Rebecca Mosely
Director for Equity, Diversity, and Inclusion
Title IX Coordinator
Office of Equity, Diversity, and Inclusion
Carnegie Building 204
Rebecca.Mosely@oberlin.edu
440-775-8555



RE:    *Title IX Report Involving* ███████

Dear Ms. Mosely,

As you are aware, the undersigned and the law firm of Zukerman Lear & Murray Co., L.P.A., represents ███████ with respect to the Title IX allegation that has been made against him.

While we would like this process to proceed informally, as per the Reporting Party's wishes, we must nevertheless inquire about several issues that have come to our attention with respect to this matter.

• **Exculpatory Evidence in the College's Video Surveillance Systems:**

It is our understanding that the alleged incident in question occurred sometime in mid-November to early December 2019. As you are aware, Mr. ███ was not notified of the existence of the Title IX complaint until February 4, 2020 – some 6 to 8 weeks subsequent to the date of the alleged incident.

We are concerned that this delay by either Oberlin College and/or the Reporting Party has resulted in the loss of certain video surveillance evidence that we believe would be exculpatory evidence.

Specifically, we believe that any and all video surveillance footage from the night in question, which will be more fully described below, would constitute exculpatory evidence.

We believe that if this evidence has been deleted, recorded over, not retained, and/or otherwise lost due to this delay and/or is otherwise unavailable, and said loss and/or unavailability was the result of the above-referenced delays by the Reporting Party or the

ZUKERMAN           1

College, that such delay may constitute a violation of Mr. ███ right to due process in these proceedings under the Fifth and Fourteenth Amendments to the United States Constitution. As you are aware, "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Doe v. Miami University*, 882 F. 3d 579, 600- Court of Appeals, 6th Circuit 2018 citing *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Procedural due process is "implicated by higher education disciplinary decisions." see *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017). "Suspension 'clearly implicates' a protected property interest, and allegations of sexual assault may 'impugn [a student's] reputation and integrity, thus implicating a protected liberty interest.'" *Univ. of Cincinnati*, 872 F.3d at 399.

As recognized in Oberlin College's *Sexual Misconduct Policy*, "Oberlin College encourages timely reporting of sexual misconduct. Prompt reporting helps ensure the preservation of evidence and timely investigation." *Id.* at 31. Furthermore, pursuant to the College's *Sexual Misconduct Policy*, it is the duty of the assigned investigator to "gather any available physical evidence, including documents, communications between the parties, and other electronic records as appropriate." *Id.* at 46. Thus, in light of this duty, it is Oberlin College's duty, pursuant to its own policy, to preserve and collect any available relevant evidence, including, but not limited to, the video surveillance evidence in question.

As such, please allow this letter to constitute a notice to immediately preserve and produce the following video surveillance evidence, which we believe to be exculpatory in nature:

- Any and all interior and exterior video surveillance recordings of Burton Hall;

- Any and all interior and exterior video surveillance recordings of Wilder Hall, including "The SCO";

- Any and all video surveillance recordings of the interior of "The SCO", including, but not limited to "The Dionysus Disco", aka, "The Dionysus Club";

- Any and all video surveillance recordings of the area between Burton Hall and Wilder Hall, known as "The Quad";

- Any and all exterior surveillance of:

- Bailey House (French House)

- Zechiel House

- Noah Hall

- East Hall

- Barrows Hall

- Barnard House

- Wright Laboratory of Physics

- Science Center (Science Library)

- Severance Hall

As the exact date of the alleged incident underlying the Title IX Complaint is unknown to us at this time, we are requesting the preservation and disclosure of the above-listed video surveillance evidence from the night in question, if said date is known to Oberlin College and, if the night in question is unknown to Oberlin College, we would respectfully request that any and all such video surveillance recordings from the dates of November 1, 2019 through December 14, 2019, between the hours of 9:00 p.m. and 1:00a.m., be immediately preserved and produced to the undersigned.

• **Failure to Adhere to College's Privacy Statement**

Furthermore, it has come to our attention that the existence of the Title IX Report against Mr.███ has been disclosed by the Complainant to other students on Oberlin's campus. As Oberlin College is aware, the Oberlin College *Sexual Misconduct Policy's* Privacy Statement provides:

**Privacy Statement**
In any report, investigation, or resolution of an allegation of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, every effort will be made to protect the privacy and confidentiality interests of the individuals involved in a manner consistent with the need for a thorough

3

review of the allegation and the protection of the parties involved and the broader campus community.

*See Oberlin College Sexual Misconduct Policy,* at 7.

Additionally, Oberlin College *Sexual Misconduct Policy* further provides

> The College is committed to protecting the privacy of all individuals involved in a report or an investigation filed under the Sexual Misconduct Policy. All College employees who participate in the College's Title IX response, including the Title IX Coordinator, Title IX Deputy Coordinators, Title IX Team members, investigators, and Hearing Panel members receive specific instruction about respecting and safeguarding private information. Throughout the process, every effort will be made to protect the privacy interests of all involved individuals in a manner consistent with the need for a thorough review of the report. All College proceedings are conducted in compliance with the requirements of the Family Educational Rights and Privacy Act (FERPA), the Clery Act, Title IX, and state and federal law. No information shall be released from such proceedings except as required or permitted by law and College policy.

*See Oberlin College Sexual Misconduct Policy,* at 16.

Thus, in light of Oberlin College's policies aimed at maintaining the privacy of all of the parties involved, including the Responding Party, and considering that "every effort will be made to protect the privacy interests of all involved individuals", to ensure Mr. ███' reputation is not needlessly diminished as a result of violative campus gossip, we would respectfully encourage and request that Oberlin College take any and all measures available to protect Mr. ███' right to privacy by advising the Reporting Party and/or anyone else that has knowledge of this Title IX matter, to cease and desist from disclosing the existence of the Title IX allegation and/or the Title IX proceedings to other Oberlin College students and/or anyone who is not involved with this process.

• **Recording Process for Statements and Interviews**

Finally, with respect to the administrative meetings wherein Mr. ███ is expected to provide a statement to Title IX Investigators, as well as all interviews of witnesses conducted by the College during its investigation, we would like to ensure that Mr. ███ statements and all witness interviews will be recorded by video and/or audio recording, or by a court reporter. Essentially, we want to ensure that Mr. ███' statement and/or witness statements are not merely summarized by another individual, such as an investigator, but actually recorded in full.

As Oberlin College is aware, when a statement is merely summarized as opposed to recorded, the summarizing individual may take certain liberties, whether consciously or unconsciously, when deciding what information to include in the summary and what information to omit.

The importance of an accurate record is not only essential in light of the significant deprivations Mr.█████ may face as a result of these proceedings, but also, given the numerous, readily available means of electronic recording in today's world, such a minor step to ensure accuracy would be of great benefit to both Mr. █████ and Oberlin College and place only a minimum to non-existent burden upon the College.

Seeing that the process of recording statements protects both the speaker and the investigator/summarizer against a later allegation of inaccuracies or incompleteness, we do not expect the College to have any issue with the recording of Mr.████' statements and all witness statements, and would respectfully request the College to confirm, in writing, the same.

The failure to record statements when it can be done with such ease, could be seen as an attempt to leave open the opportunity to mischaracterize and/or manipulate the accuracy of the summarized statement during a subsequent proceeding.

If you have any questions or concerns regarding these matters, please feel free to contact me at your earliest convenience.

Very truly yours,

Larry W. Zukerman, Esq.

5

March 2, 2020



Rebecca Mosely
Director for Equity, Diversity, and Inclusion
Title IX Coordinator
Office of Equity, Diversity, and Inclusion
Carnegie Building 204
Rebecca.Mosely@oberlin.edu
440-775-8555

     *RE:*    *Title IX Investigation*

Dear Ms. Mosely,

     As you are aware, on February 25, 2020 I, and my personal advisor, Larry W. Zukerman, Esq., met with you in regard to a Title IX allegation that I was first notified of on or about February 4, 2020. Prior to this meeting, you had informed Mr. Zukerman that the Oberlin College Title IX Team and the reporting student, ███████████, had determined that an informal resolution of the Title IX report was appropriate. Further, on February 25, 2020, you confirmed to me that an informal resolution of the Title IX complaint in question was appropriate and, accordingly, I agreed to an informal resolution of the complaint.

     Pursuant to representations made by you to both Mr. Zukerman and myself, it is my understanding that the student that has alleged the Title IX incident, ███████████, initially made the report sometime in mid-December, 2019 and, by her admission, said report related to an incident that she believed occurred sometime in mid-November, 2019. Although Oberlin College does not limit the time frame for reporting, I am concerned about the timing of Ms. ███' report, among other concerns that I have.

     I am also concerned that Oberlin College was complicit with Ms. ███' in deciding to withhold notification of this report to me until February 4, 2020. Given what I now know about Ms ███ allegations, I know that there is, or was if it is no longer in existence, exculpatory evidence – specifically, security video recordings, which would have shown Ms. ███ and I having a cigarette within the view of a security video camera mounted on the exterior door of Burton Hall. I have enclosed herein a photograph of this door with the clearly visible security camera in question. This video recording will establish, or would have established if this evidence is no longer in existence, that Ms. ███ was not in any way noticeably impaired on the evening in question. In fact, she exhibited no appearance of being under the influence of alcohol or any other substance, at that or any other time that she was in my presence on that evening.

     Given the nature of Ms. ███ allegation, Oberlin College and/or the Oberlin College Title IX Team's decision to conspire with Ms. ███ in withholding the submission of her false report has not only evidenced Oberlin College and/or the Oberlin College Title IX Team's bias in favor of Ms. ███ and prejudice against me, it has prevented and/or severely impaired my ability to obtain

evidence favorable to me. Make no mistake – this intentional decision has violated my rights under the Oberlin College Title IX Policy and/or has violated my constitutional rights to due process of law.

Based on Oberlin College's Title IX policies, in relevant part, it was incumbent on the Title IX Team to conduct an immediate assessment of the report at the time that Ms. ██ made her initial report. As stated in the policy:

> The initial review will proceed to the point where a reasonable assessment of the safety of the individual and of the campus can be made. Thereafter, *an investigation may be initiated depending on a variety of factors, such as* the Reporting Party's wish to pursue formal or informal resolution, the risk posed to any individual or the campus community, and *the nature of the investigation.*

Despite Ms. ██ initial request for "informal resolution" – a request that she reportedly made at the time of the initial report and maintained until on or about February 26, 2020 – I am quite confident that Oberlin College, recognizing the severity of the allegations made by her and recognizing its duty to also protect me from false reports, decided to initiate an immediate investigation, including, but not limited to, making sure to preserve and obtain any and all security video recordings of any video camera that could have captured Ms. ██' alleged consumption of alcohol and/or that could have captured Ms. ██ physical state on the night in question. Accordingly, I am confident that in following its own policy, the Oberlin College Title IX Team has already preserved and collected the security video recordings in question and, accordingly, I am respectfully requesting that I be provided with these recordings immediately.

I also wish to raise my concern that I have been retaliated against by ██████ herein. Again, as represented by you, ████████ reportedly made her initial Title IX complaint sometime in mid-December, 2019 and also reportedly requested an informal resolution relative to her complaint. It is my understanding, as reported by you to both myself and Mr. Zukerman, that ████████ maintained her request for informal resolution until after I had already agreed to the informal resolution. At the time that I agreed to an informal resolution, Mr. Zukerman, on my behalf, expressed to you my concern that Ms. ██ had been slandering me by calling me a "rapist" to other Oberlin College students. This fact was made known to you on February 25, 2020 and, pursuant to my request, you indicated that you would address Ms. ██' slander of me to her. Accordingly, it is my understanding based on the timing of your February 26, 2020 e-mail that ████████ "informed [you] that she is no longer interested in using an informal resolution process to resolve her report" during your meeting with her which occurred after our meeting. Thus, it appears that Ms. ██ decision to change her mind was prompted by my complaint that she was slandering me to other Oberlin College students.

As you are well aware, the Oberlin College Title IX policy prohibits retaliation against a "Responding Party":

Any adverse action or attempt to retaliate or seek retribution against a
Reporting Party, Responding Party, or any individual or group of individuals
involved in a report, investigation and/or resolution of an allegation of
sexual misconduct . . . Retaliation can take many forms, including threats,
intimidation, pressuring, . . . or other forms of harm to others, and in
varying modes, including in person and in electronic and online
communication. Retaliation can also include adverse . . . educational
actions made or taken against an individual because of their good faith
participation in the reporting, investigation, and/or resolution of an
alleged violation of this policy and/or any conduct that would discourage
a reasonable person from engaging in further protected activity.

Accordingly, it is clear that Ms. ███ decision to request a formal resolution amounts to
retaliation against me due to my request communicated to you that she refrain from further
slandering me.

As previously noted, despite Oberlin College and/or ███████████ decision to withhold
notice of the Title IX report to me until February 4, 2020 – thus preventing me from preserving
and/or collecting exculpatory evidence that clearly existed, if Oberlin College followed its own
policies, then Oberlin College has already preserved and collected security video recordings that
I know to be favorable to me and exculpatory in nature.

If Oberlin College did not follow its own policy and/or did not immediately preserve such
exculpatory security video recordings, my counsel and advisor, Larry W. Zukerman, Esq., has
already previously sent you a specific request that any and all identified security video recordings
be immediately preserved and collected.

Now that a formal resolution has been requested, an investigation has clearly been
triggered and a "fair and impartial investigator" has been appointed. Pursuant to Oberlin
College's Policy, the goal of an investigation is "a full assessment of the facts" (*See Oberlin College
Sexual Misconduct Policy,* at 46) I am hereby respectfully requesting Oberlin College and/or the
Title IX Team and/or the investigator to immediately preserve and immediately produce to me,
or my counsel, the following security video evidence, that I believe is already in the College's
possession, on the date and approximate time of the incident as reported by ███████ and/or
from 8:00 p.m. on the night on which ███████ alleges the incident occurred until 2:30 a.m.
on the early morning following day[1]:

- Any and all interior and exterior video surveillance recordings of Burton Hall;

---

[1] As the specifics of the date and time of the alleged incident have not been disclosed to me and/or were not even
provided by ███████, if Oberlin College is unaware of the specific date and time, this request is for any and all
security video recordings during dates and times that the incident could have happened.

- Any and all interior and exterior video surveillance recordings of Wilder Hall, including "The SCO";

- Any and all video surveillance recordings of the interior of "The SCO", including, but not limited to "The Dionysus Disco", aka, "The Dionysus Club";

- Any and all video surveillance recordings of the area between Burton Hall and Wilder Hall, known as "The Quad";

- Any and all exterior surveillance of:

    - Bailey House (French House)

    - Zechiel House

    - Noah Hall

    - East Hall

    - Barrows Hall

    - Barnard House

    - Wright Laboratory of Physics

    - Science Center (Science Library)

    - Severance Hall

As the exact date of the alleged incident underlying the Reporting Party's Complaint is unknown to me, I am demanding the immediate preservation and disclosure of the above-listed video surveillance evidence from the night in question if said date is known to Oberlin College, from 8:00 p.m. that night through 2:30 a.m. the following early morning. If the night in question is unknown to Oberlin College, I am demanding that any and all such video surveillance recordings listed above from the dates of November 1, 2019 through December 14, 2019, between the hours of 8:00 p.m. and 2:30 a.m., be immediately preserved and produced to me.

Based on the nature of the allegation as Reported to the College by Ms. ████, it is my belief that, in an eye towards a "fair and reliable gathering of the facts", and in all fairness to the Responding Party, the College exercised basic due diligence and immediately preserved the video footage referenced above on or about the time the Reporting Party made her initial report to the College, I am confident that the College's production of said footage to me will not be problematic or impose any burden on the College. *See Oberlin College Sexual Misconduct Policy,* at 46.

As it is my belief that the video footage referenced above was immediately preserved on or about the time the Reporting Party made her initial report, I am requesting the College to immediately disclose to me and/or my counsel copies of said footage. Again, I believe, and I believe that the College knew at the time the Reporting Party made the report, that this video footage is relevant, exculpatory, and will establish that the Reporting Party was not impaired on the evening in question.

- **Additional Evidence in The College's Possession and/or Control**

Furthermore, please allow this letter to constitute a formal request that Oberlin College and/or the Oberlin College Title IX Team and/or the investigator immediately preserve and provide to me additional evidence in its possession, so that I may effectively defend myself against ████████ false and meritless allegations against me.

    **(I)**       **The Written Report**

As an initial matter, I am specifically requesting the immediate preservation and disclosure of a copy of the written Complaint made by the reporting party against me. The only reason Oberlin College would not provide me with a copy of the Complaint against me would be to prevent me from identifying any inconsistent statements made by ████████ in the Complaint and elsewhere. Further, the identity of the date and time of the alleged incident is crucial to my ability to defend myself and/or in my ability to prove that Ms. ████ has made a false Title IX report.

    **(II)**    ████████ **Cell Phone, the Contents Thereof, and** ████████ **Cell Phone Records from November 1, 2019 through December 31, 2019**

Moreover, and as the College is aware, ████████ has alleged that the interaction between her and I began after a series of text and/or Snapchat messages. To be clear, the it was ████████ who contacted me first that night, and I believe that information, in addition to other electronic communications demonstrating the Reporting Party's intentions as well as her sobriety, are still contained on ████████ cell phone.

Specifically, it is my understanding that ████████ has alleged that on the night in question, she was suffering from a self-induced "selective blackout" i.e., that "she was impaired to the point where she doesn't remember certain events", including whether she consented to sexual activity. It is my belief that her cell phone contains evidence that contradicts that allegation, specifically including, but not limited to, her usage of Snapchat and/or Snapchat messaging on the evening in question, text messages sent and/or received by ████████ that evening, any photographs and/or videos from that night, both before I saw her that night, and in the days and weeks following the alleged incident. I believe, and I believe the College knows, that any of these items discovered on ████████ phone will contradict her allegations against me.

Considering Oberlin College's Title IX Policy and goal is to conduct thorough, unbiased investigations and, specifically, to "gather all relevant facts", it is my belief that Oberlin College and/or the Oberlin College Title IX Team and/or the investigator has already taken steps to preserve any and all evidence that is relevant to this complaint that is within ███████' cell phone and/or is already in possession of the contents of ███████'s cell phone and cell phone records. *See Oberlin College Sexual Misconduct Policy,* at 40, 46.

Accordingly, I am demanding that Oberlin College's investigator provide me with a copy of ███████' cell phone and cell phone records, already in its possession, including, but not limited to the specific electronic information set forth above. If the College is not already in possession of the Reporting Party's cell phone (which, based on the facts alleged in the Complaint, would be in violation of the College's own policy and stated goals) I am requesting the investigator to compel ███████ to sign a release to obtain and produce her phone records for the months of November and December 2019, including but not limited to call log, text log, call toll records, and billing records and I am further demanding that Oberlin College and/or the Oberlin College Title IX Team and/or the investigator immediately obtain and preserve the electronic evidence within ███████ cell phone and produce a complete copy thereof to me and/or my counsel.

As noted, I believe that electronic evidence within ███████' cell phone will establish that she initiated contact with me on the night in question, that she was not under the influence of alcohol and/or otherwise impaired as claimed by her on the night in question, contrary to her allegation herein.

Ms. Mosey, I think you would agree that the College's policies are designed to protect Responding Parties (such as myself) against meritless, retaliatory complaints. It is my belief that had the College complied with its policy, it would have preserved all of the evidence referenced herein at the time the report was made. However, if Oberlin College and/or the Oberlin College Title IX Team and/or the Investigator failed to follow its policies, I am demanding that immediate action be taken to preserve and obtain this obviously relevant evidence.

**(III)      ███████' OCID Charge Card/Charge Account Records**

Furthermore, I am requesting that the Oberlin College Title IX Team and/or Investigator immediately preserve, obtain, and produce to me a complete itemization of the ███████' student OCID charge card/ charge account, for the months of November and December 2019, or, for the specific night in question, if Oberlin College is aware of said date.

**(IV)      Schedule of Events at The Sco for November and December, 2019**

Additionally, I am requesting that the Oberlin College Title IX Team and/or Investigator immediately preserve, obtain, and produce to me a complete and accurate schedule of events that occurred and/or that were scheduled to occur at The SCO for the months of November and December 2019.

6

(V)  **Drug/Urine Test Records for** ███████ **and/or Relative to** ███████ **Participation on the Women's Volleyball Team and/or Disciplinary History Report and/or Incident Reports**

The Oberlin College Title IX Policy includes amnesty for drug or other drug use and states, in relevant part:

> . . . To encourage reporting and honest participation in an investigation, an individual who reports sexual misconduct, either as a Reporting Party or a third-party witness, . . . will not be subject to disciplinary action by the College for their personal consumption of alcohol or drugs at or near the time of the incident, provided that any such violations did not and do not place the health or safety of any other person at risk. . . .

Given that a Title IX Reporting Party has "amnesty" for alcohol and/or other drug use, I am hereby respectfully requesting that the Oberlin College Title IX Team and/or Investigator immediately preserve, obtain, and produce to me a complete copy of any and all drug/urine test results relative to ███████ that are within the possession, custody, or control of Oberlin College and/or that relate in any way to ███████ attendance at Oberlin College, including, but not limited to, her participation in any extracurricular activities (including but not limited to the Women's Volleyball Team), scholarships (athletic or otherwise), NCAA eligibility, and/or any for any other reason.

Further, I am respectfully requesting that the Oberlin College Title IX Team and/or Investigator immediately preserve, obtain, and produce to me a complete copy of ███████ disciplinary history.

Further, I am respectfully requesting that the Oberlin College Title IX Team and/or Investigator immediately preserve, obtain, and produce to me a complete copy of any incident reports that relate to any incident involving ███████ or any other witness involved in the investigation of the within matter relating to the night in question and/or for which ███████ and/or any other witness invoked the "amnesty" clause of the Title IX Policy.

In light of the College's referral of the Complaint for informal resolution following its initial assessment based on ███████ allegation that "She was so drunk that she doesn't remember if she gave consent"[2] (thus demonstrating the College's uncertainty in the merits of the complaint and ███████ credibility), the disclosure of the evidence referenced herein is essential to prevent violations of my right to due process and my rights under Oberlin College's policy.

---

[2] As the College has not provided me with a copy of the Complaint against me, this is my understanding of the nature of the allegation against me, as described to me and my counsel by you during our meeting to discuss informal resolution on February 25, 2020.

7

Further, I believe it is imperative that Oberlin College investigate the within false complaint, as it is crucial for Oberlin College to know about the existence of a false Title IX Report. Finally, as noted below, alongside ███████████' retaliatory intent in deciding to pursue formal resolution (after repeatedly stating that she wished to pursue informal resolution), renders Oberlin College's failure or refusal to disclose to me this evidence nothing short of prejudicial to the administration of justice.

Please disclose the above referenced evidence, much if not all of which I believe is already in the College's possession, to me and/or my counsel, immediately.

• **Reporting Party's Decision to Proceed Formally as Retaliation for Me Bringing her *Per Se* Slanderous Statements Against Me to The College's Attention**

To be straightforward, the timing of the Reporting Party's sudden change of heart, i.e., her decision to abandon informal resolution and pursue formal resolution after initially, repeatedly reaffirming that's she only wished to pursue informal resolution, makes clear that the Reporting Party's decision (to pursue formal resolution) was made for the improper and illegal purpose of retaliation against me.

Additionally, I believe that the Reporting Party's decision to proceed with Formal Resolution, was a direct result of my advisor bringing to your attention (in their written correspondence of February 18, 2020, during the February 25, 2020 telephone call and again during our February 26, 2020 in person meeting) the *per se* slanderous statements ███████ published to others, specifically, that ██████████ told other students that I "raped" her. As you are aware, the College's policy prohibits such retaliation and provides:

> **Statement Against Retaliation**
> It is a violation of Oberlin College policy to retaliate in any way against a student or employee because they have brought forward or been the subject of allegations of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, or participated in the College's resolution of the report. The College will take immediate and responsive action to any report of retaliation.

*See Oberlin College Sexual Misconduct Policy,* at 7.

As Oberlin College is aware, the Oberlin College *Sexual Misconduct Policy's* Privacy Statement provides:

> **Privacy Statement**
> In any report, investigation, or resolution of an allegation of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, every effort will be made to protect the privacy and confidentiality interests of the individuals involved in a manner consistent with the need for a thorough

review of the allegation and the protection of the parties involved and the broader campus community.

*See Oberlin College Sexual Misconduct Policy,* at 7.

Accordingly, please allow this letter to constitute a formal complaint against ███████ for her violation of the College's "Statement Against Retaliation". Clearly, in response to my decision to bring to the College's attention the Reporting Party's *per se* slanderous statements against me and thus my decision to exercise my legal and administrative rights through obtaining counsel, ██████ opted to wield her virtually unfettered ability to pursue formal resolution against me, "at any time" as a retaliatory sword. This is a clear violation of the College's Policy and as the Reporting Party, I look forward to being contacted by the College with respect to its initial assessment into my Report.

Thus, further demonstrating the "bad faith" of ██████ decision to proceed with formal resolution is her initial delay in reporting the allegations to the College. Moreover, I believe that her delay in reporting the allegations to the College was purposeful and designed to complicate and/or prevent preservation of and/or my collection of exculpatory evidence.

The College's subsequent decision to delay providing me with notice of the allegations was also purposeful and designed to complicate the preservation of and/or my collection of evidence, the College should have no problem immediately producing to me the evidence that it collected at the time the report was made (as referenced throughout), so that I can effectively defend myself against ██████' false and meritless allegations, as is consistent with the College's Policy.

- **Recent Title IX Litigation Demonstrates the College's Duty To Disclose the Evidence Referenced Herein and Investigate The Reporting Party's Meritless Allegations**

The importance of a thorough, fair, and unbiased investigation in my case cannot be understated, especially now, in light of recent Title IX related litigation. As you may, or may not, be aware, just last week on February 26, 2020, Syracuse University settled a federal Title IX based action filed against the University by an accused student on the grounds that the University engaged in gender-based discrimination against him, in violation of Title IX. *See John Noakes v. Syracuse University,* Case No. 5:18-cv-43 (N.D.N.Y 2018). Following a hearing, the Plaintiff in *Noakes* was found "responsible" by the University's Student Conduct Board for an alleged sexual assault on a female student. Plaintiff's appeal to the University's Appeals Board was, not surprisingly, unsuccessful.

In his federal lawsuit against the University, the Plaintiff alleged that the University's decisions in the hearing and appeal "were erroneous outcomes which were the direct result of a flawed and biased proceeding." *Id.*

9

In response to his lawsuit, Syracuse filed a Motion to Dismiss Plaintiff's claims on the grounds that the Plaintiff failed to state a claim for relief against the University. The Court denied the University's Motion to Dismiss Plaintiff's Title IX claim and found that Plaintiff's Complaint "presented allegations of facts supporting a minimal plausible inference of discriminatory intent" by the University against him in its decisions in the hearing and appeal. *Id.* In support of its decision to deny the University's Motion, the Court stated the following:

> Plaintiff has pointed to flaws in the investigation, assumptions made by investigators, and an unwillingness by investigators to consider evidence he had presented of his innocence in the attack. He also contends that Syracuse did not question Roe's credibility and did not require her to explain the circumstances of her identification of Plaintiff or her memory of the event at Plaintiff's hearing or in any investigation. Plaintiff's allegations could reasonably be read to support an understanding that the Investigator, the University Conduct Board, the Appeals Board, and other Syracuse officials ignored any evidence or contradictions in Roe's story and refused to investigate any evidence that supported Plaintiff's version of events.

*See Id. See Decision and Order, John Noakes v. Syracuse University,* Case No. 5:18-cv-43, Doc. 18 (N.D.N.Y 2018) February 26, 2019.

As an Oberlin College student, I am confident that Oberlin College, the Oberlin College Title IX Team, and the Investigator will adhere to its own policy, preserve and disclose the evidence requested herein (as much of it is already in the College's possession, pursuant to its own policy) and conduct a thorough, unbiased investigation of ██████████' false report. Furthermore, once concluded, I am confident that the College's investigation will reveal that this matter should be not referred for Formal Adjudication and ultimately, that I am not responsible for any violation of the College's policies. To be clear, I am the aggrieved party herein, and, accordingly, I am demanding that my rights as a student of Oberlin College and/or as a Responding Party be protected. I fully intend to hold Oberlin College, the Oberlin College Title IX Team, and any Investigator, to its and/or their policies. Anything less than preserving and obtaining and producing the herein requested evidence would clearly be in violation of my rights to an objective and impartial investigation, and I will respond accordingly if my rights are violated.

I look forward to hearing from you regarding my complaint against ██████████ for retaliation and the immediate preservation and disclosure of the evidence requested herein.

Sincerely,



10

**Z U K E R M A N   L E A R  &  M U R R A Y**  CO.LPA

3912 PROSPECT AVE.
CLEVELAND, OHIO 44115

216.696.0900
216.696.8800

March 5, 2020



Erin E. Butcher
Of Counsel
INCompliance
100 South Third Street
Columbus, OH 43215
Direct Dial 614.227.2303
ebutcher@incomplianceconsulting.com

RE:     *Response to March 4, 2020 Email & Request for Status of Preservation of Exculpatory
Evidence*

Ms. Butcher,

As you are aware, the undersigned and the law firm of Zukerman Lear & Murray Co.,
L.P.A., represents ▮▮▮▮▮▮ with respect to the Title IX allegation that has been made against
him.

Yesterday, you sent an email to our client, with our firm copied, acknowledging your
receipt of the letter that ▮▮▮▮▮▮ sent to Rebecca Mosely on March 2, 2020, which we
forwarded to you for review on March 3, 2020. Specifically, your email stated the following:

Good afternoon, ▮▮▮▮▮,

I wanted to let you know that I am in receipt of the letter provided by your attorney and
referenced below.  I am still in the process of reviewing it and considering your requests.
Would you and your attorneys be available for a phone call with me to discuss some of
the issues and concerns you raise in the letter sometime next week?  I think a phone call
would also allow me to introduce myself and address other questions you may have about
the process.  I realize that you have more people with whom to coordinate, so please
provide me with times that work for you.

In response to your request for a telephone call with us and Mr. ▮▮▮▮, as his advisors, we
will suggest that our client not talk to you, over the phone or in person, until, at a minimum, we
have received a *written* status update concerning the College's preservation and disclosure of
the exculpatory evidence relating to the Title IX allegation against our client.

Z U K E R M A N

1

Accordingly, please allow this letter to constitute a demand for a written status as to the College's preservation and disclosure of the exculpatory evidence, including but not limited to the electronic evidence from Ms. ███ cell phone, that we and our client previously requested, including the College's efforts to preserve any such evidence, all of which was described in detail in our previous correspondence to Rebecca Mosely on February 18, 2020, Mr. ███' correspondence to Rebecca Mosely on March 2, 2020 and Mr. ███' correspondence to you on March 4, 2020.

For good measure, and for the sake of efficiency, I have attached each of those letters to this letter. *Please See Exhibits A, B & C, attached hereto*.

As we, and our client, have repeatedly stated, we remain very concerned that the College's dilatory conduct in issuing Notice to our client of the Title IX complaint lodged against him, and its ongoing failure to disclose, or even address the repeated written demands for preservation and disclosure, have resulted in the loss and/or destruction of exculpatory evidence in this case.

While we appreciate your desire for a phone call to introduce yourself "and address other questions [we] may have about the process", we, nor our client, believe that any such phone call is appropriate until you and/or the College have answered our questions and provided us with the requested evidence.

Our correspondence, and the correspondence from our client, has made it very clear as far as what we are requesting from you and/or the College; stated differently, we are only requesting what Oberlin's Title IX Policy and the U.S. Constitution guarantees to all of Oberlin's students: "a prompt, thorough and impartial investigation", which is "completed expeditiously", which is "designed to provide a fair and reliable gathering of the facts", a "full assessment of the facts", the gathering of "all relevant facts... [and]...information", the gathering of "any available physical evidence, including documents, communications between the parties, and other electronic records", all of which is conducted by an investigator who is "impartial and free of any conflict of interest". *See Oberlin College Sexual Misconduct Policy,* at 40, 46, 47.

Finally, please advise at to the status of the College's investigation into our client's complaint against Ms. ███ for retaliation. Unlike Ms. ███, our client wishes to pursue formal

2

resolution of his complaint against Ms.█████ for retaliation immediately and he does not authorize the College to delay notifying Ms.█████ of his complaint against her, or otherwise delaying the formal resolution process against Ms.█████.

In light of the College's unambiguous policy against retaliation, its failure to address, investigate, or so much as acknowledge Mr.█████' complaint, appears to demonstrate the College's bias against Mr.█████ and in favor of Ms.█████. *See Oberlin College Sexual Misconduct Policy,* at 7.

Accordingly, the only questions we, and our client, have at this time are 1) what is the status of the College's preservation and disclosure of the exculpatory evidence that we and our client have been repeatedly demanding, 2) what efforts has the College made to preserve the exculpatory evidence described the previous correspondence, attached hereto, 3) whether any of the exculpatory evidence described in the previous correspondence (attached hereto) has been lost or destroyed, 4) what is the status of the College's disclosure of a copy of the written complaint made against Mr.█████, and its written disclosure of the specific date, time, and location of the alleged incident and the nature of the alleged incident(s) that forms the basis for Ms.█████' Complaint against Mr.█████ and finally, 5) what is the status of the College's investigation into Mr.█████' retaliation complaint against Ms.█████?

With respect to the specifics of the Complaint against him, as you may recall, on February 4, 2020, in the email from Volleyball Coach Erica Rau notifying Mr.█████ of the Complaint against him, Coach Rau advised Mr.█████ that "I am required to share with you what has been shared with me regarding this report." Again, contrary to Coach Rau's statement, Oberlin's policy and Mr.█████' basic right to due process, to date, only inconsistent, vague, non-specific versions of the allegation(s) against him have been communicated to Mr.█████.

If Oberlin's Title IX policy and procedures were truly designed to provide a "fair and reliable gathering [and assessment] of the facts" and to "ensure consistent application of the policy to all individuals and to allow the College to respond promptly and equitably" (*See Oberlin College Sexual Misconduct Policy,* at 41, 46) to prevent violations of students' right to due process of law, then we, and our client, do not understand why the College continues to play "hide the ball" with not

only the specifics of the allegations being made against him, but also, with the very evidence that will serve to exculpate Mr. ▇▇▇ based on his limited understanding of those allegations.

Thus, the College's conduct to date, in fact, suggests that such a fair search for the truth is not the College's goal, regardless of the language set forth in its own policy.

Please provide a written response to the very clear inquiries set forth above, immediately. Once we receive the written responses to the inquires above, we will consider scheduling a telephone call so that you can introduce yourself. We look forward to hearing from you regarding these matters.

Very truly yours,

Larry W. Zukerman, Esq.

Cc: ▇▇▇▇▇▇

4

ZUKERMAN  LEAR & MURRAY  CO.LPA    3912 PROSPECT AVE.
CLEVELAND, OHIO 44115

216.696.0900
216.696.8800

February 18, 2020

Rebecca Mosely
Director for Equity, Diversity, and Inclusion
Title IX Coordinator
Office of Equity, Diversity, and Inclusion
Carnegie Building 204
Rebecca.Mosely@oberlin.edu
440-775-8555



RE:    *Title IX Report Involving* ▇▇▇▇▇

Dear Ms. Mosely,

As you are aware, the undersigned and the law firm of Zukerman Lear & Murray Co., L.P.A., represents ▇▇▇▇▇ with respect to the Title IX allegation that has been made against him.

While we would like this process to proceed informally, as per the Reporting Party's wishes, we must nevertheless inquire about several issues that have come to our attention with respect to this matter.

• Exculpatory Evidence in the College's Video Surveillance Systems:

It is our understanding that the alleged incident in question occurred sometime in mid-November to early December 2019. As you are aware, Mr. ▇▇▇ was not notified of the existence of the Title IX complaint until February 4, 2020 – some 6 to 8 weeks subsequent to the date of the alleged incident.

We are concerned that this delay by either Oberlin College and/or the Reporting Party has resulted in the loss of certain video surveillance evidence that we believe would be exculpatory evidence.

Specifically, we believe that any and all video surveillance footage from the night in question, which will be more fully described below, would constitute exculpatory evidence.

We believe that if this evidence has been deleted, recorded over, not retained, and/or otherwise lost due to this delay and/or is otherwise unavailable, and said loss and/or unavailability was the result of the above-referenced delays by the Reporting Party or the

ZUKERMAN                        1

College, that such delay may constitute a violation of Mr.■■■ right to due process in these proceedings under the Fifth and Fourteenth Amendments to the United States Constitution. As you are aware, "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Doe v. Miami University*, 882 F. 3d 579, 600- Court of Appeals, 6th Circuit 2018 citing *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Procedural due process is "implicated by higher education disciplinary decisions." see *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017). "Suspension 'clearly implicates' a protected property interest, and allegations of sexual assault may 'impugn [a student's] reputation and integrity, thus implicating a protected liberty interest.'" *Univ. of Cincinnati*, 872 F.3d at 399.

As recognized in Oberlin College's *Sexual Misconduct Policy*, "Oberlin College encourages timely reporting of sexual misconduct. Prompt reporting helps ensure the preservation of evidence and timely investigation." *Id.* at 31. Furthermore, pursuant to the College's *Sexual Misconduct Policy*, it is the duty of the assigned investigator to "gather any available physical evidence, including documents, communications between the parties, and other electronic records as appropriate." *Id.* at 46. Thus, in light of this duty, it is Oberlin College's duty, pursuant to its own policy, to preserve and collect any available relevant evidence, including, but not limited to, the video surveillance evidence in question.

As such, please allow this letter to constitute a notice to immediately preserve and produce the following video surveillance evidence, which we believe to be exculpatory in nature:

- Any and all interior and exterior video surveillance recordings of Burton Hall;

- Any and all interior and exterior video surveillance recordings of Wilder Hall, including "The SCO";

- Any and all video surveillance recordings of the interior of "The SCO", including, but not limited to "The Dionysus Disco", aka, "The Dionysus Club";

- Any and all video surveillance recordings of the area between Burton Hall and Wilder Hall, known as "The Quad";

- Any and all exterior surveillance of:

2

- Bailey House (French House)

- Zechiel House

- Noah Hall

- East Hall

- Barrows Hall

- Barnard House

- Wright Laboratory of Physics

- Science Center (Science Library)

- Severance Hall

As the exact date of the alleged incident underlying the Title IX Complaint is unknown to us at this time, we are requesting the preservation and disclosure of the above-listed video surveillance evidence from the night in question, if said date is known to Oberlin College and, if the night in question is unknown to Oberlin College, we would respectfully request that any and all such video surveillance recordings from the dates of November 1, 2019 through December 14, 2019, between the hours of 9:00 p.m. and 1:00a.m., be immediately preserved and produced to the undersigned.

• Failure to Adhere to College's Privacy Statement

Furthermore, it has come to our attention that the existence of the Title IX Report against Mr. ▮▮▮ has been disclosed by the Complainant to other students on Oberlin's campus. As Oberlin College is aware, the Oberlin College *Sexual Misconduct Policy's* Privacy Statement provides:

> **Privacy Statement**
> In any report, investigation, or resolution of an allegation of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, every effort will be made to protect the privacy and confidentiality interests of the individuals involved in a manner consistent with the need for a thorough

3

review of the allegation and the protection of the parties involved and the broader campus community.

*See Oberlin College Sexual Misconduct Policy,* at 7.

Additionally, Oberlin College *Sexual Misconduct Policy* further provides

> The College is committed to protecting the privacy of all individuals involved in a report or an investigation filed under the Sexual Misconduct Policy. All College employees who participate in the College's Title IX response, including the Title IX Coordinator, Title IX Deputy Coordinators, Title IX Team members, investigators, and Hearing Panel members receive specific instruction about respecting and safeguarding private information. Throughout the process, every effort will be made to protect the privacy interests of all involved individuals in a manner consistent with the need for a thorough review of the report. All College proceedings are conducted in compliance with the requirements of the Family Educational Rights and Privacy Act (FERPA), the Clery Act, Title IX, and state and federal law. No information shall be released from such proceedings except as required or permitted by law and College policy.

*See Oberlin College Sexual Misconduct Policy,* at 16.

Thus, in light of Oberlin College's policies aimed at maintaining the privacy of all of the parties involved, including the Responding Party, and considering that "every effort will be made to protect the privacy interests of all involved individuals", to ensure Mr. █████' reputation is not needlessly diminished as a result of violative campus gossip, we would respectfully encourage and request that Oberlin College take any and all measures available to protect Mr. █████' right to privacy by advising the Reporting Party and/or anyone else that has knowledge of this Title IX matter, to cease and desist from disclosing the existence of the Title IX allegation and/or the Title IX proceedings to other Oberlin College students and/or anyone who is not involved with this process.

• Recording Process for Statements and Interviews

Finally, with respect to the administrative meetings wherein Mr. █████ is expected to provide a statement to Title IX Investigators, as well as all interviews of witnesses conducted by the College during its investigation, we would like to ensure that Mr. █████ statements and all witness interviews will be recorded by video and/or audio recording, or by a court reporter. Essentially, we want to ensure that Mr. █████ statement and/or witness statements are not merely summarized by another individual, such as an investigator, but actually recorded in full.

4

As Oberlin College is aware, when a statement is merely summarized as opposed to recorded, the summarizing individual may take certain liberties, whether consciously or unconsciously, when deciding what information to include in the summary and what information to omit.

The importance of an accurate record is not only essential in light of the significant deprivations Mr. ███ may face as a result of these proceedings, but also, given the numerous, readily available means of electronic recording in today's world, such a minor step to ensure accuracy would be of great benefit to both Mr. ███ and Oberlin College and place only a minimum to non-existent burden upon the College.

Seeing that the process of recording statements protects both the speaker and the investigator/summarizer against a later allegation of inaccuracies or incompleteness, we do not expect the College to have any issue with the recording of Mr. ███ statements and all witness statements, and would respectfully request the College to confirm, in writing, the same.

The failure to record statements when it can be done with such ease, could be seen as an attempt to leave open the opportunity to mischaracterize and/or manipulate the accuracy of the summarized statement during a subsequent proceeding.

If you have any questions or concerns regarding these matters, please feel free to contact me at your earliest convenience.

Very truly yours,

Larry W. Zukerman, Esq.

March 2, 2020



Rebecca Mosely
Director for Equity, Diversity, and Inclusion
Title IX Coordinator
Office of Equity, Diversity, and Inclusion
Carnegie Building 204
Rebecca.Mosely@oberlin.edu
440-775-8555

RE:     Title IX Investigation

Dear Ms. Mosely,

As you are aware, on February 25, 2020 I, and my personal advisor, Larry W. Zukerman, Esq., met with you in regard to a Title IX allegation that I was first notified of on or about February 4, 2020. Prior to this meeting, you had informed Mr. Zukerman that the Oberlin College Title IX Team and the reporting student,█████████, had determined that an informal resolution of the Title IX report was appropriate. Further, on February 25, 2020, you confirmed to me that an informal resolution of the Title IX complaint in question was appropriate and, accordingly, I agreed to an informal resolution of the complaint.

Pursuant to representations made by you to both Mr. Zukerman and myself, it is my understanding that the student that has alleged the Title IX incident,█████████, initially made the report sometime in mid-December, 2019 and, by her admission, said report related to an incident that she believed occurred sometime in mid-November, 2019. Although Oberlin College does not limit the time frame for reporting, I am concerned about the timing of Ms.████ report, among other concerns that I have.

I am also concerned that Oberlin College was complicit with Ms.████ in deciding to withhold notification of this report to me until February 4, 2020. Given what I now know about Ms.████ allegations, I know that there is, or was if it is no longer in existence, exculpatory evidence – specifically, security video recordings, which would have shown Ms.████ and I having a cigarette within the view of a security video camera mounted on the exterior door of Burton Hall. I have enclosed herein a photograph of this door with the clearly visible security camera in question. This video recording will establish, or would have established if this evidence is no longer in existence, that Ms.████ was not in any way noticeably impaired on the evening in question. In fact, she exhibited no appearance of being under the influence of alcohol or any other substance, at that or any other time that she was in my presence on that evening.

Given the nature of Ms████' allegation, Oberlin College and/or the Oberlin College Title IX Team's decision to conspire with Ms.████ in withholding the submission of her false report has not only evidenced Oberlin College and/or the Oberlin College Title IX Team's bias in favor of Ms.████ and prejudice against me, it has prevented and/or severely impaired my ability to obtain

1

evidence favorable to me. Make no mistake – this intentional decision has violated my rights under the Oberlin College Title IX Policy and/or has violated my constitutional rights to due process of law.

Based on Oberlin College's Title IX policies, in relevant part, it was incumbent on the Title IX Team to conduct an immediate assessment of the report at the time that Ms. ███ made her initial report. As stated in the policy:

> The initial review will proceed to the point where a reasonable assessment of the safety of the individual and of the campus can be made. Thereafter, *an investigation may be initiated depending on a variety of factors, such as* the Reporting Party's wish to pursue formal or informal resolution, the risk posed to any individual or the campus community, and *the nature of the investigation.*

Despite Ms. ███ initial request for "informal resolution" – a request that she reportedly made at the time of the initial report and maintained until on or about February 26, 2020 – I am quite confident that Oberlin College, recognizing the severity of the allegations made by her and recognizing its duty to also protect me from false reports, decided to initiate an immediate investigation, including, but not limited to, making sure to preserve and obtain any and all security video recordings of any video camera that could have captured Ms. ███ alleged consumption of alcohol and/or that could have captured Ms. ███ physical state on the night in question. Accordingly, I am confident that in following its own policy, the Oberlin College Title IX Team has already preserved and collected the security video recordings in question and, accordingly, I am respectfully requesting that I be provided with these recordings immediately.

I also wish to raise my concern that I have been retaliated against by ███ herein. Again, as represented by you, ███ reportedly made her initial Title IX complaint sometime in mid-December, 2019 and also reportedly requested an informal resolution relative to her complaint. It is my understanding, as reported by you to both myself and Mr. Zukerman, that ███ maintained her request for informal resolution until after I had already agreed to the informal resolution. At the time that I agreed to an informal resolution, Mr. Zukerman, on my behalf, expressed to you my concern that Ms. ███ had been slandering me by calling me a "rapist" to other Oberlin College students. This fact was made known to you on February 25, 2020 and, pursuant to my request, you indicated that you would address Ms. ███ slander of me to her. Accordingly, it is my understanding based on the timing of your February 26, 2020 e-mail that ███ "informed [you] that she is no longer interested in using an informal resolution process to resolve her report" during your meeting with her which occurred after our meeting. Thus, it appears that Ms. ███ decision to change her mind was prompted by my complaint that she was slandering me to other Oberlin College students.

As you are well aware, the Oberlin College Title IX policy prohibits retaliation against a "Responding Party":

Any adverse action or attempt to retaliate or seek retribution against a Reporting Party, Responding Party, or any individual or group of individuals involved in a report, investigation and/or resolution of an allegation of sexual misconduct . . . Retaliation can take many forms, including threats, intimidation, pressuring, . . . or other forms of harm to others, and in varying modes, including in person and in electronic and online communication. Retaliation can also include adverse . . . educational actions made or taken against an individual because of their good faith participation in the reporting, investigation, and/or resolution of an alleged violation of this policy and/or any conduct that would discourage a reasonable person from engaging in further protected activity.

Accordingly, it is clear that Ms. ███ decision to request a formal resolution amounts to retaliation against me due to my request communicated to you that she refrain from further slandering me.

As previously noted, despite Oberlin College and/or ███████ decision to withhold notice of the Title IX report to me until February 4, 2020 – thus preventing me from preserving and/or collecting exculpatory evidence that clearly existed, if Oberlin College followed its own policies, then Oberlin College has already preserved and collected security video recordings that I know to be favorable to me and exculpatory in nature.

If Oberlin College did not follow its own policy and/or did not immediately preserve such exculpatory security video recordings, my counsel and advisor, Larry W. Zukerman, Esq., has already previously sent you a specific request that any and all identified security video recordings be immediately preserved and collected.

Now that a formal resolution has been requested, an investigation has clearly been triggered and a "fair and impartial investigator" has been appointed. Pursuant to Oberlin College's Policy, the goal of an investigation is "a full assessment of the facts" (*See Oberlin College Sexual Misconduct Policy*, at 46) I am hereby respectfully requesting Oberlin College and/or the Title IX Team and/or the investigator to immediately preserve and immediately produce to me, or my counsel, the following security video evidence, that I believe is already in the College's possession, on the date and approximate time of the incident as reported by ███████ and/or from 8:00 p.m. on the night on which ██████████ alleges the incident occurred until 2:30 a.m. on the early morning following day[1]:

• Any and all interior and exterior video surveillance recordings of Burton Hall;

---

[1] As the specifics of the date and time of the alleged incident have not been disclosed to me and/or were not even provided by ███████ if Oberlin College is unaware of the specific date and time, this request is for any and all security video recordings during dates and times that the incident could have happened.

3

- Any and all interior and exterior video surveillance recordings of Wilder Hall, including "The SCO";

- Any and all video surveillance recordings of the interior of "The SCO", including, but not limited to "The Dionysus Disco", aka, "The Dionysus Club";

- Any and all video surveillance recordings of the area between Burton Hall and Wilder Hall, known as "The Quad";

- Any and all exterior surveillance of:

    - Bailey House (French House)

    - Zechiel House

    - Noah Hall

    - East Hall

    - Barrows Hall

    - Barnard House

    - Wright Laboratory of Physics

    - Science Center (Science Library)

    - Severance Hall

As the exact date of the alleged incident underlying the Reporting Party's Complaint is unknown to me, I am demanding the immediate preservation and disclosure of the above-listed video surveillance evidence from the night in question if said date is known to Oberlin College, from 8:00 p.m. that night through 2:30 a.m. the following early morning. If the night in question is unknown to Oberlin College, I am demanding that any and all such video surveillance recordings listed above from the dates of November 1, 2019 through December 14, 2019, between the hours of 8:00 p.m. and 2:30 a.m., be immediately preserved and produced to me.

Based on the nature of the allegation as Reported to the College by Ms. ▆ it is my belief that, in an eye towards a "fair and reliable gathering of the facts", and in all fairness to the Responding Party, the College exercised basic due diligence and immediately preserved the video footage referenced above on or about the time the Reporting Party made her initial report to the College, I am confident that the College's production of said footage to me will not be problematic or impose any burden on the College. *See Oberlin College Sexual Misconduct Policy,* at 46.

4

As it is my belief that the video footage referenced above was immediately preserved on or about the time the Reporting Party made her initial report, I am requesting the College to immediately disclose to me and/or my counsel copies of said footage. Again, I believe, and I believe that the College knew at the time the Reporting Party made the report, that this video footage is relevant, exculpatory, and will establish that the Reporting Party was not impaired on the evening in question.

- **Additional Evidence in The College's Possession and/or Control**

Furthermore, please allow this letter to constitute a formal request that Oberlin College and/or the Oberlin College Title IX Team and/or the investigator immediately preserve and provide to me additional evidence in its possession, so that I may effectively defend myself against ███████ ' false and meritless allegations against me.

    (I)    **The Written Report**

As an initial matter, I am specifically requesting the immediate preservation and disclosure of a copy of the written Complaint made by the reporting party against me. The only reason Oberlin College would not provide me with a copy of the Complaint against me would be to prevent me from identifying any inconsistent statements made by ███████ in the Complaint and elsewhere. Further, the identity of the date and time of the alleged incident is crucial to my ability to defend myself and/or in my ability to prove that Ms ███ has made a false Title IX report.

    (II)    ███████ **Cell Phone, the Contents Thereof, and** ███████ **' Cell Phone Records from November 1, 2019 through December 31, 2019**

Moreover, and as the College is aware, ███████ has alleged that the interaction between her and I began after a series of text and/or Snapchat messages. To be clear, the it was ███████ who contacted me first that night, and I believe that information, in addition to other electronic communications demonstrating the Reporting Party's intentions as well as her sobriety, are still contained on ███████ cell phone.

Specifically, it is my understanding that ███████ has alleged that on the night in question, she was suffering from a self-induced "selective blackout" i.e., that "she was impaired to the point where she doesn't remember certain events", including whether she consented to sexual activity. It is my belief that her cell phone contains evidence that contradicts that allegation, specifically including, but not limited to, her usage of Snapchat and/or Snapchat messaging on the evening in question, text messages sent and/or received by ███████ that evening, any photographs and/or videos from that night, both before I saw her that night, and in the days and weeks following the alleged incident. I believe, and I believe the College knows, that any of these items discovered on ███████ phone will contradict her allegations against me.

Considering Oberlin College's Title IX Policy and goal is to conduct thorough, unbiased investigations and, specifically, to "gather all relevant facts", it is my belief that Oberlin College and/or the Oberlin College Title IX Team and/or the investigator has already taken steps to preserve any and all evidence that is relevant to this complaint that is within ▓▓▓▓▓▓▓ cell phone and/or is already in possession of the contents of ▓▓▓▓▓▓ 's cell phone and cell phone records. *See Oberlin College Sexual Misconduct Policy*, at 40, 46.

Accordingly, I am demanding that Oberlin College's investigator provide me with a copy of ▓▓▓▓▓▓▓' cell phone and cell phone records, already in its possession, including, but not limited to the specific electronic information set forth above. If the College is not already in possession of the Reporting Party's cell phone (which, based on the facts alleged in the Complaint, would be in violation of the College's own policy and stated goals) I am requesting the investigator to compel ▓▓▓▓▓▓ to sign a release to obtain and produce her phone records for the months of November and December 2019, including but not limited to call log, text log, call toll records, and billing records and I am further demanding that Oberlin College and/or the Oberlin College Title IX Team and/or the investigator immediately obtain and preserve the electronic evidence within ▓▓▓▓▓▓' cell phone and produce a complete copy thereof to me and/or my counsel.

As noted, I believe that electronic evidence within ▓▓▓▓▓▓' cell phone will establish that she initiated contact with me on the night in question, that she was not under the influence of alcohol and/or otherwise impaired as claimed by her on the night in question, contrary to her allegation herein.

Ms. Mosey, I think you would agree that the College's policies are designed to protect Responding Parties (such as myself) against meritless, retaliatory complaints. It is my belief that had the College complied with its policy, it would have preserved all of the evidence referenced herein at the time the report was made. However, if Oberlin College and/or the Oberlin College Title IX Team and/or the Investigator failed to follow its policies, I am demanding that immediate action be taken to preserve and obtain this obviously relevant evidence.

(III)  ▓▓▓▓▓▓' OCID Charge Card/Charge Account Records

Furthermore, I am requesting that the Oberlin College Title IX Team and/or Investigator immediately preserve, obtain, and produce to me a complete itemization of the ▓▓▓▓▓' student OCID charge card/ charge account, for the months of November and December 2019, or, for the specific night in question, if Oberlin College is aware of said date.

(IV)  Schedule of Events at The Sco for November and December, 2019

Additionally, I am requesting that the Oberlin College Title IX Team and/or Investigator immediately preserve, obtain, and produce to me a complete and accurate schedule of events that occurred and/or that were scheduled to occur at The SCO for the months of November and December 2019.

(V)   **Drug/Urine Test Records for** ████████ **and/or Relative to** ████████
**Participation on the Women's Volleyball Team and/or Disciplinary History**
**Report and/or Incident Reports**

The Oberlin College Title IX Policy includes amnesty for drug or other drug use and states, in relevant part:

> . . . To encourage reporting and honest participation in an investigation, an individual who reports sexual misconduct, either as a Reporting Party or a third-party witness, . . . will not be subject to disciplinary action by the College for their personal consumption of alcohol or drugs at or near the time of the incident, provided that any such violations did not and do not place the health or safety of any other person at risk. . . .

Given that a Title IX Reporting Party has "amnesty" for alcohol and/or other drug use, I am hereby respectfully requesting that the Oberlin College Title IX Team and/or Investigator immediately preserve, obtain, and produce to me a complete copy of any and all drug/urine test results relative to ████████ that are within the possession, custody, or control of Oberlin College and/or that relate in any way to ████████' attendance at Oberlin College, including, but not limited to, her participation in any extracurricular activities (including but not limited to the Women's Volleyball Team), scholarships (athletic or otherwise), NCAA eligibility, and/or any for any other reason.

Further, I am respectfully requesting that the Oberlin College Title IX Team and/or Investigator immediately preserve, obtain, and produce to me a complete copy of ████████' disciplinary history.

Further, I am respectfully requesting that the Oberlin College Title IX Team and/or Investigator immediately preserve, obtain, and produce to me a complete copy of any incident reports that relate to any incident involving ████████ or any other witness involved in the investigation of the within matter relating to the night in question and/or for which ████████ and/or any other witness invoked the "amnesty" clause of the Title IX Policy.

In light of the College's referral of the Complaint for informal resolution following its initial assessment based on ████████ allegation that "She was so drunk that she doesn't remember if she gave consent"[2] (thus demonstrating the College's uncertainty in the merits of the complaint and ████████' credibility), the disclosure of the evidence referenced herein is essential to prevent violations of my right to due process and my rights under Oberlin College's policy.

---

[2] As the College has not provided me with a copy of the Complaint against me, this is my understanding of the nature of the allegation against me, as described to me and my counsel by you during our meeting to discuss informal resolution on February 25, 2020.

7

Further, I believe it is imperative that Oberlin College investigate the within false complaint, as it is crucial for Oberlin College to know about the existence of a false Title IX Report. Finally, as noted below, alongside ███████████' retaliatory intent in deciding to pursue formal resolution (after repeatedly stating that she wished to pursue informal resolution), renders Oberlin College's failure or refusal to disclose to me this evidence nothing short of prejudicial to the administration of justice.

Please disclose the above referenced evidence, much if not all of which I believe is already in the College's possession, to me and/or my counsel, immediately.

• **Reporting Party's Decision to Proceed Formally as Retaliation for Me Bringing her *Per Se* Slanderous Statements Against Me to The College's Attention**

To be straightforward, the timing of the Reporting Party's sudden change of heart, i.e., her decision to abandon informal resolution and pursue formal resolution after initially, repeatedly reaffirming that's she only wished to pursue informal resolution, makes clear that the Reporting Party's decision (to tursue formal resolution) was made for the improper and illegal purpose of retaliation against me.

Additionally, I believe that the Reporting Party's decision to proceed with Formal Resolution, was a direct result of my advisor bringing to your attention (in their written correspondence of February 18, 2020, during the February 25, 2020 telephone call and again during our February 26, 2020 in person meeting) the *per se* slanderous statements ███████ published to others, specifically, that ██████████ told other students that I "raped" her. As you are aware, the College's policy prohibits such retaliation and provides:

> **Statement Against Retaliation**
> It is a violation of Oberlin College policy to retaliate in any way against a student or employee because they have brought forward or been the subject of allegations of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, or participated in the College's resolution of the report. The College will take immediate and responsive action to any report of retaliation.

*See Oberlin College Sexual Misconduct Policy,* at 7.

As Oberlin College is aware, the Oberlin College *Sexual Misconduct Policy's* Privacy Statement provides:

> **Privacy Statement**
> In any report, investigation, or resolution of an allegation of sexual and/or gender-based harassment, discrimination and violence, including sexual violence, stalking, and intimate partner violence, every effort will be made to protect the privacy and confidentiality interests of the individuals involved in a manner consistent with the need for a thorough

8

review of the allegation and the protection of the parties involved and the broader campus community.

*See Oberlin College Sexual Misconduct Policy,* at 7.

Accordingly, please allow this letter to constitute a formal complaint against ███████ for her violation of the College's "Statement Against Retaliation". Clearly, in response to my decision to bring to the College's attention the Reporting Party's *per se* slanderous statements against me and thus my decision to exercise my legal and administrative rights through obtaining counsel, ███████ opted to wield her virtually unfettered ability to pursue formal resolution against me, "at any time" as a retaliatory sword. This is a clear violation of the College's Policy and as the Reporting Party, I look forward to being contacted by the College with respect to its initial assessment into my Report.

Thus, further demonstrating the "bad faith" of ███████ decision to proceed with formal resolution is her initial delay in reporting the allegations to the College. Moreover, I believe that her delay in reporting the allegations to the College was purposeful and designed to complicate and/or prevent preservation of and/or my collection of exculpatory evidence.

The College's subsequent decision to delay providing me with notice of the allegations was also purposeful and designed to complicate the preservation of and/or my collection of evidence, the College should have no problem immediately producing to me the evidence that it collected at the time the report was made (as referenced throughout), so that I can effectively defend myself against ███████ false and meritless allegations, as is consistent with the College's Policy.

- **Recent Title IX Litigation Demonstrates the College's Duty To Disclose the Evidence Referenced Herein and Investigate The Reporting Party's Meritless Allegations**

The importance of a thorough, fair, and unbiased investigation in my case cannot be understated, especially now, in light of recent Title IX related litigation. As you may, or may not, be aware, just last week on February 26, 2020, Syracuse University settled a federal Title IX based action filed against the University by an accused student on the grounds that the University engaged in gender-based discrimination against him, in violation of Title IX. *See John Noakes v. Syracuse University,* Case No. 5:18-cv-43 (N.D.N.Y 2018). Following a hearing, the Plaintiff in *Noakes* was found "responsible" by the University's Student Conduct Board for an alleged sexual assault on a female student. Plaintiff's appeal to the University's Appeals Board was, not surprisingly, unsuccessful.

In his federal lawsuit against the University, the Plaintiff alleged that the University's decisions in the hearing and appeal "were erroneous outcomes which were the direct result of a flawed and biased proceeding." *Id.*

9

In response to his lawsuit, Syracuse filed a Motion to Dismiss Plaintiff's claims on the grounds that the Plaintiff failed to state a claim for relief against the University. The Court denied the University's Motion to Dismiss Plaintiff's Title IX claim and found that Plaintiff's Complaint "presented allegations of facts supporting a minimal plausible inference of discriminatory intent" by the University against him in its decisions in the hearing and appeal. *Id.* In support of its decision to deny the University's Motion, the Court stated the following:

> Plaintiff has pointed to flaws in the investigation, assumptions made by investigators, and an unwillingness by investigators to consider evidence he had presented of his innocence in the attack. He also contends that Syracuse did not question Roe's credibility and did not require her to explain the circumstances of her identification of Plaintiff or her memory of the event at Plaintiff's hearing or in any investigation. Plaintiff's allegations could reasonably be read to support an understanding that the Investigator, the University Conduct Board, the Appeals Board, and other Syracuse officials ignored any evidence or contradictions in Roe's story and refused to investigate any evidence that supported Plaintiff's version of events.

*See Id. See Decision and Order, John Noakes v. Syracuse University,* Case No. 5:18-cv-43, Doc. 18 (N.D.N.Y 2018) February 26, 2019.

As an Oberlin College student, I am confident that Oberlin College, the Oberlin College Title IX Team, and the Investigator will adhere to its own policy, preserve and disclose the evidence requested herein (as much of it is already in the College's possession, pursuant to its own policy) and conduct a thorough, unbiased investigation of ████████' false report. Furthermore, once concluded, I am confident that the College's investigation will reveal that this matter should be not referred for Formal Adjudication and ultimately, that I am not responsible for any violation of the College's policies. To be clear, I am the aggrieved party herein, and, accordingly, I am demanding that my rights as a student of Oberlin College and/or as a Responding Party be protected. I fully intend to hold Oberlin College, the Oberlin College Title IX Team, and any Investigator, to its and/or their policies. Anything less than preserving and obtaining and producing the herein requested evidence would clearly be in violation of my rights to an objective and impartial investigation, and I will respond accordingly if my rights are violated.

I look forward to hearing from you regarding my complaint against ████████ for retaliation and the immediate preservation and disclosure of the evidence requested herein.

Sincerely,



10



March 4, 2020

Erin E. Butcher
Of Counsel
INCompliance
100 South Third Street
Columbus, OH 43215
Direct Dial 614.227.2303
ebutcher@incomplianceconsulting.com

RE:    *Response to March 3, 2020 Email & Scheduling of In Person Meeting*

Ms. Butcher,

I am writing this letter in response to your email of March 3, 2020, for the purpose of scheduling an in-person meeting with you as requested.

Since February 4, 2020, the date on which I was first notified of Ms. ▆ Complaint against me, I have heard several inconsistent versions of Ms. ▆ allegations. As a result, even though I was notified of the Complaint one (1) month ago, I am still wholly unaware of the substantive aspects of Ms. ▆ Complaint against me.

While I have no problem meeting with you regarding this matter, I am unable to do so until I am made aware of the specifics of Ms. ▆ allegations against me. Specifically, please provide me with a copy of the written complaint made against me, and please advise me of the specific date, time, and location of the alleged incident and the nature of the alleged incident(s), that forms the basis for Ms. ▆ Complaint against me.

Simply put, in light of the lack of official notice of the specific allegations, I am not going to guess about what Ms. ▆ may or may not have alleged that I did (or did not do), and when and/or where Ms. ▆ claims the alleged incident(s) allegedly took place.

As I think you would agree, it is a basic, fundamental aspect of the right to due process that I know and understand the nature of the allegation being made against me.

The College's repeated refusal to advise me in writing of the specifics of Ms. ▆ allegations is deeply concerning, as it prevents me from properly responding to and/or preparing a defense to the allegations. I cannot effectively defend myself against that of which I am unaware and although you and/or the College clearly want to force me to defend against an elusive, moving target, I will not forego by basic and fundamental rights to appease you and/or the College.

Furthermore, the College's refusal to adhere this core Notice principle of due process, alongside your request for an in-person meeting with me, could be viewed as an attempt by you

1

and/or the College to surprise me with the allegation during the in-person meeting in the hopes that I would make inculpatory statements.

If this is not your and/or the College's intent, and it is not your and/or the College's hope that I will make inculpatory statements and aid the College in justifying its pre-determined decision to pursue formal adjudication, and ultimately, to impose disciplinary sanctions against me, then I am sure you and/or the College will have no problem disclosing to me a copy of the written complaint/report made against me and advising me of the specific date, time, and location of the alleged incident and the nature of the alleged incident(s), that forms the basis of Ms. ▇▇▇ Complaint against me.

Further, as you are aware, based on what little knowledge I have gleaned from the inconsistent versions of the allegations that I have heard, there are and/or were electronically stored evidence that would be exculpatory in nature, including, but not limited to, security video recordings. Further, I believe that other electronically stored information would include exculpatory evidence, including, but not limited to, the contents of the Reporting Party's cell phone. The crucial nature of this evidence, and the crucial need to preserve and obtain it, was the subject of a letter that my advisor caused to be sent to Ms. Mosely and was the subject of the letter that I sent to Ms. Mosely, a copy of which was sent to you via e-mail by my advisor's office yesterday. *Please see Exhibits A & B, attached hereto.* If you have not already done so, I once again impress upon you the urgency of taking immediate measures to preserve this evidence, if that has not already been done. As the Investigator assigned to this matter, it is incumbent upon you to obtain this evidence. I would respectfully demand that you do so and that you produce to me such evidence for my review and use relative to this matter.

Finally, as you now know based on your review of my letter that was sent to you yesterday, it is my belief that the Reporting Party has retaliated against me in numerous ways. In the February 4, 2020 e-mail sent to me by Erica Rau, a Deputy Title IX Coordinator (and also the Reporting Party's Women's Volleyball Coach), I was reminded of the Oberlin College's prohibition against retaliation within the Sexual Misconduct Policy. In relevant part, Ms. Rau wrote:

> Also, it is important for you to know that the Sexual Misconduct Policy prohibits retaliation against anyone who has filed a report with my office, or who is participating in a resolution process with my office. With that in mind, if you experience any form of retaliation, please let me know. . . .

Prior to my meeting with Rebecca Mosely on February 25, 2020, I was made aware of certain retaliatory statements made by the Reporting Party to other Oberlin College students, wherein the Reporting Party slandered me by referring to me as a "rapist". When this was made know to Rebecca Mosely during my February 25, 2020 meeting with her (wherein she informed me that the Reporting Party and Oberlin College was going to proceed with an Informal Resolution and wherein I agreed to an Informal Resolution), Ms. Mosely assured me and my advisor that she would address this situation with the Reporting Party. On February 26, 2020, Ms. Mosely notified me that after her meeting with me, she met with the Reporting Party and, at that time, the Reporting Party abruptly changed her mind and requested a Formal Resolution.

2

As you can see, it is quite clear that the Reporting Party has retaliated against my complaints about her slanderous conduct by triggering a Formal Resolution process and this investigation. Accordingly, as part of your investigation, I would respectfully demand that you interview Rebecca Mosely about the Reporting Party's request for a Formal Resolution. I would also demand that you obtain from Ms. Mosely any and all recordings and/or notes regarding her meeting with the Reporting Party on or about February 25, 2020 – February 26, 2020.

Once this information is provided to me, I would be happy to schedule a meeting with you, as requested in your email, so that I can tell you, in person, that Ms. ████ allegations, whatever they may be, are meritless and false, that I have done nothing wrong and Ms ████ false allegations and defamatory statements against me to others, has caused me significant harm.

Accordingly, please provide the information requested as soon as possible. I look forward to hearing from you regarding this matter.

Sincerely,

/s/ ████████████

████████████

3/18/2020                                    Zukerman Daiker & Lear, Co. LPA Mail - Fwd: Report info



                                                            Adam Brown <amb@zukerman-law.com>

## Fwd: Report info

███████████████████████████████        ████████        ███████████

██████████████                                                    ┌──────────────────┐
                                                                  │     EXHIBIT      │
██████████████████                                                │ tabbies    N     │
                                                                  └──────────────────┘

**From:** Rebecca Mosely <rebecca.mosely@oberlin.edu>
**Date:** March 6, 2020 at 3:35:49 PM EST
**To:** ████████████████ @oberlin.edu>
**Cc:** "Butcher, Erin" <EButcher@bricker.com>, Larry Zukerman <lwz@zukerman-law.com>
**Subject: Report info**

,

Ms. Butcher has informed me that you have requested a written copy of the report that was made regarding
the complaint against you.  I am happy to provide you a copy of the reports that we took.  I am attaching the
information to this email as PDFs.   This covers what we discussed in our meeting about what ██████ had
shared in her report as well as some additional information regarding what ██████ n was thinking about in
terms of resolution at the time she made the report.

There are two pdfs attached.  One is the initial email that was sent to report this to my office.  The second is
additional information that was shared with me when ██████ and I met after you requested that Ms. Rau not
serve as the Title IX Coordinator on this case.  As a note, in the email (the document labeled 'Report'), Ms.
Rau stated that the incident occurred in Barrows, this was an error and the report was actually that the
incident occured in Burton.  I wish to remind you that materials that are provided to you as part of this
investigation are intended for the purposes of resolving this report and should not be shared, reproduced, or
distributed.

In addition, I understand that you feel that I was not clear on what the potential policy violations in this
matter are.  In the email I sent to you on February 26, 2020, I shared with you that the policy violations
being considered in this matter under the Sexual Misconduct Policy are Sexual Harassment and Sexual
Assault.  In that email, I also shared with you that you can find definitions of prohibited conduct on pages
21-30 of the Sexual Misconduct policy.

██████, please feel free to contact me if you have further questions, and I or Ms. Butcher will be in touch
soon with responses to the other questions you have already submitted.  Thanks.

Rebecca Mosely, Ph.D.
Title IX and ADA Coordinator and Director of Equity, Diversity, and Inclusion
Oberlin College
440-775-8555



**2 attachments**

**Report.pdf**
93K

**Notes from ▮▮▮▮▮▮▮▮ meeting with Becky Mosely Feb 10.pdf**
95K



Adam Brown <amb@zukerman-law.com>

## RE: Correspondence from Zukerman, Lear & Murray Co., L.P.A. regarding ▮▮▮▮▮▮ [IWOV-BRICKER2.FID1797982]

**Butcher, Erin** <EButcher@bricker.com>                                          Mon, Mar 9, 2020 at 10:55 AM
To: Adam Brown <amb@zukerman-law.com>
Cc: "Larry W. Zukerman" <lwz@zukerman-law.com>, "S. Michael Lear" <sml@zukerman-law.com>, ▮▮▮▮▮▮▮
<▮▮▮▮▮▮▮▮▮▮▮ >

EXHIBIT

Hello,

Thank you for the letters you provided me on March 3 and March 5.  I want to make sure that we are on the same page regarding ▮▮▮▮'s involvement in the Oberlin matter, which allows an advisor but requires communication with and from ▮▮▮▮ , as a party to the investigation, despite  the fact that ▮▮▮▮ is represented by legal counsel.  For purpose of communication, I am and have been emailing ▮▮▮▮ and Cc'ing all attorneys.  ▮▮▮▮ , please confirm that this is how you all would prefer continued communication from me.

As an aside and for transparency, I have used two separate emails and signature blocks in our communication with the same physical address and contact information: INCompliance and Bricker & Eckler.  INCompliance is a subsidiary of Bricker & Eckler.  My law firm contracts for investigations through both entities, and, I initially began emailing through my INCompliance email and signature line in this matter.  However, I then realized that our contract with Oberlin is with Bricker & Eckler.  Accordingly, my continued communications will be through my Bricker & Eckler email and signature block.

I would like to provide more information about the substance of the reporting party's complaint.  After initiating this investigation, I can clarify that the first alleged incident in this investigation occurred on the night of October 31, 2019 and the second on either November 13 or November 20, 2019 (I am still narrowing this down).

Oberlin's Policy (attached) provides that the "goal of the investigation is to gather all relevant facts and determine if there is sufficient information to refer the report to an adjudication or grievance process in order to determine responsibility and impose disciplinary action if appropriate."

To that end, I am in the process of interviewing witnesses and collecting relevant evidence that I need for my investigation.  Once I have completed my initial investigation, I will draft a report and share that report and evidence with both parties at that time.  The parties will then be provided the opportunities to respond to the investigation report and evidence for further investigation or follow up if necessary.

My understanding is that Oberlin is not opening a complaint by ▮▮▮▮ against ▮▮▮▮ for filing a false claim or retaliation.  Pursuant to Oberlin's policy, "false claim" is not an action included in its Title IX policy, although the code of conduct may be invoked by the college for providing false information during an investigation, which can be reviewed in a separate process at the resolution of this investigation.  Regarding the retaliation claim, ▮▮▮▮ alleges that the retaliatory action was deciding to change from pursuing her claims against ▮▮▮▮ in an informal process to a formal process.  ▮▮▮▮ 's choice to change from the informal to formal process is expressly permitted under the policy.

My understanding from ▮▮▮▮ is that she was upset that a private investigator was let into her residence hall and came to her private room.  She believed that an informal investigation meant that both parties took steps towards mutual

resolution. In addition to the contact from private investigator, she did not view ▇▇▇▇▇'s decision to hire criminal attorneys or the time it took for a response from him to be indicative of taking steps towards resolving the matter informally.  She reported that, accordingly, she decided to move the process to the formal track as is permitted under the Policy.

Finally, Oberlin is represented by Donica Varner, its general counsel for legal matters, and Bricker & Eckler is contracted in the underlying matter for the limited purpose of running the independent investigation.  Please direct all further legal communications with Oberlin (Rebecca Mosley) through their legal counsel.

Thank you,

Erin

**Bricker & Eckler**
ATTORNEYS AT LAW

**Erin E. Butcher**
Of Counsel
**Bricker & Eckler LLP**  |  100 South Third Street  |  Columbus, OH 43215
**Direct Dial 614.227.2303**  |  **ebutcher@bricker.com**  |  **v-card**  |  **www.bricker.com**

This electronic transmission contains information from the law firm of Bricker & Eckler LLP which is privileged, confidential or otherwise the exclusive property of the intended recipient or Bricker & Eckler LLP. This information is intended for the use of the individual or entity that is the intended recipient. If you have received this electronic transmission in error, please notify us by telephone at 614-227-8899, or by electronic mail at webmaster@bricker.com. Please promptly destroy the original transmission. Thank you for your assistance.

**From:** Adam Brown <amb@zukerman-law.com>
**Sent:** Thursday, March 5, 2020 4:48 PM
**To:** ebutcher@incomplianceconsulting.com
**Cc:** Larry W. Zukerman <lwz@zukerman-law.com>; S. Michael Lear <sml@zukerman-law.com>; ▇▇▇▇▇
**Subject:** Correspondence from Zukerman, Lear & Murray Co., L.P.A. regarding ▇▇▇▇▇

**This Message originated outside your organization.**

Ms. Butcher,

Please see the attached correspondence from Attorney Larry Zukerman regarding our client ▇▇▇▇▇. Thank you.

—

**Adam M. Brown, Esq.**

**Zukerman Lear & Murray Co., LPA**

3912 Prospect Ave. East

Cleveland, Ohio 44115

**(216) 696-0900**

### STATEMENT OF CONFIDENTIALITY

The information contained in this electronic message and any attachments are covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 and is legally privileged. Unauthorized review, use, disclosure, or distribution is strictly prohibited. The information contained in this e-mail message is only intended for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is privileged and confidential. If you are not the intended recipient, please notify the Office Manager at 216-696-0900, immediately and destroy all copies of this message and any attachments. Unintended disclosure does not in any manner whatsoever waive the attorney-client privilege.

Although this e-mail and any attachments are believed to be free of any virus or other defect that may affect a computer system into which it is received and opened, it is the responsibility of the recipient(s) to ensure that it is virus free and no responsibility is accepted by the sender or their employees for any loss or damage arising in any way from its use.

### METADATA NOTICE

This electronic message may contain information that is privileged or exempt from disclosure. This applies whether the message is sent by e-mail or by fax. Documents which accompany this electronic message may contain metadata. Unless privileged or exempt from disclosure, it is my express intention to only deliver the document in its plainly visible form. I do not authorize your access to, nor waive any privilege or exemption to, any information contained in the metadata. Any access to metadata is unauthorized and is considered an unethical examination. By reviewing any attachment I provide, you are consenting in advance to my express conditions above.

📄 **final_oberlin_college_sexual_misconduct_policy_2019.pdf**
666K



EXHIBIT

_P_

March 10, 2020

Erin E. Butcher
Of Counsel
INCompliance
100 South Third Street
Columbus, OH 43215
Direct Dial 614.227.2303
ebutcher@incomplianceconsulting.com

RE:     *Response to March 9, 2020 Email*

Ms. Butcher,

As an alleged "impartial investigator" it is your duty to objectively investigate the allegations in this matter to ensure the integrity of the process and determine whether an incident(s) even occurred as alleged, and you have not. Instead, in your email you conclude that incidents did in fact occur, now on two (2) separate dates and appear to be biased in favor of the College and Ms. ███.

Unfortunately, for the reasons set forth herein, your email of March 9, 2020 merely confirms what I and my advisors already suspected—that you are not an impartial investigator, but rather an advocate for Oberlin College, and for Ms. ███, and that you are determined to work alongside the College and Ms. ███ to violate my constitutional rights, and my rights under Oberlin's Title IX Policy.

That being said, with respect to the specifics of your email, I submit to you the following:

• **Informal Resolution:**

In your email, you described what Ms. ███ reported to you as being the reason(s) that she decided to pursue a formal process in this matter, and the truth. You stated:

> My understanding from ███ is that she was upset that a private investigator was let into her residence hall and came to her private room. She believed that an informal investigation meant that both parties took steps towards mutual resolution. In addition to the contact from private investigator, she did not view ███'s decision to hire criminal attorneys or the time it took for a response from him to be indicative of taking steps towards resolving the matter informally. She reported that, accordingly, she decided to move the process to the formal track as is permitted under the Policy.

1

Not surprisingly, this provides yet another example of the prejudice the College's unjustified notification delays, dilatory conduct, and its complicity with Ms. ██ has caused me and your justification of their abuse of my rights and the process.

By way of background, as you well know, I was not notified of the existence of the Title IX Report until February 4, 2020. When I was notified about the allegations via email from Coach Rau on February 4, 2020, *there was no mention* of any informal process or resolution. Rather, I was notified that I was being accused of "sexual misconduct" and that I would be subjected to questioning ("I'd like to learn what happened from your perspective") without even being told *any* specifics about the allegations. Knowing that Ms. Rau was Ms. ██' volleyball coach and thus could not be relied upon to be fair and impartial, I did what any normal person would do, I retained counsel.

In the emails that followed between my advisors, Coach Rau and Rebecca Mosely, *there was no mention of any informal process*. Had someone informed me of that earlier, I would never have hired an attorney or an investigator.

In fact, the very first time it was brought to my (and my advisors' attention) that Ms. ██ wished to pursue an informal process was on February 10, 2020 when Ms. ██ *told the private investigator that she requested an informal process.*

Thus, from February 4, 2020 through February 10, 2020, due to the College's failure to advise me as to even the procedural status of the proceedings, which it knew of since December 12, 2019, whether Ms. ██ was requesting formal or informal resolution, or what the allegations were, I was left only to guess as to where the College and Ms. ██ were procedurally in the process.

While the College may be in the business of keeping material information from its accused students, information that may be essential to the just and speedy resolution of complaints, I am not in the business of sitting back and allowing my due process rights to be violated; I am going to defend myself against false allegations of misconduct made against me. Query, what happened to the evidence from the dates of these alleged incidents until the date on which Coach Rau apprised me of these proceedings? I have repeatedly asked this question of others to which I have received no response. Why?

Considering the college failed to give me any information, my advisors decided to pursue an investigation on my behalf by and through the use of a private investigator.

2

The very first official notice I, and my advisors, received from the College that Ms. ██ wished to pursue an informal resolution occurred on February 24, 2020, when, during a phone call, Rebecca Mosely advised my attorney Larry Zukerman that Ms. ██ wished to pursue informal resolution. During the call, some fourteen (14) days after Ms. ██ <u>cordially invited our Private Investigator into her dorm room and voluntarily provided a lengthy statement,</u> Ms. Mosely advised Mr. Zukerman that Ms. ██ had asked for an informal resolution and that "informal resolution" involved zero investigation because it involved the Responding Party not admitting to any wrongdoing.

Given this statement, it is clear that the College failed to investigate Ms. ██' allegations on or after December 12, 2019 and instead, conspired with Ms. ██ to withhold notification to me of the existence of these allegations for almost two (2) months—during which time exculpatory evidence (video surveillance) was almost assuredly lost.

Then, after exculpatory evidence has likely been lost, based solely on the whim of Ms. ██, Oberlin diverts the process from informal to formal. Make no mistake, the College's mishandling of this report and its violations of my constitutional rights has caused me significant prejudice. It's quite apparent, Ms. Butcher, that you are only interested in prosecuting me, and you are not interested in how Ms. ██ and the College perverted this process and violated my rights.

Then, astonishingly, Ms. Mosely had the audacity to express her and the College's "concerns" that if I didn't engage in the informal resolution process in a relatively timely manner, that, even though the Reporting Party initially wanted informal resolution, she could change her mind, "until that process is engaged." On February 25, 2020, I engaged in the process. Therefore, Ms. ██ changed her mind after she found out that I asked Ms. Mosely to instruct her to no longer refer to me as a "Rapist" to our mutual friends.

Mr. Zukerman then addressed the College's unreasonable six (6) week notice delay which, initially, Ms. Mosely tried to avoid, but ultimately advised Mr. Zukerman that 1) the reporting party can decide when she wants an informal process to begin or a formal process to begin, 2) that when she made the report on December 12, 2019, Ms. ██ requested that the College not notify me, and 3) pursuant to Ms. ██' request, the College did not notify me until nearly six (6) weeks later, on February 4, 2020, when I returned from break.

Nevertheless, upon hearing that Ms. ██ and the College wished to pursue informal resolution during the phone call, Mr. Zukerman, on my behalf advised Ms. Mosely that I was

willing to meet with her to determine whether to proceed with an informal resolution; we scheduled this meeting to pursue an informal resolution *the very next day*.

So, to recap, on *the same day* that I was first officially notified by the College that Ms. ███ sought to pursue an informal resolution, my advisor, on my behalf, engaged the informal process when he set up a meeting with Ms. Mosely to pursue informal resolution for the following day, which he and I attended.

But, somehow, according to you, Ms. ███' abrupt change of heart was the result of *my* delay in resolving the matter and *my* conduct, which she allegedly believed was inconsistent with informal resolution. This is absolutely absurd, and an unreasonable justification by an alleged "impartial" investigator.

The uncontroverted facts of this case and its chronology, as well as her stated reasons for her change of mind, as reflected in your email, *clearly demonstrate* that Ms. ███' decided to pursue formal resolution for the purpose of retaliating against me for utilizing that which the College provides for under its own policy.

**• The College's Complicity with Ms. ███' to Delay Notification Resulting In the Loss of Evidence; Ms.███' Retaliatory Decision to Pursue Formal Resolution Premised on Her and The College's Own Dilatory and Complicit Conduct**

Very clearly, based on my and my advisor's immediate agreement to proceed informally, had the College immediately informed me that the College and Ms. ███ sought to proceed informally, I and my counsel may have gone about this entire process in another way. But now, as a result of the College's complicity with Ms. ███ to delay notifying me of the existence of allegations against me, the specifics of the allegations against me, and that informal resolution was being requested *(delays that Ms.███ requested, and to which the College blindly obliged)* Ms. ███ has unilaterally decided to retaliate against me, with the complete cooperation of the College, and you, by demanding to pursue formal resolution.

In the law, this is referred to as the doctrine of "invited error" but in reality, this is referred to as unconstitutional, biased, prejudicial retaliation; your failure to even address this obvious flaw in the way these proceedings have progressed demonstrates your and the College's bias against me and in favor of Ms███.

**• Reporting Party's Unfettered Discretion to Request Formal Resolution "At Any Time"**

In your email, you attempt to justify the College's unconstitutional refusal to open an investigation into my complaint for retaliation against Ms. ██ by stating, "██'s choice to change from the informal to formal process is expressly permitted under the policy." Oberlin's Policy provides the following:

> Participation in informal resolution is voluntary for all parties, and a Reporting Party can *request to end* informal resolution at any time. At that time, the *report may be* referred for formal resolution. Factors that will shape the Title IX Team's recommendation will include the nature of the report, the Reporting Party's stated preference, and relevant evidence about patterns of conduct.

*Policy,* at 45 (emphasis added).

As an initial matter, please confirm that you are not suggesting that Oberlin's Policy permits a Reporting Party to change their preferred resolution of a complaint from informal to formal resolution for *any reason or purpose,* such as for the purpose of retaliating against a Responding Party for merely gathering, seeking, and/or obtaining information about the allegation(s) being made against them, and/or for engaging the services of an Advisor—*which is expressly authorized under the Policy. See Policy, at 42.*

That is exactly what happened in this case: The College advised me of an allegation being made against me nearly six (6) weeks after the complaint was made (at the request of Ms. ██), they did not tell me any specifics about the allegation(s) other than the name of the reporting party, they did not tell me where, procedurally, they were in the process or that the Reporting Party wished to pursue the matter informally, without knowing anything about the specifics of the allegations, they attempted to have me provide a statement to the Reporting Party's biased volleyball coach (which I wisely refused to do) and then, having been kept in the dark about what was even being alleged, I and my advisors merely sought information about the allegation(s) being made against me through a private investigator. Ms. ██ stated that her decision to bring a Title IX claim against me was to teach me and the entire football team a lesson.

Ms. ██ has now cited the delay in my response, my use of a private investigator to learn the basic information about the allegation(s) against me, and my decision to obtain an advisor, as the reasons for choosing to proceed formally, even though the delays and lack of information were caused directly by Ms. ██ and the College and even though I have a right to counsel/ an advisor

pursuant to Oberlin's Title IX Policy and under the U.S. Constitution. Here, she chooses to proceed formally to teach me, and others, a lesson not to defend ourselves.

**• The College's Blind Allegiance and Bias in Favor of Ms. ███ and Prejudice Against Me**

As previously noted, Ms. Mosely admitted to my advisor that although Ms. ███ made her report on December 12, 2019, the College, complicit with and in blind allegiance to Ms. ███, that when she made the report on December 12, 2019, pursuant to Ms. ███ request, did not notify me until nearly six (6) weeks later, on February 4, 2020, when I returned from break.

From December 12, 2019 through February 25, 2020, as a result of the College's Initial Title IX Assessment, and the request of Ms. ███, the College took the position that Informal Resolution was appropriate in this matter.

Noteworthy is that from December 12, 2019, through February 12, 2020, the College did not impose any interim measures and/or implement any informal remedies upon me as a result of Ms. ███' Complaint. It was only on February 12, 2020 that the College sent me the No Contact Order via email (after the Private Investigator obtained voluntary statements from witnesses, including a voluntary statement from Ms ███, on February 10, 2020) with which I have complied.

With respect to Informal Resolution, the College's Title IX policy provides that "The decision to pursue informal resolution will be made when the College has sufficient information about the nature and scope of the conduct, which may occur at any time." *Policy,* at 45. In this case, that decision was made by Ms ███ and/or the College on or about December 12, 2019.

During the February 24, 2020 telephone call with my attorney, Ms. Mosely advised Attorney Zukerman that Informal resolution involves zero investigation because it involves [me] not admitting any wrongdoing.[1]

Thus, simply put, from December 12, 2019 through February 25, 2020, notwithstanding Ms. ███' stated desire to proceed informally, per the Policy, the College could have decided to

---

[1] As noted herein, during the February 25, 2020 meeting, Ms. Mosely advised Mr. Zukerman and I that Ms. ███ wanted to use her report to send a message to the entire Oberlin College Football team, and for the entire team to receive additional Title IX training. Thus, clearly, whereas Ms. ███ initially sought to use her Title IX report to exact revenge against the entire football team, she is now using her report to exact revenge upon me for exercising my constitutional rights and my rights under Oberlin's policy.

proceed with an investigation, pursue formal resolution against me, and implement various interim measures which, other than the February 12, 2020 "No Contact" email, it did not do.

Thus, up until February 25, 2020, the day Mr. Zukerman and I met with Ms. Mosely to proceed informally, the College was of the opinion that Informal Resolution was appropriate in my case.

Accordingly, "Based on the findings of the initial Title IX assessment" the College did not "initiate a prompt, thorough and impartial investigation" because as a result of its initial assessment, the College did not "initiate a prompt, thorough and impartial investigation" as it decided "to pursue informal resolution [because] the College had sufficient information about the nature and scope of the [alleged] conduct." *Policy, at 45.*

Thus, I engaged in the informal resolution process when, on February 25, 2020, I, and my advisor, met with Ms. Mosely in her office. Given that I had engaged in the informal resolution process, based on Ms. Mosely's statements to my advisor during the phone call on February 24, 2020, Ms. ███ no longer should have had any discretion to change her mind and pursue formal resolution.

Nevertheless, on February 26, 2020, the day after we engaged the informal process during the meeting with Ms. Mosely, I received the email from Ms. Mosely advising me that:

> As I shared with you during our meeting, I had a follow up meeting scheduled with ███ late yesterday as well. Since our meeting yesterday, ███ has informed me that she is no longer interested in using an informal resolution process to resolve her report. She has asked that I begin a formal resolution process.

This begs the question: What changed? Other than "the Reporting Party's stated preference", what changed between December 12, 2019 and February 26, 2020? The answer—nothing.

Thus, although the Policy states that a Reporting Party can *request to end* informal resolution at any time and at that time the *report may be* referred for formal resolution" and that "[f]actors that will shape the Title IX Team's recommendation will include the nature of the report, the Reporting Party's stated preference, and relevant evidence about patterns of conduct", by Ms. Mosely's statements during the February 24, 2020 phone call to Mr. Zukerman, Ms. Mosely's email to me on February 26, 2020, your email to me on March 9, 2020, it is very clear that the College violated its own policy by allowing Ms. ███ *and Ms.* ███ *alone*, to decide to have this matter referred to formal resolution.

In an attempt to cater to the demands of a Reporting Party, the College lost sight of the due process provisions in its own policy, and wholly abandoned the "check" on the Reporting Party's decision-making ability. Instead, the College once again displayed its blind allegiance to Ms. ███ when it empowered her with the unfettered discretion to control the procedural trajectory of this case, just as the College had done from the beginning. Given that nothing changed with respect to "the nature of the report" and/or "the relevant evidence about patterns of conduct", these alleged "factors that will shape the Title IX Team's recommendation (about whether to proceed)" played absolutely no part in the Title IX Team's recommendation that the matter proceed to formal resolution. This case was referred to formal resolution solely because Ms. ███ wanted it to, and the College, in violation of its own policy, and without regard to whether Ms. ███ motivations were retaliatory, and surely without regard for my rights, allowed her to control the outcome of this process. In other words, "the tail wags the dog" at Oberlin College while due process rights fall helplessly by the wayside.

Ultimately, I was fraudulently induced, by both Ms. ███ and the College, into engaging in the informal process and, once I engaged in the process, the College, in its blind allegiance to Ms. ███, pulled the rug out from under me.

So, to clarify, because Ms. ███ "is upset" that I pursued the substance of the allegations against me, that I reacted to her and the College's coordinated delays, and I obtained an advisor, I must now face an investigation, formal resolution and potential disciplinary sanctions? Whereas, if she was not "upset" that I exercised my rights, this matter would have resolved informally, without any investigation or adjudication? That is wrong. This is a clear violation of my rights under Oberlin's policy, my right to due process, and constitutes an outrageous abuse of her status as a Reporting Party under Oberlin's Policy. Furthermore, Oberlin's failure to regulate Ms. ███ outrageous, retaliatory behavior against me for exercising my rights, ultimately demonstrates its unconstitutional bias in favor of Ms. ███ and against me.

Your email demonstrates, at a minimum, your apparent complete lack of objectivity in this process and evidences your advocacy for Oberlin College and Ms. ███. As an aside, and for transparency, one cannot help but to surmise how you could be considered "impartial" given that you are being paid by the College and considering that you have defended dozens of Colleges and Universities in lawsuits throughout the State of Ohio during your lengthy employment with the Ohio Attorney General's Office. Although you clearly come to the defense of the College and Ms.

█████ in your email, you fail to do so successfully as their complicity, as well as your own complicity, to violate my rights, abuse this process and ultimately justify the pre-determined outcome of disciplinary sanctions against me, is more than obvious based on the objective evidence and timeline in this case.

**• Additional Demand for the Status and Production of Exculpatory Evidence:**

Now, it has been several weeks since my advisors and I sent correspondence to the College wherein we demanded the production of numerous specific items of exculpatory evidence and other information. As noted repeatedly, I and my advisors remain very concerned that the College's dilatory conduct in issuing Notice of the Title IX complaint lodged against me, and its ongoing failure to preserve, obtain and disclose exculpatory evidence requested in this case, or for a written status as to the College's preservation of said evidence, has resulted in the loss and/or destruction of exculpatory evidence.

Accordingly, please allow this letter to constitute a final demand for a written status as to the College's preservation and disclosure of the exculpatory evidence, including but not limited to the electronic evidence from Ms. █████ ' cell phone, that we and our client previously requested, including the College's efforts to preserve any such evidence, all of which was described in detail in my advisors' previous correspondence to Rebecca Mosely on February 18, 2020, my correspondence to Rebecca Mosely on March 2, 2020, my correspondence to you on March 4, 2020 and March 5, 2020.

In addition to all of the previously requested items of evidence, I am expressly requesting copies of any and all electronic communications between Ms. █████ and any individual regarding her Title IX Complaint against me, including but not limited to you, any witnesses, Coach Erica Rau, and Ms. Mosely, as well as any and all electronic communications between Ms. █████ and myself, which may be in your or Ms. █████ possession. Furthermore, I am demanding the disclosure of any and all notes taken by Rebecca Mosely during any of her meetings with Ms. █████ and Ms. Rau, specifically including, but not limited to, her meeting with Ms. █████ on February 25, 2020.

As the investigator in this case, you are supposed to be "impartial and free of any conflict of interest", seek to "provide a fair and reliable gathering of the facts", and conduct a "full assessment of the facts". *See Oberlin College Sexual Misconduct Policy,* at 40, 46, 47.

Accordingly, it is your job and your legal duty to pursue, obtain and preserve these materials and evidence and produce them to me immediately.

• **Social Pressures Influencing Oberlin College's Decision Making and Bias Against Me:**

My advisors and I are aware of Oberlin's very recent history of violating the rights of others, engaging in unconstitutional, tortious conduct and encouraging its students to engage in unconstitutional tortious conduct to further false narratives for alleged social justice purposes, causing harm to innocent people and entities in the process.

We are also aware of the significant societal pressures upon Oberlin to prosecute allegations of sexual assault and/or alleged Title IX violations. Unfortunately, it appears as though Oberlin, like many colleges, continues to demonstrate blind allegiance to those societal pressures and, in the interest of keepings its federal funding, adhering to a biased Title IX policy, which is merely cloaked in neutrality and constitutional compliance.

Additionally, I am further concerned that the College is trying to make an example of me, in light of the racial tensions, especially in athletics, on Oberlin's campus. These tensions are most recently reflected by the recent article in The Oberlin Review entitled "Blackletes Find Spaces at Largely-White Institution" published on February 14, 2020, as well as the College's history of succumbing to external pressures to support and/or appear to support the actions of minority students, regardless of the objective facts in front of them, at the expense of innocent business owners, or, in this case, an innocent student.

I refuse to allow you, Ms. ▮▮▮ and Oberlin College to continue your mission to manipulate this process at the expense of my rights under Oberlin's policy and my constitutional rights to due process of law; I will defend my rights, my reputation and my innocence at any cost.

Please provide written responses to the very clear inquiries set forth above and those set forth in the previous correspondence sent from me and my advisors, immediately. Please produce the exculpatory evidence that I and my advisors have repeatedly requested from the College, immediately.

Sincerely,

10

3/18/2020    Zukerman Daiker & Lear, Co. LPA Mail - Investigation Interview Communication [IWOV-BRICKER2.FID1797982]



Adam Brown <amb@zukerman-law.com>

## Investigation Interview Communication [IWOV-BRICKER2.FID1797982]

**Butcher, Erin** <EButcher@bricker.com>    Thu, Mar 12, 2020 at 4:27 PM
To: ███████████oberlin.edu>, ███████████████████████>, Adam Brown <amb@zukerman-law.com>, Michael Lear <sml@zukerman-law.com>, Larry Zukerman <lwz@zukerman-law.com>

Good Afternoon,

I am in receipt of the letters dated March 9 and March 10. I disagree with the conclusions drawn in response to my March 8 email. My email was an attempt to clarify and be transparent about information I was passing along and without any determination or adoption by me. My task is limited to gathering the statements of the parties, witnesses, and relevant evidence and producing a report without any determination regarding the underlying accusations. As a reminder, this is neither a civil nor a criminal matter, but an internal Title IX process governed by Oberlin's policy.

That said, I am proceeding with the investigation.  In the process of this investigation, I have requested camera video for October 31, 2019 and November 13 and 20, 2019, as well as the date that the private investigator entered ████'s dorm.  I learned that there is no video from any of these dates.  My understanding is that some of the cameras had technical issues and did not record and/or were only retained for 45 days.  Again, in transparency and response to your questions, I am sharing this information with you and ████.  I will also be requesting student swipe records for these dates and will share them with both parties when I meet with them in interviews or when I provide my investigation report.

As part of my information gathering, I am requesting from all parties and witnesses, any relevant text messages, emails, phone records, and/or social media related to October 31, 2019, November 13, 2019, and November 20, 2019.  Again, I am still narrowing down whether the second incident occurred on November 13 or 20. This request also extends to ████████ for any relevant records he may have.  I am also requesting any witnesses he may identify for me to interview that he thinks have relevant information.

I am available to conduct an interview online through Zoom if that is preferable and more convenient. At this time, I have some flexibility in scheduling next week (the week of March 16-20), around your schedule, especially if we can do it through Zoom.  If these dates do not work for you, please provide dates the week of March 23 as well.

If ██████ elects not to provide an interview with me by 5:00 p.m. on March 23, I will have to proceed with my report without his interview, which will be noted in my report. As I stated in my March 8 email and above, both parties will be provided with the equal opportunity to review evidence I have obtained at that time, or evidence I may have questions about that I have when I meet with the parties for interviews.

I look forward to your participation.

EXHIBIT
Q

Best,

Erin



**Erin E. Butcher**
Of Counsel
**Bricker & Eckler LLP**  |  100 South Third Street  |  Columbus, OH 43215
**Direct Dial** 614.227.2303   |   **ebutcher@bricker.com**  |  **v-card**  |  **www.bricker.com**

This electronic transmission contains information from the law firm of Bricker & Eckler LLP which is privileged, confidential or otherwise the exclusive property of the intended recipient or Bricker & Eckler LLP. This information is intended for the use of the individual or entity that is the intended recipient. If you have received this electronic transmission in error, please notify us by telephone at 614-227-8899, or by electronic mail at webmaster@bricker.com. Please promptly destroy the original transmission. Thank you for your assistance.